**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ANJITA GURUNG, | |
| *Plaintiff,* | Civil Docket No. _____ |
| -vs.- | |
| METAQUOTES LTD., a Cyprus corporation; METAQUOTES SOFTWARE CORP., a Bahamas corporation; METAQUOTES SOFTWARE CORP., a Delaware corporation; FOREXWARE LLC a Delaware Limited Liability Company; SICH CAPITAL LTD, a United Kingdom corporation; OPSON INTERNATIONAL TECHNICAL SERVICE CO., LTD., a Hong Kong corporation; VOREX TRADING LLC, a Georgia corporation; SOPHIE CAPITAL FINANCIAL TRADING LTD, a Canadian corporation; and | COMPLAINT |
| JOHN DOE, | |
| *Defendants.* | |

## PRELIMINARY STATEMENT

Plaintiff Anjita Gurung is an asylee who, in the face of extreme political violence, fled her home country of Nepal in search of a better life for herself and her family. When Plaintiff came to the United States, her focus was to obtain legal status and work to support her family in Nepal while she awaited approval for them to come to the United States. Ever since her arrival, Plaintiff has worked diligently towards these goals and, in the approximately twelve years that she has resided in the U.S., she has seen her family only once. Eager to expand her horizons, Plaintiff explored social media as a way to make friends in the U.S. Unfortunately, Plaintiff fell victim to an online fraud scheme. The Defendants (as defined below), including an as-yet-unidentified

individual or group, used various online platforms and tools, including certain software owned and developed by Defendants MSC (as defined below) and Forexware (as defined below), to manipulate Plaintiff into transferring her life savings and those of friends and family to a fraudulent online investment enterprise.  Some of the Defendants directed Plaintiff to create a trading account with Defendants MSC's MT5 application (as defined below) and provided Plaintiff with a fake brokerage website associated with the scheme to access from the MT5 account. Some of the Defendants then pretended to be customer service representatives for the victim's "brokerage" account and directed Plaintiff to wire money to a cryptocurrency wallet address associated with the said Defendants.  Using the features provided by Defendants MSC for its MT5 platform, and in combination with certain software developed by Forexware that is compatible with the MT5 platform, the said Defendants were able to manipulate Plaintiff's account. This manipulation created the false perception that the funds transferred to the said Defendants by Plaintiff were legitimately invested and growing.  This type of scheme has affected several other victims and is now being referred to as a "Pig Butchering Scam."  During the relevant time period in which John Doe(s) were defrauding Plaintiff, both Defendants MSC and Forexware were aware that their software was being pervasively leveraged for criminal purposes.  Yet, both Defendants MSC and Forexware continued to distribute their software without proper consumer warnings, and Defendants MSC continued to willingly grant licenses to its MT5 trading platform to all entities purporting to be "brokers" without conducting any due diligence into the legitimacy of such entities.

But for the intentional decisions (1) made by Defendants MSC to provide its MT5 platform to consumers without proper warnings while continuing to grant illegitimate entities licenses to act as brokers on the platform; (2) made by Forexware to continue to provide its software

integration into MSC's MT5 platform that enables MT5 "brokers" the ability to manipulate consumer accounts; and (3) made by John Doe(s) and Defendants Brokers (as defined below) to conduct financial fraud against Plaintiff and many other victims like Plaintiff, Plaintiff would not have lost her life savings and those of friends and family totaling approximately $600,000. Even today, Defendants MSC and Forexware continue to operate and distribute their software without providing warnings to consumers or conducting proper due diligence on brokers despite their awareness of these well-known schemes. These intentional decisions caused Plaintiff irreparable financial and psychiatric harm. As a result of the forgoing misconduct, Plaintiff now seeks to recover an amount to be determined at trial, but no less than her losses of $600,000.

## COMPLAINT

Plaintiff Anjita Gurung ("Anjita" or "Plaintiff"), for her Complaint against MetaQuotes Software Corp., a Bahamas corporation; MetaQuotes Ltd., a Cyprus corporation; MetaQuotes Software Corp., a Delaware corporation (the MetaQuotes entities collectively, "Defendants MSC"); Forexware LLC, a Delaware Limited Liability Company ("Forexware"); SICH Capital Ltd., a United Kingdom corporation ("SICH"); Opson International Technical Service Co., Ltd., a Hong Kong corporation ("Opson"); Vorex Trading LLC, a Georgia corporation ("Vorex"); Sophie Capital Financial Trading Ltd., a Canadian corporation ("Sophie"); and John Doe (the foregoing collectively, the "Defendants"), by and through her attorneys, alleges as follows:

## THE PARTIES

1.      Plaintiff Anjita Gurung is a native of Nepal living in the United States as an asylee awaiting a Permanent Resident Card. Plaintiff currently resides in Queens and spends her weekdays in Greenwich, Connecticut and New York City, New York, where she works as a caretaker for a family.

2.     Upon information and belief, Defendant MetaQuotes Ltd., a Cyprus limited company ("MetaQuotes Cyprus"), specializes in creating software applications and is organized under the laws of Cyprus with an address at 35 Dodekanisou str, Germasogeia, 4043, Limassol, Cyprus. Defendant MetaQuotes Cyprus maintains additional representative offices in China, Singapore, Australia, Dubai, Turkey, Pakistan, Thailand, and Japan.

3.     Upon information and belief, Defendant MetaQuotes Software Corp. is a Commonwealth of the Bahamas corporation located at P.O. Box N-341, Charlotte House, Charlotte Street, Nassau, Bahamas ("MetaQuotes Bahamas").

4.     Upon information and belief, Defendant MetaQuotes Software Corp. is a Delaware corporation ("MetaQuotes Delaware") which had a principal place of business and a registered agent at 602 Rockwood Road, New Castle County, Wilmington, DE 19802.

5.     Upon information and belief, Defendant Forexware LLC ("Forexware") is a Delaware limited liability company with its principal place of business at 525 Washington Blvd., 14th Floor, Jersey City, New Jersey, 07310.

6.     Upon information and belief, Defendant SICH Capital Ltd. ("SICH") is a United Kingdom limited company with an address of 13464286: Companies House Default Address, P.O. Box 4385, Cardiff CF14 8LH.

7.     Upon information and belief, Defendant Opson International Technical Service Co., Ltd. ("Opson") is a Hong Kong limited company with a registered office address of Office No. 12, 19th Floor, Ho King Commercial Center, No. 2-16 Fa Yuen Street, Mong Kok, KLN, Hong Kong.

8.    Upon information and belief, Defendant Vorex Trading LLC ("Vorex") is a Georgia limited liability company with an address at Krtsanisi district, Krtsanisi II lane, N 15, building 3, apartment 42, Tbilisi, Georgia.

9.    Upon information and belief, Defendant Sophie Capital Financial Trading Ltd. ("Sophie") is a Canadian limited company with an address at 4243C Dundas Street West, Unit 5, Etobicoke ON M8X 1Y3.

10.    Upon information and belief, Defendants MSC and Forexware through its predecessor, Boston Technologies, Inc., develop software applications for brokerages, banks, and exchanges.

11.    MetaTrader ("MT5") is an electronic trading platform developed by Defendants MSC and supplemented by software developed by Forexware.  Upon information and belief, Defendants MSC and Forexware license and sell services to entities such as SICH, Opson, Vorex, and Sophie (collectively, "Defendants Brokers") that allow brokerage platforms to sell brokerage services to clients.  Defendants MSC's MT5 trading application live streams prices and charts and provides a platform that allows brokers and their clients to manage their MT5 trading accounts.

12.    The Defendant named herein as John Doe is meant to represent a currently unknown individual who acted in concert and as co-conspirator with the Defendants MSC, Forexware, and Defendants Brokers. John Doe communicated with the Plaintiff under the assumed name "Connor Smith" through assumed email addresses, telephone numbers, and various social media accounts.  Through these communications, John Doe intended to and, with the other Defendants, did deprive Plaintiff of her funds.  Upon information and belief, John Doe is located outside of the United States in Laos.

## JURISDICTION AND VENUE

13.     These causes of action arise under (i) the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. §§ 1962(c) and (d), (ii) fraud, (iii) conspiracy to commit fraud, (iv) breach of contract and breach of implied covenant of good faith and fair dealing, (v) unjust enrichment, (vi) negligence, (vii) negligent misrepresentation, (vii) products liability, (ix) conversion, (x) aiding and abetting conversion, (xi) violations of New York's deceptive trade practices act, (xiii) violations of New York's false advertising law, (xii) negligent infliction of emotional distress, and (xiii) intentional infliction of emotional distress under New York common law.

14.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action is a civil action arising under the federal laws of the United States, including the RICO Act.  This court has subject-matter jurisdiction pursuant to supplemental jurisdiction over the remaining causes of action under 28 U.S.C. § 1367(a) because this action has claims that arise out of the same facts as the federal law claim and are related to Plaintiff's federal law claim such that they form part of the same case or controversy under Article III of the United States Constitution.  This court additionally has subject-matter jurisdiction pursuant to diversity jurisdiction under 28 U.S.C. § 1332(a) because the parties are citizens of different states and the amount in controversy exceeds $75,000.

15.     This Court has personal jurisdiction over Defendants pursuant to New York C.P.L.R. § 302.  This Court's exercise of personal jurisdiction passes constitutional due process because there are minimum contacts related to the claims by Plaintiff against the Defendants MSC, Forexware, Defendants Brokers, and John Doe that would not violate notions of fair play or substantial justice. The claims contained herein arose out of Defendants' contacts with New York

because Defendants MSC, Forexware, Defendants Brokers, and John Doe deceived Plaintiff in New York using social media communications and Defendants MSC's MT5 trading application, which is available to New York residents, along with Defendant Forexware's software. Upon information and belief, Defendants MSC enabled Defendants Brokers to operate trading businesses on the MT5 platform via licensing agreements. Upon information and belief, Defendants MSC transacted a user agreement in New York where the Defendants MSC asked for and obtained Plaintiff's New York address. In addition, Defendants MSC, Forexware, and Defendants Brokers committed, or aided and abetted John Doe in committing, fraud, in which the MT5 platform is advertised as a trading platform to users in New York through which users may deposit, invest, and withdraw funds; Civil Conspiracy, where John Doe in an agreement with Defendants Brokers deceived Plaintiff in New York regarding funds allegedly held by Defendants Brokers on behalf of Plaintiff; Negligence, by providing a defective platform and failing to warn clients about illegitimate entities using the platform to defraud clients; and Conversion, whereby John Doe and/or Defendants Brokers wrongfully obtained Plaintiff's funds.

16.    This court has jurisdiction over all Defendants because Defendants' contacts with the forum state are active. MSC required Plaintiff to actively download MSC's application from Apple Inc.'s App Store, which, upon information and belief, involves an interaction between the Plaintiff, her smartphone, and MSC's servers, which are physically and intentionally located in New York.[1]  In addition, MSC actively required Plaintiff to input her residency in New York, agree to the End User License Agreement ("MT5 EULA"), and provided within the MT5 trading platform a list of brokers licensed to operate the trading platform. Upon information and belief,

---

[1] MSC advertises that it places servers in New York specifically to better serve its clients by executing trades faster. The New York placement of servers is therefore, by definition, intentionally utilizing the benefits of the forum for a business purpose.

Broker and Forexware interacted with Plaintiff in New York through Defendants MSC's MT5 trading platform and Defendants Brokers, utilizing Defendants MSC and Forexware's software and caused Plaintiff to transfer her funds to Defendants Brokers—funds that Defendants Brokers never invested or intended to invest on behalf of Plaintiff.

17.     Furthermore, upon information and belief, Defendant John Doe used a social media application and misrepresented to Plaintiff that he was located in New York, either by actively selecting New York in the social media application itself or by actively selecting New York through a virtual private network service. Upon information and belief, John Doe, acting in both an individual capacity and on behalf of Defendants Brokers actively communicated with Plaintiff in New York through instant messaging services repeatedly over the course of many months in order to improperly deprive Plaintiff of her funds.

18.     Exercise of jurisdiction would not violate notions of fair play and substantial justice because: (1) New York has a substantial interest in litigating similar cases, as seen in the Eastern District of New York's criminal indictment of eleven individuals utilizing the same or substantially similar software as MT5 to deceive New Yorkers and deprive them of their funds; (2) Plaintiff has a substantial interest in obtaining relief because Plaintiff's life's savings, as well as those of her family, friends, and creditors—some of who are located in New York—are implicated; (3) the burden on Defendants to litigate the case in New York would not be substantially unfair because the Defendants engage in business in New York;[2] and (4) it is efficient to resolve the conflict in this forum because Plaintiff is in New York, Defendants conduct business in New York and are able to travel to New York, and all matters alleged herein occurred in New York.

---

[2] Although the MetaQuotes Cyprus Defendant is a foreign corporation, it engages in business in the United States and has already retained counsel in New York for other matters. Warshaw Burstein, LLP, a law firm with an address at 575 Lexington Avenue 7th Floor, New York, New York, United States 10022, is listed as the attorney of record for Trademark Registrations of MetaQuotes Cyprus, including Registration Numbers (6248533, 4750105).

19.     Venue is proper in the Eastern District of New York pursuant to 28 U.S. Code § 1391(b)(2) as a substantial part of the events giving rise to the claims occurred in this District in Queens County, New York.  Moreover, venue is proper for MetaQuotes Cyprus, MetaQuotes Bahamas and Defendants Brokers, each a foreign entity as defined in 28 U.S. Code § 1603(a), because each said Defendant conducted all acts related to the matters alleged herein in this District in Queens County, New York.

## FACTS

### I.     PLAINTIFF'S BACKGROUND AND ASYLUM IN THE UNITED STATES

20.     Plaintiff was born in Kathmandu, Nepal on April 7, 1980 and fled to the United States on or about March 30, 2011 by herself. Plaintiff's primary and first language is Nepali. Plaintiff has no formal education in the English language and has learned and continues to learn English informally and incrementally as she continues her life in the United States. Plaintiff filed for asylum using an interpreter and currently has a conversational understanding of English.

21.     Plaintiff fled from Nepal because of the physical violence, threats and persecution perpetrated against her and her family by the Communist Party of Nepal for her political views. She left Nepal after she was beaten by half a dozen men in her office and had a gun shoved into her head for refusing to leave her political party, the Nepali Congress.

22.     Plaintiff had a United States Visa from a trip to see her family in 2010.  She purchased a ticket to the U.S. and fled Nepal immediately.  Plaintiff's husband and two sons, who were ages eight and thirteen at the time she fled Nepal, remained in Nepal because they did not have Visas and could not leave.

23.     When she arrived in the United States, Plaintiff knew she could not safely return to Nepal and filed for asylum in September 2011.  Her asylum petition was granted by U.S. Immigration Judge Wright in August 2021.

24.     In October 2021, Plaintiff was able to file Form I-730 derivative asylum applications for her husband, Dev, and her two sons, Devanshu and Himanshu. Plaintiff's family members have experienced both threats of violence and actual physical violence in Nepal. In October 2022, Plaintiff filed requests to expedite the approval of her family's derivative asylum applications, which were granted in November 2022.

25.     Plaintiff has been alone and separated from her family for over a decade. Plaintiff is a full-time caretaker, was a live-in caretaker for an American family with young children during the aforementioned events, and does not have strong community supports that she can rely on in the United States since her arrival. Plaintiff has been struggling with severe health issues due to loneliness and being separated from her family for so long, all the while worrying about her family's safety.

## II.    DEFENDANTS' FRAUDULENT SCHEME

26.     As Plaintiff has been living in the U.S. and awaiting her permanent resident card, she has split her time between living in Queens, New York on her off-days and Connecticut, where she worked as a full-time caretaker for a family.

27.     In or about late 2021, when dealing with extreme loneliness and separation anxiety from being away from her family, worsened by stresses of the COVID-19 pandemic, Plaintiff met John Doe through a social networking application intended for friendship and connections.

28.     In or about late 2021, John Doe, who purported to be named Connor Smith ("Smith") on social media, connected with Plaintiff and began to converse with her. Plaintiff

described Smith as someone that she considered, at that time, to be one of the few American friends that she made since seeking asylum in the United States (since it had been hard for her to do so with a full-time job as an in-house caretaker).

29.    Soon after Plaintiff began corresponding with Smith, the two moved their conversations to a different social media application, WhatsApp Messenger. After a few weeks of friendly conversation, Smith encouraged Plaintiff to consider trading in the currency and commodity markets and offered to assist her with opening certain accounts and earning extra income.

30.    Plaintiff became interested in the idea of earning extra income for her family in Nepal and in Smith's willingness to assist her. Smith directed Plaintiff to download Defendants MSC's application for its MT5 trading platform and Forexware's software onto Plaintiff's smartphone. Smith further directed Plaintiff to create a trading account in the MT5 application and to look for brokerage services in the list of licensed brokers provided by MT5. Smith first directed Plaintiff to the Broker "SICH Capital Ltd." Smith directed Plaintiff to select SICH as her broker from MT5's menu of licensed brokers and create a trading account on MT5.

31.    Under the pretense of funding Plaintiff's MT5 trading account, Smith directed Plaintiff to open accounts with certain cryptocurrency exchange platforms, including Coinbase Global, Inc. ("Coinbase") and Gemini Trust Company, LLC ("Gemini"). Plaintiff linked her bank account to Coinbase and Gemini to buy US Dollar Coin ("USDC"), which is a stable cryptocurrency collateralized by fiat currency.

32.    Smith then directed Plaintiff to contact an individual through the Telegram application, which is an online encrypted messaging service, to obtain a digital wallet address and send the purchased cryptocurrency to "fund her MT5 account." Smith told Plaintiff that the

individual on Telegram was SICH customer service.  Plaintiff believed that she was communicating with SICH customer service on the Telegram platform, and the individual she communicated with purported to be SICH customer service.  Plaintiff also believed that the wallet addresses that the individual on Telegram sent her were being used to fund her trading account because the corresponding balances were visible to her in the MT5 application.

33.    Plaintiff, on Smith's direction, also selected from MT5's menu of purported licensed brokers, the purported brokers Sophie Capital Financial Trading Ltd., Vorex Trading LLC, and Opson International Technology Services.  Each time, Plaintiff would utilize the Telegram messaging service to request a wallet address and send cryptocurrency to what she believed was her MT5 trading account. Plaintiff believed she was communicating with legitimate brokers because she believed her MT5 trading account to be legitimate, she was able to select the brokers from MT5's interface, and MT5's interface showed each one of Plaintiff's transactions and alleged profit and loss values as provided by the MT5 platform.

34.    On or about June 1, 2022, after transferring approximately $376,440.05 to what Plaintiff believed was sent to her MT5 trading account, Plaintiff contacted what she believed to be customer service for Defendants Brokers through Telegram and requested a withdrawal of funds from her MT5 account.  Defendants Brokers responded that Plaintiff was required to pay a thirty-five percent tax on her total profit to date, which at the time was $429,117.  The individual purporting to be the Defendants Brokers' customer service agent requested that Plaintiff send $150,191 by June 25, 2022 or face overdue fees accruing at 1% of the account principal per day.

35.    On June 10, 2022, Plaintiff contacted what she believed to be the Defendants Brokers' customer service through Telegram requesting cancellation of her withdrawal request.

Defendants Brokers informed her that she could not cancel it and she was still required to pay on time.

36.    On or about June 14, 2022, Plaintiff transferred approximately $29,882.77 to pay towards the tax that the Defendants Brokers informed her that she allegedly owed on the profits that the MT5 application provided in her MT5 trading account.

37.    On June 23 and June 24, 2022, Plaintiff transferred an additional $60,763.51 through two separate transactions to pay towards the tax that the Defendants Brokers told her that she allegedly owed on the profits that the MT5 application provided in her MT5 account.  On or about the same dates, Plaintiff transferred an additional $37,087.98.

38.    Subsequently, on or about June 25, 2022, Plaintiff initiated two more transactions, transferring $8,690 and $8,687.97.  The individual purporting to be a broker indicated through Telegram that Plaintiff's tax bill had been paid and directed her to consult with customer service through Telegram on June 29, 2022.

39.    When Plaintiff contacted what she believed to be customer service on June 29, 2022, the Defendants Brokers purporting to be customer service indicated that Plaintiff was required to pay a $60,000 "large channel" deposit due to her account funds reaching more than $500,000.  Plaintiff requested a copy of Defendants Brokers' policies surrounding withdrawal of funds.

40.    On July 5, 2022, Plaintiff transferred $14,182.90 to pay what Defendants Brokers told her to be a required fee to open a large channel to withdraw funds from her MT5 trading account.  On July 8, 2022, Plaintiff transferred the remaining $45,835.62 to pay what Defendants Brokers told her was a required fee to open a large channel to withdraw funds from her MT5 account.

41.    On or about July 11, 2022, Plaintiff followed up with Defendants Brokers on Telegram requesting information on withdrawing her funds.  Defendants Brokers responded that her account had been flagged for money laundering and that she would be required to transfer $33,200. Plaintiff utilized an open account with Gemini to make transfers.  On July 19, 2022, Plaintiff transferred $33,287 to pay what Defendants Brokers told her to be a required fee to unlock her MT5 trading account and allow for withdrawals following government intervention for suspected money laundering.

42.    On July 25, 2022, Plaintiff again requested to withdraw funds from her account. The Defendants Brokers responded on Telegram indicating that Plaintiff's MT5 account was inactive and that Plaintiff needed to send $45,734 to verify the account.

43.    On or about July 31, 2022, and August 6, 2022, Plaintiff transferred $7,742.37 and $8,500 respectively, to pay towards what Defendants Brokers told her to be an inactivity fee on her MT5 account.  On August 16, 2022, Plaintiff transferred $29,628 to pay towards what Defendants Brokers told her to be an inactivity fee on her MT5 account.

44.    Subsequently, Plaintiff realized that she had fallen victim to a scam and demanded that the Defendants Brokers' representative with whom she was communicating over Telegram to return her funds.  However, Defendants Brokers never returned to Plaintiff her funds that were purportedly were in her MT5 trading account, which totaled approximately $596,708.  Of this total, Plaintiff invested approximately $20,000 of her own funds and borrowed approximately $576,708 from friends, family, and loan providers. Plaintiff's parents even offered their house as collateral to provide more capital for Plaintiff.

45.    On August 27, 2022, Plaintiff was admitted as an in-patient to the emergency department for extreme psychiatric distress directly resulting from the facts stated above.

46.     As of December 2, 2023, Plaintiff received threatening and sexually vulgar communication and telephone calls from individuals purporting to represent the Broker Defendant Sophie Capital at various hours throughout the day and night, demanding payment of fees or face fines and criminal penalties for tax evasion and money laundering.

47.     Furthermore, Broker Defendants have shared Plaintiff's personal contact number with others who harass Plaintiff to invest in cryptocurrency to this day. These communications occur through calls on mobile applications such as Telegram and Viber.

## III.    FACTUAL ALLEGATIONS AGAINST DEFENDANTS

48.     MT5 is Defendants MSC's proprietary software application supported by Forexware's software that enables foreign exchange and cryptocurrency trading by connecting brokers to a user's computer or smartphone. MT5 (and its predecessor, MetaTrader 4, "MT4") is a platform where users can use a brokerage service to place orders to trade. The MT5 platform displays trades conducted by a chosen broker (licensed by MT5) on the client's MT5 trading account. The MT5 platform interacts with the MT5 application downloaded on their smartphone or computer.

49.     At the time of Plaintiff's interaction with Defendants, the MT5 application was available for download on Apple, Inc.'s App Store ("Apple App Store"). MT5 and MT4 have been removed from the Apple App Store for reasons suspected to be related to MT5's enabling of entities that have deceived and deprived users of their funds. MT5's availability and positive reviews on the Apple App Store led Plaintiff to believe that she was engaging in a legitimate business relationship.

50.     Upon downloading the MT5 trading application from the Apple App Store, users are presented with a pop-up MT5 EULA, which they must accept before being able to utilize the MT5 trading application.

51.     On information and belief, Defendants MSC's business includes selling license agreements for MT4 and MT5 to brokerages (each a "Licensee"). Upon information and belief, Defendants MSC and Licensees who obtained a license directly from Defendants MSC are permitted to sell license agreements, called "White Labels," of MT4 or MT5 to individuals and entities purporting to be brokerages. Similarly, upon information and belief, those who obtain White Labels may sell further discounted "Gray Labels" of MT5 to individuals and entities purporting to be brokerages. Regardless of who sells the MT4 or MT5 trading platform to a broker or purported broker, Defendants MSC provides full access to its MT4 and MT5 trading platform, and Forexware provides supporting software as well as software support and maintenance, for which Defendants MSC and Forexware charge a monthly fee.

52.     Upon information and belief, Defendants MSC, John Doe, and Licensees including Defendants Brokers collect a royalty based on activity of brokerages' clients.

53.     On information and belief, Defendants MSC only conducts due diligence procedures on Licensees with which it directly interacts. Diligence procedures for White Labels and Gray Labels not obtained from Defendants MSC are up to Licensees and are not conducted by Defendants MSC. Therefore, Defendants MSC create the opportunity for illegitimate brokerages to fully utilize the MT5 platform without any diligence.

54.     On information and belief, the MT5 trading platform displays all brokers that have obtained licenses to MT5, whether directly from Defendants MSC or from a White Label holder. Anyone who downloads the app, such as Plaintiff, can select the listed brokerages from the MT5

application. This list includes legitimate brokerages who provide services to clients and also includes illegitimate entities who deceive and deprive victims of their funds. There is no distinction visible to an MT5 user between legitimate and illegitimate brokers.

56.    On information and belief, MSC Defendants, through White Labels and Gray Labels, license their MT5 product to an unidentified number of illegitimate, criminal organizations purporting to be brokers.  Such illegitimate entities utilize the MT5 platform to conduct internet scams, including the scam perpetrated on Plaintiff, commonly known as a "Pig Butchering Scam."

56.    On information and belief, some of Defendants MSC's Licensees of MT5, including the Defendants Brokers and John Doe, lure victims onto the MT5 platform through social media networking applications.  Such Defendants manipulate individuals to create MT5 trading accounts through the pretense of profits. Then, a Licensee, such as Defendants Brokers, instructs the victim to select a fraudulent brokerage from the MT5 menu and create an account with that brokerage. This associates the victim's account with the illegitimate entities. The illegitimate entities then direct the victim to correspond with their purported "customer service" through social media, including Telegram or WhatsApp.  The communications that the victim receives through those platforms ostensibly comes from the illegitimate entities directly or individuals or enterprises associated with them.  The illegitimate entities, disguised as a legitimate brokerage entity's customer service, direct the victim, under the guise of funding the victim's MT5 trading account, to wire U.S. currency or to purchase and transfer cryptocurrency to a wallet address associated with them.

57.    On information and belief, the MT5 trading platform, through Forexware's software contributions, provides features that are essential for illegitimate entities to manipulate user account balances and delay trading at prices more favorable to the illegitimate entities. The

MT5 trading platform allows the display of false profit and funds information to the victims through their MT5 trading accounts. This displayed information on the MT5 trading accounts, with no warning from Defendants MSC that the platform is susceptible to scams, enables the scheme by creating an illusion of successful trading. The illegitimate entities continue the scam, using the MT5 trading platform, as long as possible, until the victim is unwilling or unable to transfer more funds.

58.    On information and belief, Defendants MSC and Forexware are aware of the pervasive criminal activity that takes place by way of the MT5 platform.  On or about September 23, 2022, Apple, Inc. removed the MT4 and MT5 platforms from its application store. There has been speculation that Apple, Inc. took such action due to the pervasive and increasing number of scams being executed through Defendants MSC and Forexware's software.

**FACTUAL ALLEGATIONS COMMON TO ALL RICO COUNTS**

59.    Plaintiff repeats and realleges all of the allegations set forth above as if fully set forth herein.

60.    ***Culpable Person***. Each of Defendants MSC, Forexware, and Defendants Brokers is a legal entity and John Doe is a person, and therefore each Defendant is a person within the meaning of 18 U.S.C. § 1961(3), and is capable of holding a legal and/or beneficial interest in property.

61.    ***Enterprise***. The "Pig Butchering Enterprise" ("Enterprise") consists of the association-in-fact created by the relationships between Defendants MSC, Forexware, John Doe, and Defendants Brokers.

62.    First, the purpose of the Enterprise is to defraud and profit off unsuspecting victims', such as Plaintiff's, eagerness to make substantial returns on investment in the

cryptocurrency and commodity markets. Second, each person in the Enterprise has relationships with the others that are necessary to achieve this purpose. Defendant John Doe was instrumental in luring the victim into the Enterprise's grasp. John Doe did this by engaging in a months-long, one-on-one conversation with the Plaintiff to establish trust, to introduce Plaintiff to the other members of the Enterprise, to direct Plaintiff on how to interact with Defendants Brokers and to instruct Plaintiff on how to use Defendants MSC and Forexware's MT5 trading platform in furtherance of a scheme to defraud. Defendants MSC and Forexware, through the MT5 trading platform, provided the tools for Defendants Brokers to 1) list their illegitimate brokerage services alongside and indistinguishable from actual licensed brokers on MSC and Forexware's MT5 trading platform, 2) misrepresent to Plaintiff that the Defendants Brokers were operating a trading account on Plaintiff's behalf, and 3) manipulate the data related to Plaintiff's supposed trading account by showing false or delayed market gains on Plaintiff's MT5 trading account. Once John Doe and Defendants Brokers, using Defendants MSC and Forexware's MT5 trading platform, convinced the Plaintiff to input actual funds, the Defendants Brokers moved the funds out of the victim Plaintiff's hands and into the hands of the Enterprise. Each member's participation and their coordinated activity were critical to the Enterprise's success because their actions altogether ultimately deceived the victim Plaintiff into believing that she was engaging legitimate financial brokerages to manage a trading account on the Plaintiff's behalf.

63.     Third, there is sufficient longevity to permit those associates to pursue the Enterprise's purpose because, as discussed above, the coordinated efforts of the Enterprise's members over 8 months resulted in actual loss of Plaintiff's funds.

64.     ***Interstate Commerce.*** For many years, the Enterprise engaged in the provision of brokerage services that pretended to acquire securities placed in interstate commerce. Additionally,

the Defendants MSC and Forexware's MT5 trading platform allowed the Defendants Brokers to trade securities in various markets located in the United States. Thus, this trading platform is "produced for" interstate commerce.

65.     Additionally, each of the Defendants as part of the Enterprise used—or reasonably knew it would be using—instrumentalities of interstate commerce such as telephones, mobile phones, e-mails, and the internet to conduct its unlawful practices. John Doe used a mobile phone to manipulate the Plaintiff. The Defendants Brokers used the application Telegram, on their mobile phones, to provide false information to the Plaintiff. Finally, the Enterprise used the internet to misappropriate Plaintiff's funds deposited in the wallet addresses, to misrepresent—through MT5 trading platform—the existence of a trading account, and to misrepresent profits on Plaintiff's fake account. Each use of these instrumentalities of interstate commerce has enabled the Defendants to misappropriate Plaintiff's funds, through false statements and omissions.

66.     ***Pattern of Racketeering Activity.*** The Defendants engaged in a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). Each use of the instrumentalities of interstate commerce that occurred over a period of over 8 months as part of the scheme constitutes a separate instance of wire fraud under 18 U.S.C. § 1343, and thus is a predicate act. These predicate acts constitute "a pattern of racketeering activity" under 18 U.S.C. §§ 1961 and 1962.

## COUNT I:  VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT SECTION 1962(C)

67.     Plaintiff repeats and realleges all of the allegations set forth above as if fully set forth herein.

68.     This Count is against Defendants MSC, Forexware, John Doe, and Defendants Brokers (the "Count I Defendants").

69.     ***Racketeering Activity.*** The Count I Defendants, individually and as part of the Enterprise, engaged directly or indirectly in a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

70.     Wire fraud is a RICO predicate act under 18 U.S.C. § 1343. The Count I Defendants intentionally devised a scheme to defraud Plaintiff of her funds, including cryptocurrency, through their individual and coordinated activity, which resulted in the actual use at least 30 wires where Plaintiff was defrauded of about $600,000 in the form of the cryptocurrency USDC.

71.     Defendants MSC and Forexware willfully or knowingly intended to engage in wire fraud because they willfully and knowingly provided illegitimate Defendants Brokers a platform designed to allow them to make fraudulent misrepresentations to the Plaintiff. Defendants MSC willfully and knowingly sell licensing agreements for the MT5 platform either directly or indirectly through White and Grey Labels without sufficient controls to secure the legitimacy of the brokers that will operate MSC's MT5 trading platform. Upon information and belief, Defendants MSC are fully aware that their platforms are being used by scammers in a wire fraud scheme. Upon information and belief, MSC's involvement in the Enterprise is the cause of MT4 and MT5's removal from the Apple App Store. Furthermore, Defendants MSC were, at least, reckless in listing fraudulent brokerages alongside and indistinguishable from legitimate, well-known brokerages in their platform for clients to select. The danger of misleading MT4 and MT5 client users that Defendants MSC and Forexware are not involved in a wire fraud scheme was so obvious that Defendants MSC and Forexware must have been aware of it.

72.     Defendants MSC and Forexware's MT5 trading platform is distinguished from the general internet providers, who may not be responsible for actions carried out by other users, because the MT5 trading platform is a financial services application within the realm of the

regulated financial services sector. Therefore, and at the very least, sufficient due diligence compliance procedures for their partner brokerages are widely expected.

73.    Similarly, Defendants Brokers willfully or knowingly intended to engage in wire fraud because Defendants Brokers established themselves to defraud Plaintiff. Defendants Brokers convinced Plaintiff that Defendants Brokers were legitimate financial services providers because they were listed on Defendants MSC's supposedly vetted list of providers. Defendants Brokers willfully or knowingly intended to engage in wire fraud because Defendants Brokers, through their customer service chat function, communicated multiple wire numbers for the false purpose of investing Plaintiff's funds, and never return Plaintiff's funds. Defendants Brokers' customer service agents also communicated multiple false statements to persuade Plaintiff to transfer more funds to Defendants Brokers' wallet addresses and to hold Plaintiff's funds hostage. This included false accusations that Plaintiff's funds were involved in money laundering schemes and that she was delinquent on taxes associated with her gains. Defendants Brokers then threatened Plaintiff with suspension of her account, the inability to withdraw her funds, and sending her information to Interpol.

74.    John Doe willfully or knowingly intended to engage in wire fraud because John Doe initiated and continued direct one-on-one conversation with Plaintiff with the intention to defraud Plaintiff and to send Plaintiff the Defendants Brokers' wire numbers upon Plaintiff's initial introduction to Defendants Brokers and MSC.

75.    ***A Pattern of Racketeering Activity.*** The unlawful Enterprise engaged in at least 30 related and continuous counts of wire fraud.

76.     John Doe's predicate crimes of multiple counts of wire fraud are vertically related because John Doe was enabled to commit each act of wire fraud solely because he was Plaintiff's direct contact to the Defendants Brokers.

77.     Defendants Brokers' predicate crimes of multiple instances of wire fraud are vertically related because Defendants Brokers were enabled to commit wire fraud solely due to Defendants MSC's license to operate the MT5 trading platform as if they were vetted, legitimate brokers.

78.     Defendants MSC and Forexware's predicate crimes of wire fraud are vertically related because they are directly related to MSC's business model. MSC's business model, through their MT5 trading platform, generates financial gain from wire fraud practices by providing the tools to enable Defendants Brokers' scheme to defraud. Defendants MSC allowed the Defendants Brokers to appear on the MT5 trading platform as if they were legitimate brokers and allowed them to manipulate Plaintiff's account to misrepresent to her the existence of actual trading activity and actual gains.

79.     The Count I Defendants' predicate crimes have horizontal relatedness because each count of wire fraud has the same purpose of defrauding the Plaintiff, the same participants (the Count I Defendants and Plaintiff), the same results and tactics (defraud Plaintiff of her cryptocurrency), and the same methods of commission (mobile phone interactions through communication on social media or through the use of a trading platform for mobile phones).

80.     The Enterprise is open-ended and therefore continuous because it is a known, on-going criminal scheme out of Asia, targeting U.S. nationals. Furthermore, an actual and specific threat of repetition exists in this case by the fact that 1) John Doe and Defendants Brokers' customer service agents are still holding Plaintiff's funds hostage and demanding Plaintiff to "pay

the taxes and fees" associated with her account and 2) MSC and Forexware's fraudulent practices

are a regular part of MSC's business and a part of its regular revenue stream.

81.     ***Injury.*** As a direct and proximate result of Count I Defendants' conduct, Plaintiff

has suffered actual damages in an amount to be proven at trial.

### COUNT II:  VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO) SECTION 1962(D)

82.     Plaintiff repeats and realleges all of the allegations set forth above as if fully set

forth herein.

83.     This Count is against Defendants MSC, Forexware, John Doe, and Defendants

Brokers (the "RICO Defendants").

84.     In violation of 18 U.S.C. § 1962(d), John Doe, Defendants Brokers, Forexware, and

MSC conspired to violate the provisions of 18 U.S.C. § 1962(c), in that they knowingly agreed

and conspired to conduct or participate in, directly or indirectly, the affairs of an enterprise through

the pattern of racketeering activity described above. The volume and frequency of the fraudulent

activity, and the continuance of the scheme to the present day against Plaintiff and other victims,

could not have occurred without the consent and knowing collusion of the RICO Defendants.

85.     As part of, and to advance, their conspiracy, the RICO Defendants agreed to and

conspired in the commission of the at least 30 predicate acts described above, with the knowledge

or reason to know that those acts were in furtherance of that pattern of racketeering activity. As

part of and to advance their conspiracy, each RICO Defendant agreed to and did commit at least

two predicate acts of racketeering.

86.     As a direct and proximate result of each RICO Defendant's engagement in the

conspiracy, Plaintiff has suffered actual damages in an amount to be proven at trial, but no less

than $600,000.

## COUNT III:  FRAUD

87.    Plaintiff repeats and realleges all of the allegations set forth above as if fully set forth herein.

88.    This Count is against Defendants MSC, Forexware, John Doe, and Defendants Brokers (the "Count III Defendants").

89.    All of the Count III Defendants, individually and as part of the Enterprise, engaged directly or indirectly in fraud against the Plaintiff under New York law.

90.    Defendants MSC and Forexware made misrepresentations and omissions of certain material facts to the Plaintiff while Plaintiff was using their MT5 platform.  Defendants MSC and Forexware represented to Plaintiff, through allowing illegitimate "brokers" to manipulate Plaintiff's MT5 trading account, that it had possession of Plaintiff's funds and that Plaintiff's account was growing and generating profit due to certain trades placed on Plaintiff's behalf on the MT5 platform.  Further, because Defendants MSC made a list of "brokers" for selection available to Plaintiff when Plaintiff signed up for her MT5 account, Defendants MSC materially misrepresented to Plaintiff that the "brokers" using the MT5 platform were legitimate entities subject to a due diligence process conducted by Defendants MSC.  In fact, Plaintiff's account balance never contained her principal or profits from trades placed by certain "brokers" on her behalf, and Defendants MSC never conducted sufficient diligence to ensure that entities it licensed to use its platform were legitimate brokers.  Such misrepresentations were material because, but for Plaintiff's belief that 1) the "brokers" that she engaged with were legitimate entities, and 2) her account balance, as displayed through her personal MT5 account, accurately displayed both her principal investment and purported profits, Plaintiff would not have continued to engage with MT5 and to send funds to entities she believed were legitimate brokers.

91.    Defendants MSC and Forexware knew 1) that the balances it displayed to Plaintiff in her account were false and 2) that certain "brokers" using its platform were illegitimate organizations conducting criminal activities and making false representations to MT5 users.  As MSC notes in its End-User License Agreement, it is not "involved…in any way in trading operations, nor does it open or control real trading accounts."  Defendants MSC knew that the balances it displayed to Plaintiff through her own personal account were fake balances for both her principal and her profits, which were being manipulated by third-party scammers. Additionally, as previously stated, Defendants MSC knowingly and willingly sells license agreements for the MT5 platform either directly or indirectly through White and Grey Labels without sufficient diligence, even knowing that such licenses are to criminal organizations making false claims to MT5 users.  Defendants MSC and Forexware are fully aware that their platforms are being used by scammers as evidenced by wide speculation that Defendants MSC's involvement in the Pig Butchering Enterprise is the cause of Apple, Inc.'s decision to suspend the MT5 application from the Apple App Store.  Nonetheless, MSC chooses to grant such licenses to criminal organizations, giving them the imprimatur of legitimacy and the ability to take advantage of unsuspecting victims, such as Plaintiff.

92.    Defendants MSC and Forexware's intent to defraud Plaintiff is evidenced by its willful and knowing display of false account balances to Plaintiff while willfully and knowingly allowing criminal organizations to use its MT5 platform for crime.  As stated, the MT5 application was removed from the Apple store for that exact reason.  Upon information and belief, Defendants MSC waited until it was removed from the Apple store to address this issue because Defendants MSC was benefiting from the payments given to it from illegitimate brokers and criminal organizations taking licenses to use its platform.  Defendants MSC was at least reckless in selling,

without sufficient due diligence, White and Grey Labels to what turned out to be illegitimate brokers, because Defendants MSC is fully aware that their platforms are being used by scammers. Moreover, Defendants MSC's intent is evidenced by continuing to display false account balances to its users and to allow illegitimate entities to access its platform and use it to deceive individual users even after it had already been sued for similar matters as early as 2014. Defendants MSC further intentionally listed fraudulent brokerages alongside legitimate, well-known brokerages on its platform for unsuspecting clients to select. Such "brokers" were indistinguishable from legitimate brokers. The danger of misleading Defendants MSC's client users that they are not involved in a wire fraud scheme was so obvious that they must have been aware of it and intended to deceive its users.

93.    Plaintiff was justified in relying on the representations of Defendants MSC and Forexware because Defendants MSC and Forexware appear to be a legitimate organization through which users may survey the markets, execute trades through their brokers, and generate profits. Plaintiff had no reason to believe that the account balances displayed in her personal MT5 account were being manipulated by a criminal organization or that Defendants MSC did not conduct sufficient diligence for entities that it grants licenses to its platform. But for the false account balances displayed in Plaintiff's MT5 account that were meant to represent her principal and profits, Plaintiff would not have continued to invest her life savings with her "broker." Due to the fraudulent conduct by Defendants MSC, Plaintiff suffered damages totaling approximately $600,000.

94.    Similarly, Defendants Brokers knowingly made a material misrepresentation of fact with the intent to deceive Plaintiff by holding themselves out as legitimate entities within the financial sector that would place legitimate trades for Plaintiff. The actors behind these illegitimate

"broker" entities pretended to be customer service representatives of Plaintiff's broker and communicated to her using Telegram regarding her account balances, deposits, and withdrawals to entice her to invest more funds with them. Defendants Brokers also knowingly and intentionally provided Plaintiff with wallet addresses that were not linked to any investment account associated with Plaintiff, but that, on information and belief, were linked to wallet addresses associated with the Enterprise. Defendants Brokers also knew that the balances shown in Plaintiff's personal investing account, including her principal and her profit, were false, and Defendants Brokers intentionally manipulated the balances in her MT5 account to appear as if the account was growing substantially. All the while Defendants Brokers knew that any funds she transferred to the wallet address the Defendants Brokers provided would be stolen. Additionally, Defendants Brokers' customer service agents threatened Plaintiff multiple times with false assertions to extort more funds from her—telling her that if she did not pay more, she would either lose her funds or be subject to penalties and account freezing. These threats included false accusations that Plaintiff's funds were involved in money laundering schemes, that she was delinquent on taxes associated with her gains, that her account would be suspended, that she would be unable to withdraw her funds, and that her information would be sent to Interpol. Plaintiff justifiably relied on the representations made by Defendants Brokers because they held themselves out as legitimate entities helping her with her MT5 account and with making trades and profits. Further, Plaintiff's MT5 account appeared to be growing based on trades placed by Defendants Brokers on behalf of Plaintiff, while unbeknownst to her, Defendants Brokers were falsely manipulating the balances shown to her in her personal MT5 account to entice more investment from her.

95.     Lastly, John Doe made a material misrepresentation of fact with the intent to deceive Plaintiff by engaging in one-on-one conversation with her over social media platforms,

adopting a false identity, and holding himself out to Plaintiff as being associated with legitimate financial entities.  Upon information and belief, John Doe was aware that he was using a false identity, that Defendants Brokers were not legitimate, that the wallet address provided by Defendants Brokers was not associated with Plaintiff's investing account, that the information displayed in Plaintiff's MT5 account with principal and profit was false, and that Plaintiff would lose any money transferred to the wallet addresses provided by Defendants Brokers.  John Doe made such misrepresentations intentionally to deceive Plaintiff and entice her into transferring funds to Defendants Brokers, and Plaintiff justifiably relied on such misrepresentations because she believed that she was interacting with legitimate brokers and other financial entities, including Defendants MSC and Forexware, and that her funds would be available to withdraw from her MT5 account at any time.  John Doe led Plaintiff to believe she was sending money to a broker to place in her account and did so in order to steal Plaintiff's life savings.  Plaintiff suffered losses of about $600,000 as a result.

96.    But for the fraud perpetrated by Defendants MSC, Forexware, Defendants Brokers, and John Doe, Plaintiff would never have invested and lost the amount of money that she did.

## COUNT IV:  CONSPIRACY TO COMMIT FRAUD

97.    Plaintiff repeats and realleges all of the allegations set forth above as if fully set forth herein.

98.    This Count is against Defendants MSC, Forexware, Defendants Brokers, and John Doe (the "Count IV Defendants").

99.    Defendants deceived Plaintiff and deprived her of her funds via the Pig Butchering Scam.

100.     In pursuit of the Enterprise, Defendants MSC and Forexware formed an agreement with Defendants Brokers. Defendants Brokers would utilize MSC and Forexware's MT5 software to engage in investment activities. Upon information and belief, in exchange, MSC would receive a percentage share of each transaction. Because Defendants MSC conducted little to no diligence on Defendants Brokers, Defendants MSC knew or obviously should have known that its listed Defendants Brokers could be fraudulent.

101.     Defendants Brokers provided MSC with its share of each successful fraudulent wire.

## COUNT V:  BREACH OF CONTRACT & BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

102.     Plaintiff repeats and realleges all of the allegations set forth above as if fully set forth herein.

103.     This Count is against Defendants MSC (the "Count V Defendants").

104.     Defendants MSC and Plaintiff entered into a user agreement displayed through the MT5 application.  Defendants MSC through the MT5 EULA promised (1) to provide an explicit license agreement with any third-party software, and (2) that Defendants are not "INVOLVED DIRECTLY OR INDIRECTLY IN ANY RESPECT IN ANY COMMISSION BASED PAYMENTS CONCERNING ANY TRADING OPERATIONS WHATSOEVER."  However, upon information and belief, Defendants MSC through the sale of labels and relationships with Defendants Brokers derive commissions from the Defendants Brokers.  Defendants MSC owed Plaintiff a duty to warn of deceptive activity that was taking place through the platform, and to notify Plaintiff of its commercial relationship with Defendants Brokers.

105.     The aforementioned breaches of contract are actual causes of damage to Plaintiff. Accordingly, Plaintiff is entitled to contractual damages from Defendants MSC for their breaches.

## COUNT VI: UNJUST ENRICHMENT

106.    Plaintiffs repeat and reallege all of the allegations set forth above as if fully set forth herein.

107.    This Count is against Defendants MSC, Forexware, John Doe, and Defendants Brokers (the "Count VI Defendants").

108.    The user agreement between Plaintiff and Defendants MSC does not govern this claim because the user agreement does not contemplate that Defendants MSC derives monetary benefit from Plaintiff's deposits with Defendants MSC's Licensees. This claim does not pertain to Plaintiff's perceived trading, but rather Defendants MSC's receipt of Plaintiff's funds through Plaintiff's broker, of which Plaintiff and Defendants MSC are not governed by any contract.

109.    There is a close relationship between Plaintiff and Defendants MSC because Defendants MSC and Plaintiff contracted with each other and was thereby aware of each other's existence, though that contract does not govern this present claim.

110.    Plaintiff relied on its relationship to Defendants MSC in using Defendants MSC's MT5 platform. Plaintiff researched Defendants MSC, its legitimacy, its well-regarded reputation, and because of such reputation, engaged in a user agreement contract with MSC and selected one of Defendants' Licensees to enter into a brokerage arrangement.

111.    There was no contractual relationship between Plaintiff and Defendants John Doe and Defendants Brokers.

112.    There was a close relationship between Plaintiff and Defendant John Doe because John Doe personally brought Plaintiff into the Pig Butchering Scam by forming a friendship with her. Based on this friendship, Plaintiffs engaged with Defendants MSC, Forexware, and Defendants Brokers.

113.    There was a close relationship between Plaintiff and Defendants Brokers because Plaintiff believed that Defendants Brokers were legitimate brokerages, and based on that belief, entrusted her funds to be invested by Defendants Brokers.

114.    John Doe and Defendants Brokers derived an unjust benefit by siphoning Plaintiff's funds through the aforementioned Enterprise.

115.    Defendants MSC derive income, and therefore benefit, from their business model, which involves 1) its licensing structure with brokers who obtain direct licenses, White Label licenses, or Gray label licenses, 2) its monthly maintenance and support fees that Defendants provides to all licensees, and 3) upon information and belief its percentage share of all deposits a Licensee's client, here Plaintiff, entrusts to the Licensee utilizing Defendants' MT5 application. These three streams of income do not exist in isolation but together enable Defendants MSC to benefit monetarily from its Licensees involved in Pig Butchering Scams.

116.    Defendants MSC directly benefited monetarily at Plaintiff's expense because Defendants MSC obtained fees from Defendants Brokers including upon information and belief a percentage of each deposit that Plaintiff made with Plaintiff's broker, John Doe, who was Defendants MSC's Licensee and whom Defendants MSC provided customer support. Defendants MSC knew or should have known, because MSC did not conduct sufficient diligence on John Doe to determine John Doe's legitimacy, that John Doe's depositing of Plaintiff's funds was wrongful. Nevertheless, MSC derived fees from Defendants Brokers including upon information and belief a percentage of each of Plaintiff's deposits that John Doe stole.

117.    Defendants MSC, through its business structure, allowed and enabled John Doe and Defendants Brokers to obtain Plaintiff's funds, of which Defendants MSC should not have

received any benefit percentage. In keeping a share of Plaintiff's funds, Defendants MSC continues to derive the benefit of having those wrongfully obtained funds.

118.    Equity and good conscience require restitution of the fees including upon information and belief a percentage of Plaintiff's funds, plus interest, by which Defendants MSC, Defendants Brokers, and John Doe were unjustly enriched.

## COUNT VII: NEGLIGENCE

119.    Plaintiff repeats and realleges all the allegations set forth above as if fully set forth herein.

120.    This Count is against Defendants MSC, Forexware, and Defendants Brokers (the "Count VII Defendants").

121.    Defendants MSC and Forexware owed Plaintiff a warning about the illegal entities conducting schemes on the MT4 and MT5 platforms and to conduct sufficient diligence investigations on brokerages that require licenses to their MT5 trading platform. Defendants MSC's business model, through the MT5 trading platform, enables Defendants Brokers' scheme to defraud. Additionally, Defendants MSC stated publicly it does conduct due diligence inquiries on its business partners.[3] Defendants MSC and Forexware provided a trading platform to the Defendants Brokers allowing them to appear as if they were legitimate brokers, and it allowed them to misrepresent on the very MT5 trading platform the existence of a trading account and false gains. Defendants Brokers were specifically targeting clients of MT4 and MT5 platforms and as a result, MSC had a duty to warn against these types of schemes.

122.    Defendants MSC set up a brokerage-license structure that enables this scheme. Upon information and belief, Defendants MSC sells license agreements for MT4 and MT5 to

---

[3] "Trader KYC verification from Sum&Substance in MetaTrader 5," on December 16, 2019, available on February 3, 2023 at https://www.metaquotes.net/en/company/news/5202.

brokerages. Brokers with license agreements are then permitted to themselves sell discounted White Labels to individuals and entities purporting to be brokerages. Those who attain these White Labels may in turn sell discounted Gray Labels to individuals and entities purporting to be brokerages. MSC provided full access to its MT4 and MT5 platforms to brokers and purported brokers alike.

123.    Despite no diligence procedure or other system to verify their legitimacy, Defendants MSC allows these Gray Label brokers to operate the MT5 trading platform as MT5-licensed brokers; the names of the brokers appear in a drop-down list in the MT5 trading platform and can be selected by any user. In addition, Defendants MSC and Forexware's MT5 trading platform allowed the Defendants Brokers to misrepresent to the Plaintiff that the Defendants Brokers were managing a trading account on Plaintiff's behalf and that this supposed trading account had profits.

124.    Defendants MSC, therefore, breached a cognizable duty of care by deviating from the established standard of care for its industry and neglected its ethical responsibility by not establishing enough controls to operate the MT5 trading platform, or by turning a blind eye to its responsibility to implement these controls. Additionally, it was negligent in creating a user agreement that does not warn of the known schemes taking place on their platform. Therefore, Defendants MSC breached its duty of care by listing the Defendants Brokers as MT5-licensed brokers without proper controls to verify its legitimacy.

125.    Additionally, as a broker hired to invest on behalf of Plaintiff, Defendants Brokers also owed Plaintiff a duty of care. Defendants Brokers breached their duty of care by misrepresenting that the money the Plaintiff transferred to the wallet address was going to be used for investment purposes and by misappropriating Plaintiff's funds.

126.    The Defendants Brokers, through Defendants MSC's MT5 trading platform, used a fake investment account to convince Plaintiff to transfer money to a wallet address controlled only by the Defendants Brokers. After the money was transferred, the Defendants Brokers immediately transferred the amount through numerous other wallets addresses to conceal the source of the funds.

127.    Defendants MSC and Defendants Brokers actions resulted in damages to Plaintiff in the amount of $600,000 and resulted in the infliction of emotional and psychological harm. If Defendants MSC had conducted any diligence on Defendants Brokers, such diligence would have revealed their illegitimacy, or at the very least, would have revealed the high risk of fraudulent activity.

## COUNT VIII:  NEGLIGENT MISREPRESENTATION

128.    Plaintiff repeats and realleges all of the allegations set forth above as if fully set forth herein.

129.    This Count is against Defendants Brokers (the "Count VIII Defendants").

130.    Defendants Brokers owed Plaintiff a duty of care to properly execute the transactions in her trading account following Plaintiff's instructions.

131.    Defendants Brokers, through Defendants MSC and Forexware's MT5 trading platform, misrepresented that they were managing Plaintiff's trading account and that Plaintiff had profits in the supposed trading account. Defendants Brokers misrepresented that the wallet addresses provided was not intended for Plaintiff's investment. Plaintiff justifiably relied on the misrepresentation when she retained Defendants Brokers to operate her trading account and when she kept investing. Plaintiff would never have retained Defendants Brokers or would never have

transferred money to the wallet addresses had she known the true circumstances. Plaintiff sustained monetary damage of about $600,000 as a result of the fraud.

132.    In addition, Defendants Brokers would not have been able to misrepresent to Plaintiff that they were managing a trading account on Plaintiff's behalf without Defendants MSC and Forexware's MT5 trading platform.

133.    Plaintiff reasonably relied on the false profit and loss visualizations because of MT5's positive reputation and her belief that Defendant was a prudent and legitimate business. Plaintiff's investment decisions were made because of the false profit numbers.

## COUNT IX: PRODUCTS LIABILITY

134.    Plaintiff repeats and realleges all of the allegations set forth above as if fully set forth herein.

135.    This Count is against Defendants MSC and Forexware.

136.    At all relevant times, Defendants MSC and Forexware were aware of the misuse of MT4 and MT5 by cyber-scammers and the danger posed to unsuspecting MT4 and MT5 users. MSC and Forexware were aware of a particular scheme to deceive MT4 and MT5 users to log into the MetaTrader websites and view false market information and false account information, whereupon they were induced to deposit real currency into fake accounts. Defendants MSC, as early as August 30, 2014, knew that "frauds of parties" were implemented using their platform and further were aware of how their platform had been used in the scheme and its clients victimized. (*See, Amended Complaint As To Defendant MetaQuotes Software Corp.* No. SACV-12-01448AQ-JP (C.D. Cal. Aug. 30, 2014).

137.    Specifically, MSC knew that:

    a.    illegitimate entities had access to these platforms and would lure victims into signing up as clients onto the MT4 & MT5 platforms;

    b.    these platforms would display false account balances to its clients;

    c.    these illegitimate entities would use the platforms to deceive victims by inducing them to deposit money into fake accounts. *Id.*

138.    Plaintiff was never warned nor given any information about fraudulent schemes by MSC or Forexware despite the fact that she was a client, which made her particularly vulnerable to the scheme. At all relevant times, MSC, especially, knew that their clients were targeted by this scheme.

## COUNT X: CONVERSION

139.    Plaintiff repeats and realleges all the allegations set forth above as if fully set forth herein.

140.    This Count is against Defendants John Doe and Brokers.

141.    Plaintiff has a possessory right to her funds in the amount of about $600,000 because John Doe and Defendants Brokers obtained Plaintiff's funds through fraud, namely, the Pig Butchering Scam. Therefore, a conversion occurred when John Doe and Broker fraudulently possessed Plaintiff's funds. Specifically, John Doe and Defendants Brokers converted Plaintiff's funds through a series of at least 30 wire transactions, and MSC obtained a benefit including upon information and belief a percentage cut of each of those transactions.

## COUNT XI: AIDING AND ABETTING CONVERSION

142.    Plaintiff repeats and realleges all the allegations set forth above as if fully set forth herein.

143.    This Count is against Defendants MSC.

144.    The Defendants MSC aided and abetted John Doe and Defendants Brokers' conversion of Plaintiff's funds because they provided a full license and platform for Defendants Brokers to operate, and thereby for John Doe to solicit for, a criminal brokerage. By providing full access to manipulate the MT5 software and therefore provide false profit and loss statements, by the indiscriminate listing of fraudulent brokerages on MT5's platform next to legitimate brokerages, by turning a blind eye to any diligence procedures for Defendants Brokers, and by collecting fees including upon information and belief a percentage cut or a fee with each transaction, Defendants MSC knew or should have known that fraudulent brokerages such as Defendants Brokers and John Doe were converting MT5 users' funds.

### COUNT XII: VIOLATIONS OF N.Y. DECEPTIVE PRACTICES ACT

145.    Plaintiff repeats and realleges all of the allegations set forth above as if fully set forth herein.

146.    This Count is against Defendants MSC, Forexware, and Defendants Brokers.

147.    Defendants MSC and Forexware are businesses engaged in consumer-oriented conduct through developing and providing software applications, such as its MT5 application, for brokerages, banks, and exchanges, and consumers with the intent to offer such services to end users. *See e.g.,* MetaQuotes Ltd. End User License Agreement.  The MSC End User License Agreement defines "Product" as "the Trading Terminal which is one of the client components comprising the MetaTrader 5 Trading Platform and includes MetaTrader 5 Mobile terminal, which enables traders to execute trades in the financial markets via the Financial Institutions with which they have entered into an agreement."  Plaintiff created her MT5 account directly through the MT5 mobile application, where she also selected the "broker" that she would be working with.  Further,

the MT5 application interfaces directly with users on their mobile phones and displays the user's "account balance" to the user.  Plaintiff logged directly into her MT5 account using her mobile phone and could see her account balance.

148.    Defendants MSC and Forexware's consumer-oriented conduct in offering services and displaying account balances to end users is materially misleading because it leads unsuspecting consumers, such as Plaintiff, into a false belief that their principal and profits are contained in their MT5 account.  Through such misleading conduct, MSC and Forexware gives its consumers false confidence that their assets are safe—all the while knowing that its platform is being used by illegitimate organizations to steal from its consumers.  But for Defendants MSC and Forexware's misleading conduct and deceptive practice of displaying false account balances in Plaintiff's personal MT5 account, Plaintiff would not have continued to send funds to organizations she believed were legitimate brokers and would not have suffered the extent of loss that she did.

149.    Defendants Brokers, posing as legitimate financial institutions, engaged in consumer-oriented conduct by interacting with Plaintiff via the MT5 application and communicating with her through the Telegram application under the false premise that Defendants Brokers were provided customer support to Plaintiff.  Defendants Brokers' consumer-oriented conduct was materially misleading because it caused Plaintiff to "invest" nearly $600,000 of her own assets and those of her friends and family into what turned out to be, ostensibly, a criminal enterprise.  Plaintiff's injury due to Defendants Brokers' materially misleading conduct constitutes her entire life savings and more.

## COUNT XIII: VIOLATIONS OF N.Y. FALSE ADVERTISING LAW

150.    Plaintiff repeats and realleges all of the allegations set forth above as if fully set forth herein.

151.    This Count is against Defendants MSC, Forexware, and Defendants Brokers.

152.    Defendants MSC and Forexware are businesses engaged in consumer-oriented conduct through developing and providing software applications, such as its MT5 application, for brokerages, banks, and exchanges, and consumers with the intent to offer such services to end users. *See e.g.,* MT5 EULA.  The MSC End User License Agreement defines "Product" as "the Trading Terminal which is one of the client components comprising the MetaTrader 5 Trading Platform and includes MetaTrader 5 Mobile terminal, which enables traders to execute trades in the financial markets via the Financial Institutions with which they have entered into an agreement."  Plaintiff created her MT5 account directly through the MT5 mobile application, where she also selected the "broker" that she would be working with.  Further, the MT5 application interfaces directly with users on their mobile phones and displays the user's "account balance" to the user.  Plaintiff logged directly into her MT5 account using her mobile phone and could see her account balance.

153.    Defendants MSC and Forexware's consumer-oriented conduct in offering services and displaying account balances to end users is materially misleading because it leads unsuspecting consumers, such as Plaintiff, into a false belief that their principal and profits are contained in their MT5 account.  Through such misleading conduct, MSC and Forexware gives its consumers false confidence that their assets are safe—all the while knowing that its platform is being used by illegitimate organizations to steal from its consumers.  But for MSC and Forexware's misleading conduct and deceptive practice of displaying false account balances in Plaintiff's personal MT5 account, Plaintiff would not have continued to send funds to organizations she believed were legitimate brokers and would not have suffered the extent of loss that she did.

154.    Defendants Brokers, posing as legitimate financial institutions, engaged in consumer-oriented conduct by interacting with Plaintiff via the MT5 application and communicating with her through the Telegram application under the false premise that Defendants Brokers were provided customer support to Plaintiff.  Defendants Brokers' consumer-oriented conduct was materially misleading because it caused Plaintiff to "invest" nearly $600,000 of her own assets and those of her friends and family into what turned out to be, ostensibly, a criminal enterprise.  Plaintiff's injury due to Defendants Brokers' materially misleading conduct constitutes her entire life savings and more.

### COUNT XIV: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

155.    Plaintiff repeats and realleges all of the allegations set forth above as if fully set forth herein.

156.    This Count is against Defendants MSC and John Doe.

157.    Defendants MSC breached a duty of care to the Plaintiff because Defendants MSC had a duty to conduct diligence investigations for White Label licensors, did not do so, and listed the unverified White Label brokerages alongside legitimate brokerages and thus provided a platform for criminal brokerages to prey on victims, such as Plaintiff.

158.    John Doe, as Defendants' agent, breached a duty of care to the Plaintiff because every person owes a duty to all other persons to use reasonable care to avoid causing injury to them or their property. Specifically, as an introducing broker, John Doe breach a duty of care to his client, the Plaintiff, by fraud. Here, John Doe purposely deprived Plaintiff of her property. John Doe did not use any care to avoid causing psychological harm to Plaintiff when he deprived Plaintiff of her property, because he threatened to and continues to threaten to extract more of Plaintiff's funds.

159.    John Doe caused Plaintiff to fear for her safety by threatening her daily, throughout the night and day, often times with verbal acts of sexual harassment, regarding repayment of fees or being faced with heavy fines and criminal penalties. The Plaintiff's fears manifested and resulted in her psychiatric diagnosis and hospitalization on August 27, 2022. The threats continue to this day.

160.    John Doe's conduct was extreme and outrageous in the context of a financial services broker because no legitimate financial broker would sexually harass and threaten their client non-stop, in the middle of the night, for months on end, with baseless claims as part of their business practices.

## COUNT XV: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

161.    Plaintiff repeats and realleges all of the allegations set forth above as if fully set forth herein.

162.    This Count is against Defendants MSC and John Doe.

163.    Defendants MSC's conduct, through its agent John Doe, was extreme and outrageous in the context of a financial services broker because no legitimate financial broker would sexually harass and threaten their client non-stop, in the middle of the night, for months on end, with baseless claims as part of their business practices.

164.    Defendants MSC caused and disregarded a substantial probability of causing severe emotional distress by providing a platform to illegitimate and criminal brokerages who foreseeably exist only to deprive MT5 users, such as Plaintiff, of their money, which would foreseeably cause and did cause severe emotional distress.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests that this Court:

1.      Enter Judgment for Plaintiff and against Defendants on all counts of this Complaint;

2.      Award Plaintiff damages in an amount to be proven at trial;

3.      Award Plaintiff their costs of suit and attorneys' fees incurred in connection with this litigation and to the extent provided by law;

4.      Award pre-judgment and post-judgment interest as provided by law; and

5.      Award such other and further relief as the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands trial by jury on all issues so triable.

*[signature page follows]*

Dated: New York, New York
       August 24, 2023

Respectfully submitted,

s\ Shong Yin

ROPES & GRAY LLP
1211 Avenue of the Americas
New York, NY 10036-8704
(650) 617-4078
Shong.Yin@ropesgray.com


*Pro hac vice* forthcoming:

Peter Welsh
Karina Thomas
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, NY 10036-8704
(617) 951-7865
(202) 508-4798
Peter.Welsh@ropesgray.com
Karina.Thomas@ropesgray.com

Mark Cianci
ROPES & GRAY LLP
Prudential Tower, 800 Boylston Street
Boston, MA 02199-3600
(617) 951-7122
Mark.Cianci@ropesgray.com


*Attorneys for Plaintiff Anjita Gurung*