**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **GURUNG, ANJITA**, <br><br> Plaintiff, <br><br> v. <br><br> **METAQUOTES LTD.**, a Cyprus corporation; **METAQUOTES SOFTWARE CORP.**, a Bahamas corporation; **METAQUOTES SOFTWARE CORP.**, a Delaware corporation; **FOREXWARE LLC**, a Delaware Limited Liability Company; **SICH CAPITAL LTD**, a United Kingdom corporation; **OPSON INTERNATIONAL TECHNICAL SERVICE CO., LTD.**, a Hong Kong corporation; **VOREX TRADING LLC**, a Georgia corporation; **SOPHIE CAPITAL FINANCIAL TRADING LTD**, a Canadian corporation; and **JOHN DOE**, <br><br> Defendants. | Case No.: 1:23-cv-06362-OEM-PK <br><br> **ECF CASE** <br> **Electronically Filed** <br><br> **Oral Argument Requested** |

**PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS'**
**MOTIONS TO DISMISS THE COMPLAINT**

_____

Mark A. Cianci
**ROPES & GRAY LLP**
Prudential Tower
800 Boylston Street
Boston, MA 02199-3600
Tel: (617) 951-7000
Fax: (617) 951-7050
Mark.Cianci@ropesgray.com

Shong Yin
**ROPES & GRAY LLP**
1900 University Avenue, 6th Floor
East Palo Alto, CA 94303
Tel: (650) 617-4000
Fax: (650) 617-4090
Shong.Yin@ropesgray.com

_____

Karina Thomas
**ROPES & GRAY LLP**
2099 Pennsylvania Ave, NW
Washington, DC 20006
Tel: (202) 508-4600
Fax: (202) 508-4650
Karina.Thomas@ropesgray.com

*Attorneys for Plaintiff Anjita Gurung*

**TABLE OF CONTENTS**

Page

Preliminary Statement ................................................................................................ 1

Factual Background ..................................................................................................... 3

I.      The MT5 App ................................................................................................... 3

II.     Defendant Forexware's Software Plug-In ........................................................ 4

III.    Defendants' Scheme to Defraud Ms. Gurung .................................................. 4

Legal Standard ............................................................................................................ 5

Argument ..................................................................................................................... 6

I.      The FSC Is Inapplicable and Unenforceable. .................................................. 6

    A.    MSC's Fraudulent Actions Do Not Arise Under the EULA. ......................... 6

        1.    Ms. Gurung's Non-Contract Claims Are Based in MSC's Scheme and Bear No Causal Connection to the EULA. ............................................... 7

        2.    The EULA's Only Relevance Is as A Defense Asserted By MSC. .......... 8

        3.    MSC's Argument for the FSC's Applicability Fails. ............................... 9

    B.    The FSC Is Unenforceable Because It Is Unreasonable, Is Unjust, and Would Deprive Ms. Gurung of Her Day in Court. ........................................ 9

        1.    The FSC Would Effectively Deny Ms. Gurung Her Day in Court. ........ 10

        2.    Cyprus Is a Wholly Inadequate Forum, Where it Would Be Impossible for Ms. Gurung to Bring her Claims. ..................................................... 11

II.     This Court Has Personal Jurisdiction Over MSC. .......................................... 11

    A.    New York's Long-Arm Statute Confers Jurisdiction. ................................. 12

    B.    MSC has "minimum contacts" with New York. .......................................... 13

III.    Ms. Gurung's Causes of Action Are Not Barred by Section 230 of the Communications Decency Act ("CDA"). ...................................................... 15

    A.    Defendants Are Not Providers of Interactive Computer Services ("ICS"). ..................... 15

    B.    Section 230 Does Not Apply When Defendants Generate At-Issue Content. ................. 15

    C.    Section 230 Does Not Shield MSC Against Liability for Failure to Warn Ms. Gurung of Known Risks of Using MSC's Trading Platform. .......................................................... 16

D.   Section 230 Does Not Shield MSC and Forexware Against Ms. Gurung's Claims that Arise from their Products and Other Conduct. ........................................................ 17

IV.   Ms. Gurung's RICO Claims Are Adequately Pleaded. .................................................. 18

A.   Moving Defendants Were Part of a RICO Enterprise. ..................................................... 18

B.   Plaintiff Adequately Alleges that the Defendants Engaged in a Pattern of Racketeering Activity that Resulted in Dozens of Fraudulent Wire Transfers..................................... 22

C.   The Complaint Demonstrates Moving Defendants' Fraudulent Intent............................ 24

D.   Ms. Gurung Adequately States RICO Conspiracy Claims. ............................................. 26

V.   If This Court Dismisses Ms. Gurung's RICO Claims, It May Still Assert Supplemental Jurisdiction Over State Law Claims. .................................................................................... 27

VI.   Plaintiff Adequately Pleads Each of the State Law Causes of Action............................. 28

A.   Ms. Gurung's Fraud and Conspiracy to Commit Fraud Claims Meet the Requirements of FRCP 9(b).................................................................................................................. 28

1.   Fraud (Count III)..................................................................................................... 28

2.   Conspiracy to Commit Fraud (Count IV) ............................................................... 30

B.   The Complaint States Claims for Breach of Contract and Breach of the Implied Covenant of Good Faith and Fair Dealing (Count V)...................................................... 31

C.   The Complaint Adequately Pleads Unjust Enrichment against MSC Forexware .......... 32

D.   MSC Owed—and Breached—a Duty of Care to Ms. Gurung........................................ 33

E.   Both MSC and Forexware Breached Their Duty to Warn............................................... 35

F.   The Complaint Adequately Pleads Aiding and Abetting Conversion ............................ 37

G.   Defendants Cannot Escape Liability for Violating New York Deceptive Practices and False Advertising Law .................................................................................................... 38

H.   The Complaint States a Claim for Negligent Infliction of Emotional Distress and Intentional Infliction of Emotional Distress .................................................................... 39

Conclusion ........................................................................................................................... 40

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*,
888 F. Supp. 2d 431 (S.D.N.Y. 2012) ..................................................................30

*Alfadda v. Fenn*,
159 F.3d 41 (2d Cir. 1998) .................................................................................9

*Allianz Glob. Invs. GmbH v. Bank of Am. Corp.*,
463 F. Supp. 3d 409 (S.D.N.Y. 2020) ...............................................................7, 8

*Allstate Ins. Co. v. Lyons*,
843 F. Supp. 2d 358 (E.D.N.Y. 2012) ...............................................................24

*Arimoto v. Rhee*,
No. 21-CV-4875, 2022 WL 17156554 (S.D.N.Y. Nov. 22, 2022) .......................10

*Armco Inc. v. N. Atl. Ins. Co.*,
68 F. Supp. 2d 330 (S.D.N.Y. 1999) ..................................................................8

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......................................................................................5, 6

*Automated Teller Mach. Advantage LC v. Moore*,
No. 08 Civ. 3340, 2009 WL 2431513 (S.D.N.Y. Aug. 6, 2009) ..........................20

*Ball v. Metallurgie Hoboken-Overpelt, S.A.*,
902 F.2d 194 (2d Cir. 1990) ............................................................................11

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*,
305 F.3d 120 (2d Cir. 2002) ..........................................................................13, 14

*Bascunan v. Elsaca*,
927 F.3d 108 (2d Cir. 2019) ............................................................................23

*Bell Atl. Corp v. Twombly*,
550 U.S. 554 (2007) ........................................................................................5

*Bocre Leasing Corp. v. General Motors Corp.*,
84 N.Y.2d 685 (2001) ......................................................................................37

*Boyle v. United States*,
556 U.S. 938 (2009) ...............................................................................19, 20, 21

*Brookdale Univ. Hosp. & Med. Ctr. v. Health Ins. Plan*,
    Civ No. 07-1471, 2009 WL 928718 ...................................................26

*Brown v. N.Y. Design Ctr., Inc.*,
    215 A.D.3d 1 (1st Dep't 2023) ......................................................39

*Burger King Corp. v. Rudzewicz*,
    471 U.S. 462 (1985)...................................................................14

*Carmona v. Sea Park E., L.P.*,
    206 A.2d 965 (2d Dep't 2022)........................................................35

*Center Cadillac v. Bank Leumi Tr. Co. of N.Y.*,
    808 F. Supp. 213 (S.D.N.Y. 1992) ..................................................23

*Citigroup Inc. v. City Holding Co.*,
    97 F. Supp. 2d 549 (S.D.N.Y. 2000)................................................12

*Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc.*,
    187 F.3d 229 (2d Cir. 1999)..........................................................21

*Cohen v. JP Morgan Chase & Co.*,
    498 F.3d 111 (2d Cir. 2007)........................................................3, 38

*Colo. Cap. v. Owens*,
    227 F.R.D. 181 (E.D.N.Y. 2005) ..................................................2, 34

*Com. Union Ins. Co. v. Blue Water Yacht Club Assn.*,
    239 F. Supp. 2d 316 (E.D.N.Y. 2003) ..............................................34

*Dangerfield v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    No. 02 Civ. 2561, 2006 WL 335357 (S.D.N.Y Feb. 15, 2006) .............................37

*Davis v. South Nassau Cmtys. Hosp.*,
    26 N.Y.3d 563 (2015) ...............................................................34

*DeFalco v. Bernas*,
    244 F.3d 286 (2d Cir. 2001).....................................................2, 18, 22

*Demaree v. Castro*,
    No. 22 Civ. 8772, 2023 WL 6465881 (S.D.N.Y. Oct. 4, 2023) .............................18

*Doe v. Internet Brands, Inc.*,
    824 F.3d 846 (9th Cir. 2016) ....................................................2, 16, 17

*Duafala v. Globecomm Sys. Inc.*,
    91 F. Supp. 3d 330 (E.D.N.Y. 2015) ................................................28

*Dubai Islamic Bank v. Citibank, N.A.*,
   126 F. Supp. 2d 659 (S.D.N.Y. 2000) .................................................................34

*Duffy v. Kaman Aerospace Corp.*,
   590 F. Supp. 3d 1317 (D. Mont. 2022) ..................................................................8

*Eades v. Kennedy, PC Law Offs.*,
   799 F.3d 161 (2d Cir. 2015) ................................................................................14

*Edmar Fin. Co., LLC v. Currenex, Inc.*,
   No. 21-CV-6598, 2023 WL 3570017 (S.D.N.Y. May 18, 2023) ........................8, 9

*In re Eighth Jud. Dist. Asbestos Litig.*,
   33 N.Y.3d 488 (2019) ..........................................................................................36

*Erie Ins. Co. v. Amazon.Com, Inc.*
   925 F.3d 135 (4th Cir. 2019) .................................................................................2

*Errant Gene Therapeutics, LLC v. Sloan-Kettering Inst. for Cancer Research*,
   174 A.D.3d 473 (1st Dep't 2019) ....................................................................31, 40

*Fair v. Roommates*,
   521 F.3d 1157 (9th Cir. 2008) .............................................................................16

*First Cap. Asset Mgmt. v. Satinwood, Inc.*,
   385 F.3d 159 (2d Cir. 2004)..................................................................................19

*Flexborrow LLC v. TD Auto Fin. LLC*,
   255 F. Supp. 3d 406, 421 (E.D.N.Y. 2017) ..........................................................26

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*,
   141 S. Ct. 1017 (2021)..........................................................................................14

*FTC v. LeadClick Media LLC*,
   838 F.3d 158 (2d Cir. 2016)..................................................................................15

*Gale v. Smith & Nephew, Inc.*,
   989 F. Supp. 2d 243 (S.D.N.Y. 2013)...................................................................39

*Goldman v. Simon*,
   58 A.D.3d 208 (2d Dep't 2008) ............................................................................33

*Goshen v. Mut. Life Ins. Co. of N.Y.*,
   98 N.Y.2d 314 (2002) ...........................................................................................38

*Greenlight Capital, Inc. v. GreenLight (Switzerland) S.A.*,
   No. 04 CIV. 3136, 2005 WL 13682 (S.D.N.Y. Jan. 3, 2005)................................11

*Grice v. VIM Holdings Group, LLC*,
  280 F. Supp. 3d 258 (D. Mass. 2017) ..................................................................10

*Gross v. Sweet*,
  49 N.Y.2d 102 (1979) ........................................................................................35

*H. Lewis Packaging, LLC v. Spectrum Plastics, Inc.*,
  No. CIV. 3:02CV2259(PCD), 2003 WL 22434080 (D. Conn. Apr. 11, 2003) .....................14

*Hain v. Jamison*,
  28 N.Y.3d 524 (2016) ........................................................................................35

*Matter of Hapag-Lloyd Aktiengesellschaft*,
  573 F. Supp. 3d 934 (S.D.N.Y. 2021) ....................................................................6

*Hawkins v. Coca-Cola Co.*,
  654 F. Supp. 3d 290 (S.D.N.Y. 2023) ...................................................................39

*Henry Loheac, P.C. v. Children's Corner Learning Ctr.*,
  51 A.D.3d 476 (1st Dep't 2008) ...........................................................................33

*Herrick v. Grinder, LLC*,
  306 F. Supp. 3d 579 (S.D.N.Y. 2018) ...................................................................30

*Herrick v. Grindr LLC*,
  765 F. App'x 586 (2d Cir. 2019) ..........................................................................17

*Hughes v. Ester C Co.*,
  930 F. Supp. 2d 439 (E.D.N.Y. 2013) ...................................................................29

*Index Fund, Inc. v. Hagopian*,
  107 F.R.D. 95 (S.D.N.Y. 1985) ............................................................................11

*Int'l Shoe Co. v. Washington*,
  326 U.S. 310 (1945) ..........................................................................................13

*Johnson v. State of New York*,
  37 N.Y. 2d 378 (1975) .......................................................................................40

*Kalisch-Jarcho, Inc. v. City of New York*,
  58 N.Y.2d 377 (1983) ........................................................................................30

*Lemmon v. Snap, Inc.*,
  995 F.3d 1085 (9th Cir. 2021) .............................................................................17

*Liberty Mut. Ins. Co. v. Blessinger*,
  No. 06 CV 391, 2007 WL 951905 (E.D.N.Y. Mar. 27, 2007) ....................................18

*Licci v. Lebanese Canadian Bank, SAL*,
    732 F.3d 161 (2d Cir. 2013)................................................................11

*Madanes v. Madanes*,
    981 F. Supp. 241 (S.D.N.Y. 1998) .....................................................23

*Mandarin Trading Ltd. v. Wildenstein*,
    16 N.Y.3d 173 (2011) .......................................................................32

*Marks v. New York Univ.*,
    61 F. Supp. 2d 81 (S.D.N.Y. 1999) ...................................................31

*Martinez v. Bloomberg LP*,
    740 F.3d 211 (2d Cir. 2014)...............................................................10

*MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*,
    87 A.D.3d 287 (1st Dep't 2011) ........................................................29

*MCW, Inc. v. Badbusinessbureau.com, L.L.C.*,
    No. CIV.A.3:02-CV-2727-G, 2004 WL 833595 (N.D. Tex. Apr. 19, 2004) ..........................16

*Melnick v. Adelson-Melnick*,
    346 F. Supp. 2d 499 (S.D.N.Y. 2004).................................................14

*Moore Charitable Found. v. PJT Prs., Inc.*,
    40 N.Y.3d 150 (2023) .......................................................................33

*Moore v. PaineWebber, Inc.*,
    189 F.3d 165 (2d Cir. 1999)...............................................................22

*In re N.Y.C. Asbestos Litig.*,
    27 N.Y.3d 765 (2016) .......................................................................36

*Neville v. Snap, Inc.*,
    No. 22STCV33500, Superior Court of Cal. Los. Ang.  (Jan. 2, 2024)....................................17

*New York v. United Parcel Serv., Inc.*,
    No. 15-cv-1136, 2016 WL 4203547 (S.D.N.Y. Aug. 9, 2016)........................................19, 20

*Norex Petroleum Ltd. v. Access Industries, Inc.*,
    416 F.3d 146 (2d Cir. 2005)...............................................................11

*Ouaknine v. MacFarlane*,
    897 F.2d 75 (2d Cir. 1990)................................................................23

*Paduano v. Express Scripts, Inc.*,
    55 F. Supp. 3d 400 (E.D.N.Y. 2014) ...................................................9

*Palm Bay Intl., Inc. v. Winebow Grp., LLC*,
    No. 18CV1094JMASIL, 2018 WL 5776266 (E.D.N.Y. Nov. 1, 2018) ...................................6

*Philatelic Found. v. Kaplan*,
    647 F. Supp. 1344 (S.D.N.Y. 1986)........................................................................28

*Phillips v. Audio Active Ltd.*,
    494 F.3d 378 (2d Cir. 2007)...........................................................................7, 8, 9

*Plumbers & Pipefitters Nat'l Pension Fund v. Tableau Software, Inc.*,
    No. 17 CV 5753 (JGK), 2019 WL 2360942 (S.D.N.Y. Mar. 4, 2019)................................25

*Powers v. British Vita, P.L.C.*,
    57 F.3d 176 (2d Cir. 1995)................................................................................24

*Purgess v. Sharrock*,
    33 F.3d 134 (2d Cir. 1994)...............................................................................27

*Rabinowitz v. Kelman*,
    75 F.4th 73 (2d Cir. 2023) .............................................................................1, 9

*Rio Tinto PLC v. Vale S.A.*,
    No. 14 CIV. 3042, 2014 WL 7191250 (S.D.N.Y. Dec. 17, 2014)......................................7, 8

*Royalty Network Inc. v. Dishant.Com, LLC*,
    638 F. Supp. 2d 410 (S.D.N.Y. 2009)................................................................1, 12

*S-Fer Intern., Inc. v. Paladion Partners, Ltd.*,
    906 F. Supp. 211 (S.D.N.Y. 1995) .........................................................................7

*Saba Cap. Master Fund, Ltd. v. ClearBridge Energy Midstream Opportunity
    Fund Inc.*,
    No. 23-CV-5568, 2023 WL 6279934 (S.D.N.Y. Sept. 26, 2023)............................................6

*Salinas v. United States*,
    522 U.S. 52 (1997)....................................................................................26, 27

*Santana v. Leith*,
    117 A.D.3d 711 (2d Dep't 2014) ...........................................................................39

*Schutte Bagclosures Inc. v. Kwik Lok Corp.*,
    48 F. Supp. 3d 675 (S.D.N.Y. 2014)........................................................................12

*Sharette v. Credit Suisse Int'l*,
    127 F. Supp. 3d 60 (S.D.N.Y 2015)........................................................................26

*Sivaslian v. Rawlins*,
    88 A.D.2d 703 (3d Dep't 1982) ...........................................................................35

*Stuart v. Fed. Energy Sys., Inc.*,
  596 F. Supp. 458 (D. Vt. 1984).................................................................................14

*In re Sumitomo Copper Litig.*,
  995 F. Supp. 451 (S.D.N.Y. 1998) ...........................................................................23

*In re Terrorist Attacks on Sept. 11, 2001*,
  714 F.3d 659 (2d Cir. 2013)......................................................................................13

*Tolbert v. Queens College*,
  242 F.3d 58 (2d Cir. 2001)........................................................................................32

*Tropical Sails Corp. v. Yext, Inc.*,
  No. 14 CIV. 7582, 2015 WL 2359098 (S.D.N.Y. May 18, 2015)...........................29

*United States v. Ciccone*,
  312 F.3d 535 (2d Cir. 2002)......................................................................................27

*United States v. Gershman*,
  31 F.4th 80 (2d Cir. 2022) ........................................................................................20

*United States v. Guadagna*,
  183 F.3d 122 (2d Cir. 1999)......................................................................................24

*United States v. Houlihan*,
  332 F.2d 8 (2d Cir. 1964)..........................................................................................23

*United States v. Jabar*,
  19 F.4th 66 (2d Cir. 2021) ........................................................................................22

*United States v. Rastelli*,
  870 F.2d 822 (2d Cir. 1989).................................................................................20, 25

*United States v. Zemlyansky*,
  908 F.3d 1 (2d Cir. 2018)..........................................................................................26

*Universal Grading Servs. v. eBay, Inc.*,
  No. 08-CV-3557, 2009 WL 2029796 (E.D.N.Y. June 10, 2009) .........................9, 10

*Warren v. John Wiley & Sons Inc.*,
  952 F. Supp. 2d 610 (S.D.N.Y. 2013)........................................................................30

*Whalen v. CSX Transp., Inc.*,
  No. 13 Civ. 3784, 2017 WL 4075200 (S.D.N.Y. Sept. 13, 2017)...........................36

*Wiand v. ATC Brokers Ltd.*,
  No. 22-13658 (11th Cir.) ...........................................................................................15

*Wiand v. ATC Brokers Ltd.*,
    No. 8:21-CV-1317, 2022 WL 19336431 (M.D. Fla. Sept. 27, 2022).....................................15

*Wilson v. Dynatone Publ'g Co.*,
    892 F.3d 112 (2d Cir. 2018).....................................................................................................6

**Statutes**

18 U.S.C. § 1961..............................................................................................................19, 22

18 U.S.C. § 1962....................................................................................................................18

28 U.S.C. 1367.................................................................................................................27, 28

**Other Authorities**

*MetaQuotes*, www.metaquotes.net (last visited 1/16/2024) .........................................15

Plaintiff Anjita Gurung ("Plaintiff" or "Ms. Gurung") respectfully submits this omnibus Opposition to the Motions to Dismiss filed by Defendants Forexware LLC ("Forexware"), MetaQuotes Ltd., and MetaQuotes Software Corp. (collectively with MetaQuotes Ltd., "MSC") ("Forexware" and "MSC" are collectively referred to as "Moving Defendants").

## PRELIMINARY STATEMENT

Ms. Gurung, an asylee who fled political violence in Nepal twelve years ago, came to the United States with no family, friends, or money. Compl. at 1. Since arriving, she has worked as a caretaker for children in New York while hoping that her family can join her in the U.S. *Id.* ¶¶ 24–25. During the pandemic, she found it difficult to form human connections, and turned to social media for friendship. *Id.* ¶¶ 25, 27-28. Instead, she fell victim to a "pig butchering scam" carefully orchestrated by the Defendants. As a result, Ms. Gurung lost nearly $20,000 of her own funds and another $580,000 in loans from friends, family, and others—including loans collateralized by her parents' home. *Id.* ¶ 44. All losses were caused by MSC's MetaTrader 5 application ("MT5" or "App") and Forexware's associated software plug-in ("Plug-In"). *Id.* ¶¶ 44, 70, 93.

Ms. Gurung brought this action in an appropriate forum, and this Court has personal jurisdiction over Moving Defendants. The Forum Selection Clause ("FSC") in the MSC End User License Agreement ("EULA") is prima facie inapplicable to the overwhelming majority of Ms. Gurung's claims and is unenforceable as to all of them; enforcement would be unreasonable and unjust, and would deprive Ms. Gurung of her day in court. *See Rabinowitz v. Kelman*, 75 F.4th 73, 80 (2d Cir. 2023). There is also plainly personal jurisdiction over Moving Defendants due to their contacts with the state of New York, including in connection with Plaintiff's claims. S*ee Royalty Network Inc. v. Dishant.Com, LLC*, 638 F. Supp. 2d 410, 419 (S.D.N.Y. 2009).

Moreover, contrary to the assertions of Moving Defendants, Ms. Gurung's claims are not barred by Section 230 of the Communications Decency Act. Moving Defendants are not providers

of internet computer services (ICS), and, even if they were, Ms. Gurung's claims challenge Moving Defendants' *own* actions, rather than any publishing of others' content. Section 230 does not absolve Moving Defendants of their duty to warn, nor does it provide immunity from product liability claims, especially given that, as alleged, MSC and Forexware designed MT5's features so as to enable illegal activities. *See Doe v. Internet Brands, Inc.*, 824 F.3d 846, 851 (9th Cir. 2016); *Erie Ins. Co. v. Amazon.Com, Inc.* 925 F.3d 135, 139 (4th Cir. 2019).

Ms. Gurung has also adequately pled each element of her claims. To support her RICO claims, Plaintiff has pled facts detailing how each Moving Defendant is part of a "pig butchering enterprise" that facilitates fraud through criminal wire transfers. *See DeFalco v. Bernas*, 244 F.3d 286, 306 (2d Cir. 2001). To support Plaintiff's claims of fraud and conspiracy to commit fraud, the Complaint describes how Moving Defendants conspired to make, and in fact made, material and knowing misrepresentations of fact, including the foundational misrepresentation that brokers on the MT5 platform were legitimate entities. Moving Defendants knowingly made these misrepresentations even as they sold MT5 license agreements to criminal organizations. Unfortunately, Ms. Gurung reasonably relied on these statements when she "invested"—and lost— $600,000. Likewise, with respect to the breach of contract and unjust enrichment claims, MSC as alleged blatantly breached the EULA's representation that the company is "not involved . . . in any commission based payments" by selling labels and deriving commissions from brokers, and Moving Defendants have been unjustly enriched as a result.

Further, to support her claims of negligence and products liability, Ms. Gurung has pled facts establishing that Moving Defendants had a duty to warn MT5 users of illegitimate entities on the App, that they breached that duty, and that the breach caused her injuries. *See Colo. Cap. v. Owens*, 227 F.R.D. 181, 187 (E.D.N.Y. 2005). Moreover, it was highly foreseeable that criminals

would exploit features of the MT5 app to commit exactly the sort of fraud to which Ms. Gurung fell victim, and the acts of the Criminal Brokers (defined below) were not remote, unforeseeable, or intervening. With respect to the New York Deceptive Practices and False Advertising Law, the Complaint alleges how Moving Defendants' acts were directed at consumers, were materially misleading, and caused Plaintiff's injuries. *See Cohen v. JP Morgan Chase & Co.*, 498 F.3d 111, 126 (2d Cir. 2007). The Moving Defendants jointly developed a consumer-oriented trading platform to enable foreign exchange and cryptocurrency trading by connecting brokers to a user's computer or smartphone. And the account balances displayed by MT5 to end users are materially misleading because they give unsuspecting consumers, including Ms. Gurung, the false belief that their principal and profits are safe, when in reality these balances have been siphoned off by fraudulent "brokers" who pay to be listed on the MT5 platform.

Finally, to support her claims for infliction of emotional distress, Ms. Gurung has pled that she was hospitalized with extreme psychiatric distress resulting from the financial losses occasioned by MSC's negligence and the extreme and outrageous behavior of their co-conspirators.

## FACTUAL BACKGROUND

### I.    THE MT5 APP

The MT5 software application has at relevant times been widely available in Apple Inc.'s App Store ("App Store") and other smartphone application stores, despite temporarily being removed over concerns of rampant fraud conducted through the App. Compl. ¶ 49. Upon downloading MT5, consumer-side users such as Ms. Gurung are required to create an account. *Id.* ¶ 56. To do so, users must provide personal information, such as state of residency, and accept the EULA. *Id.* ¶ 16. Users are then offered a variety of interactive features, including the ability to connect with brokers, *id.*; to deposit and withdraw investment funds, *id.* ¶ 15; and to view their

(purported) balances on MT5, *id.* ¶¶ 11, 15. Through MT5, MSC provides users a list of (legitimate and illegitimate) brokers with whom users may connect. *Id.* ¶ 54. Brokers displayed by MSC must purchase either a "White Label" license directly from MSC or a "Gray Label" license from another broker, who in turn purchase from MSC. *Id.* ¶ 51. Brokers who purchase a license from MSC are subject to MSC internal vetting procedures, but those that purchase a license from another broker are not. *Id.* ¶ 53. Importantly, MSC's labeling regime provides legitimacy to all brokers on MT5, including criminals and fraudsters, because users see that MT5's brokers are licensed and transact business with MSC. *Id.* ¶ 54. MT5-listed brokers pay monthly fees to MSC, and MSC collects royalties on user activity (*i.e.*, "investment" transactions). *Id.* at ¶ 51–52.

## II.      DEFENDANT FOREXWARE'S SOFTWARE PLUG-IN

Forexware created and maintains a software Plug-In on MT5. *Id.* ¶¶ 10–11. A software plug-in is added on to a "base" application to enhance functionality. The Plug-In expands MT5's functionality by giving users access to various financial products by connecting brokers to a user's computer or smartphone. *Id.* ¶ 48. The Plug-In also gives brokers the ability to alter the investment information that MT5 displays to users. *Id.* ¶ 94. Forexware charges monthly fees for the use of the Plug-In. *Id.* ¶ 51. Brokers use Forexware's Plug-In to create a mirage of successful investments in order to hide their actual theft of MT5 users' funds. *Id.* ¶¶ 94, 100. At no point are users warned that the Plug-In allows brokers to alter the presentation of user's financial information, and there is no way to know that brokers are manipulating information once the Plug-In is installed. *Id.* ¶ 94.

## III.     DEFENDANTS' SCHEME TO DEFRAUD MS. GURUNG

MSC and Forexware—in concert with SICH Capital Ltd., Opson International Technical Service Co., Ltd., Vorex Trading LLC, Sophie Capital Financial Trading Ltd. (the "Criminal Brokers"), and John Doe—participated in the scheme that defrauded Ms. Gurung. Each of the Defendants has a relationship to the other and to the scheme. *Id.* ¶ 62. Specifically, John Doe lured

Ms. Gurung into the scam by preying on her loneliness. *Id*. After reeling her in, John Doe introduced Ms. Gurung to MT5 and the Plug-In, as developed by the Moving Defendants. *Id*. ¶¶ 29–30. After Plaintiff downloaded MT5, John Doe instructed her to connect with the Criminal Brokers, who used MT5 and the Plug-In to steal Ms. Gurung's funds, all while creating the false impression that Ms. Gurung still had access to her funds (and a considerable profit). *See id*. ¶¶ 30, 56–57. The Criminal Brokers "fattened up" Ms. Gurung's MT5 account by inducing a series of deposits, eventually totaling $600,000, and "slaughtered" her by stealing every cent she deposited. *See id*. ¶¶ 34–44. Moving Defendants, in turn, collected royalties from the criminal Brokers on each of Ms. Gurung's transactions. *See id*. ¶ 52. As a result of the scheme, Ms. Gurung has suffered both catastrophic financial losses and severe emotional distress. *Id*. ¶¶ 44–45. She receives frequent communications from creditors demanding repayment of the stolen funds. *Id*. ¶¶ 46, 159. Because of the Moving Defendants' conduct, Ms. Gurung regularly fears for her safety, was hospitalized on August 27, 2022 as a result, remains severely traumatized, and suffers emotional distress each and every day. *Id*. ¶¶ 159, 164.

## LEGAL STANDARD

Rule 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief," such that "defendant [has] fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp v. Twombly*, 550 U.S. 554 (2007) (internal citations omitted). All that is required to survive a motion to dismiss is for a complaint to "state a claim to relief that is plausible on its face." *Id.* at 570. A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable." *Id.* at 556; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A plaintiff's allegations must be enough to show that there is more than a *sheer possibility* that a defendant acted unlawfully, but are not required to demonstrate that the defendant *probably* acted unlawfully. *Iqbal*, 556 U.S. at 678. In evaluating

a motion to dismiss under Rule 12(b)(6), the Court "must accept as true" all the factual allegations in the complaint, *Iqbal*, 556 U.S. at 678, and "draw all reasonable inferences in favor of the plaintiff." *Wilson v. Dynatone Publ'g Co.*, 892 F.3d 112, 117 (2d Cir. 2018).

## ARGUMENT

**I.    THE FSC IS INAPPLICABLE AND UNENFORCEABLE.**

The FSC provides that disputes "arising under" the EULA will be litigated in Cyprus.  Decl. of Fivos Georgiades ¶ 13 ("Georgiades Decl."). But because the FSC is inapplicable and unenforceable, the Court should reject MSC's assertion of *forum non conveniens.* The Court must first determine whether Plaintiffs' claims are subject to the FSC. Even if found so, the FSC is not enforceable if "enforcement would be unreasonable or unjust, or if the clause is invalid."[1] *See Matter of Hapag-Lloyd Aktiengesellschaft*, 573 F. Supp. 3d 934, 953 (S.D.N.Y. 2021) (forum selection clause unenforceable). Here, the FSC is by its own terms inapplicable to most of Plaintiff's claims, which do not arise under the EULA. Moreover, as to all claims, enforcement of the FSC would be patently unfair, unjust, and unreasonable.

**A.    MSC's Fraudulent Actions Do Not Arise Under the EULA.**

A claim "arises under" a contract where the underlying wrongful conduct violates rights guaranteed by the contract. *See Saba Cap. Master Fund, Ltd. v. ClearBridge Energy Midstream Opportunity Fund Inc.*, No. 23-CV-5568, 2023 WL 6279934, at *3 (S.D.N.Y. Sept. 26, 2023). The reach of a forum selection clause is construed narrowly—where a clause, like the FSC here, solely references claims "arising under" the contract, only those claims relating to rights or duties originating from the contract are subject to the clause. *See Palm Bay Intl., Inc. v. Winebow Grp., LLC*, No. 18CV1094JMASIL, 2018 WL 5776266, at *3 (E.D.N.Y. Nov. 1, 2018) ("claims that can stand without reference to a contract do not 'arise out of' that agreement."). Courts in this

---

[1] Ms. Gurung does not contest that the FSC was reasonably communicated or mandatory.

jurisdiction consider several factors to determine if a cause of action "arises under" a forum selection clause, including (1) whether the plaintiff's claims arise out of rights and protections granted outside of the scope of the contract, such as those guaranteed by federal law or common law, *S-Fer Intern., Inc. v. Paladion Partners, Ltd.*, 906 F. Supp. 211, 214 (S.D.N.Y. 1995); (2) whether there is a causal connection between the contract and the wrongful conduct, *Allianz Glob. Invs. GmbH v. Bank of Am. Corp.*, 463 F. Supp. 3d 409, 435–36 (S.D.N.Y. 2020); and (3) whether the defendant is using the contract merely as a shield against litigation, *Phillips v. Audio Active Ltd.*, 494 F.3d 378, 391 (2d Cir. 2007). Here, each factor weighs in favor of rejecting application of the FSC.

1.   <u>Ms. Gurung's Non-Contract Claims Are Based in MSC's Scheme and Bear No Causal Connection to the EULA.</u>

To arise under a contract, a claim must "relate in a meaningful way to the terms, validity, or enforceability" of the contract. *See Rio Tinto PLC v. Vale S.A.*, No. 14 CIV. 3042, 2014 WL 7191250, at *11 (S.D.N.Y. Dec. 17, 2014). Because Ms. Gurung's non-contract claims are based on rights guaranteed by federal and NY common law, not the EULA, the success of these allegations inherently relies on extracontractual proof. *Allianz*, 463 F. Supp. 3d at 435–36.

Ms. Gurung's non-contract claims bear no causal relationship to the EULA. For example, Ms. Gurung's RICO claims allege Moving Defendants engaged in racketeering activity and conspired to conduct or participate in such activity. Compl. ¶ 69, 84; *see also infra* pp. 18–27 (listing elements). None of the RICO elements relate in a meaningful way to the terms, validity, or enforceability of the EULA. *See Rio Tinto*, 2014 WL 7191250, *11. As in *Rio Tinto*, Ms. Gurung's allegations against MSC involve other Defendants that are completely out of the scope of the EULA. *See id*. at 12 (FSC inapplicable as RICO claims "depend[] upon proof of unlawful arrangements" between defendant and "third parties with whom [plaintiff] had no relationship

whatsoever"). Neither party asserts that the EULA contemplates MSC engaging in illegal conduct with third parties, and accordingly, proof of that illegal conduct will not be found in the EULA. Similarly, causes sounding in fraud and conspiracy to commit fraud require proof of MSC's illegal and fraudulent behavior that is not contemplated in the EULA. *See infra* pp. 28–31 (listing elements); *Armco Inc. v. N. Atl. Ins. Co.*, 68 F. Supp. 2d 330, 338 (S.D.N.Y. 1999) (forum selection clause inapplicable where plaintiff alleges fraud). Because Ms. Gurung's non-contract allegations rely on proof outside of the EULA, those claims bear no causal relationship to, and therefore do not arise under, the EULA.

Indeed, enforcement of forum selection clauses is routinely denied where invoked against claims arising under: **RICO (Counts I and II)**, *see, e.g., Rio Tinto,* 2014 WL 7191250, at \*13; **NY General Business Law (Counts XII and XIII)**, *see, e.g., Edmar Fin. Co., LLC v. Currenex, Inc.*, No. 21-CV-6598, 2023 WL 3570017, at \*25–26 (S.D.N.Y. May 18, 2023); **Fraud and Conspiracy to Commit Fraud (Counts III and IV)**, *see, e.g.*, *Armco* 68 F. Supp. 2d at 338; **Unjust Enrichment (Count VI)**, *see, e.g., Allianz*, 463 F. Supp. 3d at 435–36); and **Products Liability (Count IX)**, *see, e.g., Duffy v. Kaman Aerospace Corp.*, 590 F. Supp. 3d 1317, 1329–30 (D. Mont. 2022). The same logic extends to Ms. Gurung's negligence (Count VII) and emotional distress (Counts XIV and XV) claims. Because Ms. Gurung's non-breach-of-contract claims do not arise under the EULA, the FSC is inapplicable as to those claims.

### 2.    The EULA's Only Relevance Is as A Defense Asserted By MSC.

Claims do not "originate from" or "arise out of" a contract only used for defense. *Phillips*, 494 F.3d at 391. Ms. Gurung's Complaint does not rely on the EULA to allege non-contract claims against the Defendants. The few references to the EULA in the Complaint do not form the basis of her non-breach-of-contract causes of action—they merely provide context. *See* Compl. ¶ 16 (noting that the EULA was executed in New York); *id.* ¶ 50 (explaining mandatory nature of

EULA); *id.* ¶ 91 (pertaining only to breach of contract claim); *id.* ¶ 104 (same); *id.* ¶ 147 (providing relevant definition); *id.* ¶ 152 (providing background on MSC). Since the EULA does not underpin Ms. Gurung's non-contract claims and MSC is using the EULA purely as a defense, the FSC cannot be applied to Ms. Gurung's claims.

### 3.    MSC's Argument for the FSC's Applicability Fails

MSC argues in utterly conclusory fashion that "Plaintiff's claims against MSC all relate to Plaintiff's use of the MT5 software and are therefore covered by this clause." MSC Br. at 7. MSC provides no citation or further explanation to support this claim, nor could they, as "arising under" and "relate to" are entirely different standards as a matter of law. *See Edmar*, 2023 WL 3570017, *25; *see also Phillips*, 494 F.3d at 389. MSC relies exclusively on case law in which the relevant forum selection clauses were not contested or contained an "expansive" formulation, in contrast to the FSC's narrow language. *See, e.g.*, *Universal Grading Servs. v. eBay, Inc.*, No. 08-CV-3557, 2009 WL 2029796, at *14–15 (E.D.N.Y. June 10, 2009) (declining to decide whether claims arose under a user agreement because defendants conceded the issue); *Paduano v. Express Scripts, Inc.*, 55 F. Supp. 3d 400, 419 (E.D.N.Y. 2014) (applying forum selection clause to claims "in connection with [or] aris[ing] out of" the relevant agreement). MSC's other citations merely establish that the *forum non conveniens* doctrine is not *per se* inapplicable to RICO claims. *See, e.g., Alfadda v. Fenn*, 159 F.3d 41, 47 (2d Cir. 1998). The FSC is inapplicable.

### B.    The FSC Is Unenforceable Because It Is Unreasonable, Is Unjust, and Would Deprive Ms. Gurung of Her Day in Court.

Even if the FSC applied (and it does not for the vast majority of the claims), it is unenforceable if "enforcement would be unreasonable or unjust." *Rabinowitz*, 75 F.4th at 81. Forum selection clauses are "unreasonable" and "unjust" where enforcement would, as here, deprive a plaintiff of their day in court because of an inability to litigate, or deprive them of their

ability to bring a claim altogether. *Martinez v. Bloomberg LP*, 740 F.3d 211, 227 (2d Cir. 2014).

### 1.    The FSC Would Effectively Deny Ms. Gurung Her Day in Court.

Courts do not enforce forum selection clauses where enforcement goes beyond inconvenience to manifest injustice, including where pursuing an alternative forum is functionally impossible due to financial limitations. *See Grice v. VIM Holdings Group, LLC*, 280 F. Supp. 3d 258, 282 (D. Mass. 2017). The *Grice* court found that plaintiff, a single parent who earned less than $15.00 an hour and was the only means of support for her and her child, would "for all practical purposes be deprived of her day in court" if forced to bring her claims in Illinois rather than Massachusetts. *Id*. at 282.

Compared to the facts of *Grice*, Ms. Gurung's situation is even more dire. She lost substantially more money than the plaintiff in *Grice*. *Compare* Compl. ¶ 70 ($600,000), *with Grice*, 280 F. Supp. at 268 ($1,600). Ms. Gurung is still unable to pay back loans from friends, family, and other creditors, and her current earnings are all Ms. Gurung has to support herself and fund her family's reunification. Compl. ¶¶ 141, 154. Litigating abroad would also be far more complicated and expensive than in another state. *Compare* Compl. ¶ 70 (Cyprus), *with Grice*, 280 F. Supp. 3d at 268 (Illinois). Additionally, Ms. Gurung is an asylee who cannot legally leave the United States during the *years* her application for permanent residency is pending.

The cases cited by MSC are easily distinguishable: in *Arimoto*, neither plaintiff resided in the United States, undermining any claims concerning forum convenience, and in *Universal Grading*, plaintiffs include an LLC and the president of that entity. *See Arimoto v. Rhee*, No. 21-CV-4875, 2022 WL 17156554, at *9 (S.D.N.Y. Nov. 22, 2022); *Universal Grading Serv.*, 2009 WL 2029796, at *1. Ms. Gurung does not have the financial or legal ability to travel the more-than 11 hours to Cyprus, much less find a Greek translator and retain Cypriot counsel to replace her pro bono counsel in New York. Simply put, enforcing the Cyprus FSC would wholly deprive Ms.

Gurung of her ability to litigate this case.

> ### 2. Cyprus Is a Wholly Inadequate Forum, Where it Would Be Impossible for Ms. Gurung to Bring her Claims.

To secure dismissal of an action on grounds of *forum non conveniens*, a movant must demonstrate the availability of an adequate alternative forum. *Norex Petroleum Ltd. v. Access Industries, Inc.*, 416 F.3d 146, 157 (2d Cir. 2005). A forum is not adequate when it offers a remedy that is clearly unsatisfactory. *Id.* at 153. Here, application of the FSC would preclude Ms. Gurung's RICO claims, an individualized right unique to this country. Further, Cyprus does not recognize claims based on an implied duty of good faith and fair dealing. Alternative fora have been found inadequate where legal concepts unique to the United States represent the core of a plaintiff's claims. *See, e.g., Greenlight Capital, Inc. v. GreenLight (Switzerland) S.A.*, No. 04 CIV. 3136, 2005 WL 13682, at *6 (S.D.N.Y. Jan. 3, 2005). So too here.

## II.    THIS COURT HAS PERSONAL JURISDICTION OVER MSC.[2]

Where, as here, the plaintiff asserts specific jurisdiction over an out-of-state defendant, courts apply a two-step inquiry. *Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 168 (2d Cir. 2013). First, the Court must look to New York's long-arm statute (N.Y. C.P.L.R. 302(a)(1)) to determine whether specific jurisdiction will lie. *Id.* If jurisdiction lies under the long-arm statute, then jurisdiction over an out-of-state defendant must comport with constitutional due process. *Id.* Before discovery, a plaintiff need only make a prima facie showing that jurisdiction exists, established solely by allegations. *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990). "[E]ven a single transaction of business is sufficient to give rise to personal

---

[2] Defendant Forexware has not contested personal jurisdiction in its Motion to Dismiss and therefore consents to personal jurisdiction in this case. It is firmly established that a defendant who wishes to raise lack of personal jurisdiction as a defense "must do so in [her] first defensive move, be it a Rule 12 motion or a responsive pleading." *Index Fund, Inc. v. Hagopian*, 107 F.R.D. 95, 101 (S.D.N.Y. 1985) (internal citations omitted).

jurisdiction under CPLR § 302(a)(1), if the claim arises out of the transaction." *Schutte Bagclosures Inc. v. Kwik Lok Corp.*, 48 F. Supp. 3d 675, 684 (S.D.N.Y. 2014).

### A.    New York's Long-Arm Statute Confers Jurisdiction.

To make a prima facie showing that N.Y. C.P.L.R. 302(a)(1) applies, a plaintiff must show that the instant action arises from a transaction in New York. *Citigroup Inc. v. City Holding Co.*, 97 F. Supp. 2d 549, 564 (S.D.N.Y. 2000). With respect to transactions on a website, courts consider where the website falls on a "'spectrum' of interactivity." *Royalty Network Inc. v. Dishant.Com, LLC*, 638 F. Supp. 2d 410, 418–19 (S.D.N.Y. 2009). Unlike "passive" websites, which "merely make information available to viewers," "interactive websites . . . knowingly transmit goods or services to users in other states" and are therefore amenable to jurisdiction. *Id.*

Here, MSC operates an interactive website, available to users via the MT5 smartphone application, used to transact business in New York. *See* Compl. ¶ 16. MT5 is a deeply interactive platform: it allows users to create accounts, *id.* ¶ 11; collects personal information (including state of residency), *id.* ¶ 16; requires execution of the EULA, *id.*; connects users with brokers, *id.*; facilitates money transactions, *id.* ¶ 15; (purports to) present current information about a user's holdings, *id.* ¶¶ 11, 15; vets and licenses its brokers, *id.* ¶ 121; collects monthly fees and charges, *id.* ¶ 51; and collects royalties on user activity, *id.* These are precisely the types of activities that make a website "interactive" and allow this Court to exercise specific jurisdiction over Defendant MSC. *See Citigroup Inc.*, 97 F. Supp. 2d at 564–65. Ms. Gurung used all of these interactive features while in New York. *Id.* ¶ 16. Every transaction she entered on MT5 was done in New York. *See id.* As alleged in the Complaint, MSC collected royalties based on clients'—*i.e.*, Ms. Gurung's—activities on MT5, thus generating revenue on activities Ms. Gurung conducted in New York. *See id.* ¶ 51. These facts demonstrate that MSC transacts business in New York and is subject to the long-arm statute.

To evade application of the long-arm statute, MSC misstates Ms. Gurung's bases for jurisdiction in New York. MSC is not subject to jurisdiction by virtue of the availability of its website alone, MSC Br. at 11—it is subject to jurisdiction because of the purposeful activities carried out through the website. Tellingly, MSC does not even attempt to dispute that MT5 interacts with users in the variety of ways described above. MSC largely relies on its lack of *physical* presence in New York, Georgiades Decl. ¶ 18, and ignores its *digital* presence in the state.

MSC other arguments are equally unavailing. For instance, MSC asserts that the factual allegation that "the MT5 platform is advertised as a trading platform to users in New York through which users may deposit, invest, and withdraw funds" is conclusory because it lacks "specificity" as to the "whether, when, or what" of the alleged advertising. MSC Br. at 11. But Ms. Gurung's jurisdictional allegations are not held to the high standards of Federal Rule of Civil Procedure 9(b), which requires such specificity, because jurisdiction is not an allegation sounding in fraud. The Complaint gives MSC notice of the claims against it, and that is all that it is required to do.

Finally, MSC asserts that its New York servers are irrelevant to this case. Georgiades Decl. ¶ 18. Ms. Gurung alleges that MSC's servers are purposefully placed to serve MSC users in New York. Compl. ¶ 16. At best, then, MSC creates a factual dispute that must be resolved in favor of Ms. Gurung on a motion to dismiss. *See In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013) (affidavits conflicting with complaint create a factual dispute resolved in the plaintiff's favor). MSC is subject to N.Y. C.P.L.R. 302(a)(1) .

### B.    MSC has "minimum contacts" with New York.

Jurisdiction over MSC here comports with constitutional due process. *See Int'l Shoe Co. v. Washington*, 326 U.S. 310, 321 (1945). To determine whether due process is satisfied, courts consider whether the defendant has "minimum contacts" with the forum state. *See Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 127 (2d Cir. 2002). Upon a finding of

minimum contacts, the burden then shifts to the defendant to make a "compelling case" that jurisdiction is unreasonable. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985); *see also Eades v. Kennedy, PC Law Offs.*, 799 F.3d 161, 169 (2d Cir. 2015).[3] "[M]inimum contacts exist where the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there." *Bank Brussels Lambert*, 305 F.3d at 127.

Here, MSC has sufficient minimum contacts with New York. As described above, MT5 is an interactive website that allows users to carry out a variety of activities in a digital trading marketplace. *See supra* pp. 12–13. MSC also generates royalties on the activity of New York residents, including Ms. Gurung. Compl. ¶ 51. By creating an interactive marketplace through which royalties are generated, MSC has subjected itself to jurisdiction in this Court. *See Stuart v. Fed. Energy Sys., Inc.*, 596 F. Supp. 458, 459 (D. Vt. 1984) (denying motion to dismiss where defendant offered services, advertised, and collected royalties on plaintiff's activity in the forum); *H. Lewis Packaging, LLC v. Spectrum Plastics, Inc.*, No. CIV. 3:02CV2259, 2003 WL 22434080, at *3 (D. Conn. Apr. 11, 2003) (holding that company had sufficient minimum contacts with Connecticut where it entered into agreement with Connecticut packaging company, and sent commission payments and correspondence to packaging company in Connecticut).

MSC's arguments to the contrary miss the mark because they focus on *physical* presence in New York, not *digital* presence. *See* Georgiades Decl. ¶¶ 17–18. First, Mr. Georgiades's statement that MSC does not transact business here is a legal conclusion that this court need not credit. *Melnick v. Adelson-Melnick*, 346 F. Supp. 2d 499, 503 (S.D.N.Y. 2004). The other facts listed by Mr. Georgiades only reflect *physical* presence, none of which relate to Ms. Gurung's claims. *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024 (2021) (explaining

---

[3] MSC does not contest that jurisdiction would be reasonable. MSC Br. at 9–14.

that only those contacts related to the plaintiff's claims are relevant for specific jurisdiction). With respect to the internet, Georgiades Decl. ¶ 18.i, Ms. Gurung *does* allege that MSC solicits business from New York residents through the MT5 app, *see supra* pp. 12–14, which again creates a factual dispute that must resolve in Ms. Gurung's favor. This Court has jurisdiction.

## III.    MS. GURUNG'S CAUSES OF ACTION ARE NOT BARRED BY SECTION 230 OF THE COMMUNICATIONS DECENCY ACT ("CDA").

Although neither Moving Defendant asserted a Section 230 defense in its pre-motion letters to the Court (ECF Nos. 13, 21), Ms. Gurung responds herein to these newly raised arguments.

### A.    Defendants Are Not Providers of Interactive Computer Services ("ICS").

As a threshold matter, Moving Defendants are not ICS providers under Section 230 because they are not "internet service provider[s], website exchange system[s], online message board[s], or search engine[s]." *FTC v. LeadClick Media LLC*, 838 F.3d 158, 175 (2d Cir. 2016). MSC itself describes its MT5 platform as a "multi-asset trading platform," *see* www.metaquotes.net (last visited 01/08/2024), and Forexware operates software that serves the trading platform. Compl. at 2. Moving Defendants have cited no controlling authority suggesting Section 230 applies to their respective financial trading software tools, which operate on financial information, rather than expressive content as addressed by Section 230's protections against defamatory claims. *See FTC*, 838 F.3d at 173. MSC cites an out of district case, *Wiand v. ATC Brokers Ltd.*, No. 8:21-CV-1317, 2022 WL 19336431, at *8 (M.D. Fla. Sept. 27, 2022), which extended Section 230 to a "white label software suite," but *Wiand* failed to cite such controlling authority, and is on appeal. MSC Br. at 25; *see Wiand v. ATC Brokers Ltd.*, No. 22-13658 (11th Cir.).

### B.    Section 230 Does Not Apply When Defendants Generate At-Issue Content.

Even if the Court determines that Moving Defendants are ICS providers, Section 230 does not shield MSC and Forexware against Ms. Gurung's claims that seek to hold them accountable for financial information that they curated and provided on MSC's trading platform. Compl. ¶ 90; *see FTC*, 838 F.3d at 174–76; *see also Fair v. Roommates*, 521 F.3d 1157,1165–66 (9th Cir. 2008). For example, MSC is a content creator because MSC licensed brokers and provided a curated list of such brokers to Ms. Gurung on its trading platform. Compl. ¶¶ 51, 53, 90. MSC's process of validating some, but not all, brokers that use its trading platform, and creating a curated list of brokers to share with users of its trading platform, is content creation. *See FTC*, 838 F.3d at 176; *see* Compl. ¶¶ 33, 147, 152. MSC Br. at 16–17 and Forexware Br. at 24 suggest that all information shown to Ms. Gurung was entirely created by third parties, but MSC or Forexware may still control or generate aspects of that information through its "provide[d] features" (Compl. ¶ 57), resulting in a factual dispute. *See MCW, Inc. v. Badbusinessbureau.com, L.L.C.*, No. CIV.A.3:02-CV-2727-G, 2004 WL 833595, at *10 (N.D. Tex. Apr. 19, 2004). And none of Moving Defendants' cited cases apply here, where Defendants created or contributed to some or all of the content at issue. *See* MSC Br. at 15-17; Forexware Br. at 23–24.

## C.    Section 230 Does Not Shield MSC Against Liability for Failure to Warn Ms. Gurung of Known Risks of Using MSC's Trading Platform.

Section 230 does not protect against MSC's failure to warn Ms. Gurung of known risks of using MT5 where such risks are unrelated to MSC's alleged editorial role. For example, in *Internet Brands*, the Court rejected a modeling website operator's assertion of a Section 230 defense where a model using the platform was lured into a false audition, drugged, and raped, and where the operator knew that rapists were using its platform and failed to warn the rape victim. 824 F.3d at 848–51, 854. There, the victim's claim had "nothing to do with [the modeling website's] efforts, or lack thereof, to edit, monitor, or remove user generated content," and instead sought to hold the

modeling website liable "based on its knowledge of the rape scheme . . . for failing to generate its own warning." *Id.* at 852. Here, MSC knew as early as 2014 from a prior lawsuit that scammers and illegitimate brokers, whom MSC allegedly licensed, used features of the MT5 trading platform as part of schemes to harm and deceive MSC's users. Compl. ¶¶ 15, 49, 58, 92, 136. Even though MSC knew of such harmful activity on its trading platform, it provided no warning of such activity and instead provided a curated list to Ms. Gurung that included illegitimate brokers. None of the cases cited by MSC apply here, where MSC failed to warn of known risks of misuse by illegitimate brokers that MSC learned from sources outside any monitoring of its trading platform. MSC Br. at 15–17. For example, unlike *Herrick v. Grindr LLC*, 765 F. App'x 586, 591 (2d Cir. 2019), which distinguished *Internet Brands* because the failure to warn was based on a failure to edit, monitor, or remove content, here the failure to warn was based on MSC's knowledge of harmful activity that it learned from a prior lawsuit as opposed to through any content monitoring by MSC.

### D.    Section 230 Does Not Shield MSC and Forexware Against Ms. Gurung's Claims that Arise from their Products and Other Conduct.

Section 230 does not shield MSC and Forexware against Ms. Gurung's claims (*e.g.*, product liability, breach of contract, RICO) that are based on defects in their trading software products and other conduct beyond alleged publication of the Criminal Brokers' content. *See e.g., Erie*, 925 F.3d at 139 (4th Cir. 2019); *Lemmon v. Snap, Inc.*, 995 F.3d 1085, 1092–93 (9th Cir. 2021). For example, defective features in the MT5 trading platform designed by MSC and Forexware that facilitate illegal activity are not protected by Section 230. *See Neville v. Snap, Inc.*, No. 22STCV33500, Superior Court of Cal. Los. Ang. at *5–6, *21–22 (Jan. 2, 2024) (denying demurrer where plaintiffs' claims as alleged arose from defendant's independent wrongful conduct—facilitating criminal acts—not publishing of others' content). The Complaint alleges Forexware and MSC's features allowed the Criminal Brokers to falsify trading account balances

with the appearance of legitimacy, and thus enabled perpetrators to deceive Ms. Gurung. Compl. ¶¶ 15, 57, 92, 136. Here, Ms. Gurung alleges that MSC's and Forexware's software products were defective because of such features, which allowed for the falsification of trading account balances, and for failing to warn MT5 users of such misuse by illegitimate brokers. *Id*. For similar reasons, Section 230 does not shield Moving Defendants from liability for claims that arise from their other conduct, such as MSC's alleged breach of its representation not to receive "COMMISION BASED PAYMENTS," and MSC's recklessness in enabling fraudulent trading account balances and in listing illegitimate brokers indistinguishably alongside legitimate brokers within MT5. Compl. ¶¶ 71, 104. None of the cases cited by MSC and Forexware apply here to their independently defective or wrongful software or conduct. *See* MSC Br. at 15–17; Forexware Br. at 23–24. For example, unlike *Demaree v. Castro*, No. 22 Civ. 8772, 2023 WL 6465881, at *11 (S.D.N.Y. Oct. 4, 2023), which dismissed a RICO claim against an "internet service provider," here the RICO claims arise from Moving Defendants' enabling fraudulent trading account balances, licensing brokers, and creating for customer usage broker lists that include illegitimate brokers. Compl. ¶¶ 71–72.

## IV.    MS. GURUNG'S RICO CLAIMS ARE ADEQUATELY PLEADED.

To state a claim for a RICO violation, a plaintiff must show "(1) a violation of the RICO statute, 18 U.S.C. § 1962; (2) an injury to business or property; and (3) that the injury was caused the violation of Section 1962." *Liberty Mut. Ins. Co. v. Blessinger*, No. 06 CV 391, 2007 WL 951905, at *9 (E.D.N.Y. Mar. 27, 2007). To establish a violation of Section 1962(c), "a plaintiff must show (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *DeFalco*, 244 F.3d at 306. Section 1962(d) makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." 18 U.S.C. § 1962(d).

### A.    Moving Defendants Were Part of a RICO Enterprise.

*Association-in-Fact.* An "association-in-fact" enterprise is a 'group of persons associated

together for a common purpose of engaging in a course of conduct,' the existence of which is proven 'by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit.'" *First Cap. Asset Mgmt. v. Satinwood, Inc.*, 385 F.3d 159, 173 (2d Cir. 2004) (quoting *United States v. Turkette*, 452 U.S. 576, 581-82 (1981)); *see also* 18 U.S.C. § 1961(4). Association-in-fact enterprises "must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009).[4] As Forexware concedes in its Motion, *Boyle* "establish[es] a low threshold for pleading such an enterprise." Forexware Br. at 8. Ms. Gurung meets this low burden because she plausibly alleges the pig butchering enterprise ("Pig Butchering Enterprise" or the "Enterprise") was established so that Defendants with different capacities could contribute to an international fraud intended to target and injure victims like Ms. Gurung. Compl. ¶¶ 61–63, 69–74. Thus, Ms. Gurung satisfies *Boyle*'s standard.

  ***Common Purpose.*** To satisfy the "common purpose" feature, a plaintiff must demonstrate that the defendants comprising the enterprise "share a common purpose to engage in a particular fraudulent course of conduct and work together to achieve such purposes." *New York v. United Parcel Serv., Inc.*, No. 15-cv-1136, 2016 WL 4203547, at *3 (S.D.N.Y. Aug. 9, 2016) (quoting *First Cap.*, 385 F.3d at 174). The Complaint plainly alleges that each of the Defendants was motivated by a common purpose: "to defraud and profit off of unsuspecting victims [eager] to make substantial returns on investment in the cryptocurrency and commodities markets." Compl. ¶ 62. As described below, *see infra* p. 20, each Defendant utilized its distinct skills in furtherance

---

[4] In *Boyle v. United States*, the Supreme Court expressly rejected the outdated association-in-fact standard referenced by Forexware, Br. at 7, explaining that there "was no basis in the language of RICO" to require a plaintiff to demonstrate that an association-in-fact enterprise has other characteristics like hierarchy, organization, or regular activities. 556 U.S. at 948.

of this objective. Forexware's conclusory argument that Ms. Gurung failed to allege "even a colorable claim of 'common interest,'" *see* Forexware Br. at 11, only attacks the veracity of the pleadings, which are accepted as true on a motion to dismiss. *United States v. Gershman*, 31 F.4th 80, 96 (2d Cir. 2022); *see also Boyle*, 556 U.S. at 944 (RICO enterprise is "expansive" concept; it does not require "hierarch[y]," a "chain of command," "fixed roles," a "name," "established rules," "disciplinary procedures," or "ceremonies") (quotation omitted).

*Relationships Among Defendants.* To satisfy the "relationships" feature, a plaintiff "must demonstrate the relationships between the various members and their roles in the purported RICO scheme." *United Parcel Serv., Inc.*, 2016 WL 4203547, at *3. Throughout, the Complaint explains how each Defendant, including Moving Defendants, are related to one another and used their unique skillsets to complete the fraudulent scheme. The Complaint alleges that: Forexware and MSC contract with each other and created the software tools necessary to defraud investors; MSC vetted and listed the Criminal Brokers on MT5; Criminal Brokers coordinate with John Doe to meet victims; and that John Doe lured Ms. Gurung to use MT5, the Plug-In, and transact with Criminal Brokers. *See supra* pp. 4–5. These explanations are sufficient to satisfy the "relationships" prong of the *Boyle* test. *See, e.g.*, *Automated Teller Mach. Advantage LC v. Moore*, No. 08 Civ. 3340, 2009 WL 2431513, at *7 (S.D.N.Y. Aug. 6, 2009) (describing groups of defendants who acted in different capacities such as "front-men" and those who transmitted fraudulent reports was adequate).

Forexware suggests that Ms. Gurung fails to allege an association-in-fact enterprise because she failed to allege that Forexware had relationships with Defendants other than MSC. Forexware MTD at 9. But Forexware cites no decisions requiring each RICO defendant to have a relationship with one another, nor could it. *Cf. United States v. Rastelli*, 870 F.2d 822, 828 (2d Cir.

1989) (stating that a defendant may agree to join a RICO conspiracy without knowing the identities of "all the other conspirators" and without "full knowledge of all the details of the conspiracy.").

**Longevity.** The Complaint also satisfies the "longevity" prong under the *Boyle* test because the Enterprise has operated for years for the primary purpose of engaging in the pig butchering scheme. Where an "enterprise is primarily engaged in racketeering activity, and the predicate acts are inherently unlawful, there is a threat of continued criminal activity, and thus open-ended continuity" sufficient to establish longevity. *See Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc.*, 187 F.3d 229, 242–43 (2d Cir. 1999). The Complaint alleges that the Pig-Butchering Enterprise exists for the purpose of defrauding individuals by wire fraud; accordingly, there is a threat of continued criminal activity and thus open-ended continuity. Compl. ¶¶ 62, 66.

Even if this Court were to find that the Enterprise primarily engages in legitimate business activity, Ms. Gurung could still demonstrate longevity by pleading some allegations "from which it may be inferred that the predicate acts were the regular way of operating that business, or that the nature of the predicate acts themselves implies a threat of continued criminal activity." *Cofacredit*, 187 F.3d at 243. Ms. Gurung was first targeted by the Pig-Butchering Enterprise in 2021, Compl. ¶ 27, and received messages from Criminal Brokers in furtherance of the enterprise's scheme as late as December 2022, *id*. ¶ 46. While Ms. Gurung does not know, specifically, how long the Pig Butchering Enterprise existed before she was targeted or the identities of many of the victims of the enterprise's racketeering activity, the Court may reasonably infer that it existed long before she entered its crosshairs. As early as 2014, MSC was sued for operating its trading platform in a manner that facilitated financial schemes like the one of which Ms. Gurung complains. *Id.* ¶ 136. The Plug-In, meanwhile, has been attributed to the financial frauds perpetrated on MSC's trading platform since as early as 2014. *Id.* ¶¶ 57, 92, 136. The Criminal Brokers, to the best of

Ms. Gurung's knowledge, are sham entities that exist solely for the purpose of defrauding victims like Ms. Gurung.

MSC attempts to rebut Ms. Gurung's position by arguing that the Complaint is merely "focused on a single scheme involving a single victim." MSC Br. at 20. That position, however, ignores the repeated references in the Complaint to the other victims of the Pig-Butchering Enterprise. Furthermore, each of the cases MSC cites is divorced from the facts set forth in the Complaint, and are readily distinguishable because, in each case, the plaintiff was the only person who could have been victimized by the alleged enterprise. *See* Compl. at p. 2–3; ¶¶ 55-57, 91. On the contrary, Ms. Gurung is one of potentially thousands of individuals who use the MT5 trading application, interact with the Criminal Brokers, or who may be contacted by the John Doe defendant who could fall victim to the Enterprise's ongoing scheme.

### B. Plaintiff Adequately Alleges that the Defendants Engaged in a Pattern of Racketeering Activity that Resulted in Dozens of Fraudulent Wire Transfers.

Wire fraud is one type of racketeering activity that may serve as a predicate act under the RICO statutes. 18 U.S.C. § 1961(1). To establish wire fraud, a plaintiff must show "(1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of wires to further the scheme." *United States v. Jabar*, 19 F.4th 66, 76 (2d Cir. 2021). A "pattern of racketeering activity" is demonstrable by a showing the defendant's "commission of two or more acts constituting a pattern of racketeering activity, directly or indirectly participated in an enterprise, the activities of which affected interstate or foreign commerce." *DeFalco*, 244 F.3d at 306. A plaintiff must also show that a defendant had sufficient fraudulent intent. *Moore v. PaineWebber, Inc.*, 189 F.3d 165, 173 (2d Cir. 1999).

The Complaint adequately pleads that Moving Defendants meet the three elements of wire fraud. The Complaint extensively details how the Pig-Butchering Enterprise operated a scheme to

defraud Ms. Gurung and victims like her. *See* Compl. ¶¶ 48–86; *Bascunan v. Elsaca*, 927 F.3d 108, 122 (2d Cir. 2019) (finding that a violation of the wire fraud statute is established when "(1) the defendant used domestic mail or wires in furtherance of a scheme to defraud, and (2) the use of the mail or wires was a core component of the scheme to defraud"). The object of each wire transfer solicited by the Criminal Brokers and concealed using MT5 and the Plug-In was to deprive Ms. Gurung of her and her family and friends' money. Compl. ¶¶ 16, 30, 38, 48, 51, 93–95, 116; *Ouaknine v. MacFarlane*, 897 F.2d 75, 81 (2d Cir. 1990) (noting allegations of scienter "are not subjected to the more exacting consideration applied to the other components of fraud"). The fraud was accomplished through dozens of wire transfers to cryptocurrency wallets maintained by the Criminal Brokers. Compl. ¶¶ 32–33, 55-56, 65, 73, 94–95; *In re Sumitomo Copper Litig.*, 995 F. Supp. 451, 456 (S.D.N.Y. 1998) (holding that Rule 9(b) does not require pleading "the temporal or geographic particulars").

In arguing that the Complaint fails to explain how each Defendant engaged in wire fraud sufficient to satisfy Rule 9(b), MSC Br. at 19; Forexware Br. at 14, Moving Defendants misstate Ms. Gurung's burden. It is "not necessary" to allege that a defendant "directly participated in . . . use of the wires" if the fraudulent wire transfers "were the foreseeable result of [the defendant's] acts." *United States v. Houlihan*, 332 F.2d 8, 13 (2d Cir. 1964). In particular, Rule 9(b) requires only that the plaintiff delineate, with adequate particularity in the body of the complaint, the specific circumstances constituting the overall fraudulent scheme. *Madanes v. Madanes*, 981 F. Supp. 241, 254 (S.D.N.Y. 1998); *Center Cadillac v. Bank Leumi Tr. Co. of N.Y.*, 808 F. Supp. 213, 229 (S.D.N.Y. 1992). The Complaint clearly does so. Ms. Gurung alleges that MSC and Forexware materially supported the Criminal Brokers' fraudulent wire transfers by permitting them to use MT5 and the Plug-In, which enabled the Criminal Brokers to manipulate Ms. Gurung's account

and conceal fraud. Compl. ¶ 62. The Complaint also states how the Criminal Brokers sent instructions to Ms. Gurung to "request a wallet address and send cryptocurrency to what she believed was her MT5 trading account." *Id.* ¶ 33. The Complaint then details dozens of fraudulent wire transfers that Ms. Gurung sent to the Criminal Brokers by wire. *Id.* ¶¶ 34-43. The Complaint thus states with sufficient particularity the predicate racketeering activities (wire transfers) for the Pig Butchering Enterprise, and that Moving Defendants enabled and profited from the racketeering activities.

### C.    The Complaint Demonstrates Moving Defendants' Fraudulent Intent.

The Second Circuit has recognized a "strong inference" of fraudulent intent, *Powers v. British Vita, P.L.C.*, 57 F.3d 176, 184 (2d Cir. 1995), may be inferred from the scheme itself "when the necessary result of the scheme is to injure others." *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999) (quotations and alterations omitted) (wire fraud) (quoting *United States v. D'Amato*, 39 F.3d 1249, 1257 (2d Cir. 1994) (mail fraud)). MSC and Forexware's fraudulent intent can be inferred here because the necessary result of these pig butchering scams was to cause unsuspecting victims such as Ms. Gurung's to suffer direct and actual damages. Compl. ¶ 149.

A complaint successfully alleges fraudulent intent by either "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Allstate Ins. Co. v. Lyons*, 843 F. Supp. 2d 358, 373 (E.D.N.Y. 2012) (quoting *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290–91 (2d Cir. 2006)). The Complaint adequately pleads that both MSC and Forexware acted with conscious misbehavior by continuing to operate and distribute MT5 and the Plug In without providing necessary warnings to consumers or conducting proper due diligence on brokers despite their awareness of the persistent pig butchering scams on their trading platform. Compl. ¶¶

71, 91, 136.[5]

To avoid liability, MSC mischaracterizes Ms. Gurung's assertions and misleads this Court by arguing that Ms. Gurung advances one mere "conclusory assertion" that MSC "intended to engage in wire fraud." MSC Br. at 19. But MSC's argument cherry-picks one phrase from nearly a page-length paragraph explicitly detailing MSC's support of the predicate racketeering acts. Compl. ¶ 71. In exchange for its participation, Ms. Gurung alleges that MSC received commissions from the Criminal Brokers upon the completion of the fraud. *Id.* ¶ 78.

Similarly, Forexware resorts to a slippery slope noting that it could be substituted with various other companies to the same result in the Complaint. Forexware Br. at 10. But Forexware never contends with the fact of the Plug In's continued contribution to MT5, Compl. ¶ 57, and its knowledge of the pervasive criminal activity by MT5 and the Plug In. The Complaint has adequately pointed out the distinction between entities and also explains the difference between Moving Defendants and internet service providers. *Id.* ¶ 72. General internet service providers transfer information without any modification, and without intent to defraud. In contrast, MT5 provides financial services, and as explained above in Part III, includes content created and modified by Moving Defendants, including the list of brokers create by MSC. Compl. ¶¶ 58, 71, 91–92. Moreover, a defendant may even agree to join a RICO conspiracy without knowing the identities of "all the other conspirators" and without "full knowledge of all the details of the conspiracy." *Rastelli*, 870 F.2d at 828. To perpetuate the pig butchering scam, MT5, through Forexware's contribution, provides essential features for illegitimate entities to manipulate user account balances. Compl. ¶ 78. Additionally, MT5 facilitates the display of falsified balances and

---

[5] These allegations also provide circumstantial evidence of fraudulent intent. *See Plumbers & Pipefitters Nat'l Pension Fund v. Tableau Software, Inc.*, No. 17 CV 5753, 2019 WL 2360942, at *6 (S.D.N.Y. Mar. 4, 2019) (citing *Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000)).

brokers to victims through their MT5 trading accounts. *Id.* ¶ 91. The falsified balances and brokers, displayed without warning by MSC and Forexware of known harmful activity on the trading platform, progresses the scheme by creating an illusion of gains and attracting continued investments by victims. *Id*. ¶¶ 57, 90.

Relying on *Flexborrow LLC v. TD Auto Fin. LLC*, 255 F. Supp. 3d 406, 421 (E.D.N.Y. 2017), and *Brookdale Univ. Hosp. & Med. Ctr. v. Health Ins. Plan*, Civ No. 07-1471, 2009 WL 928718, at *6, Forexware also attempts to contend that a "generalized profit motive" is insufficient to substantiate fraudulent intent. *See* Forexware Br. at 13, 15. This is not accurate. While courts have rejected generalized profit motive in pleading scienter, scienter is adequately plead by allegations that a misrepresentation enabled a defendant to individually "secur[e] a specific, highly profitable … business opportunity." *Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60, 95–96 (S.D.N.Y 2015). Misrepresentations regarding MT5 and the Plug-In generated profit for Moving Defendants, who knew those misrepresentations were linked to pervasive fraud. Compl. ¶¶ 51, 58, 71, 136. Thus, Moving Defendants' business model profits from licenses granted to pig butchering scammers, demonstrating a specific and concrete financial motive.

### D.    Ms. Gurung Adequately States RICO Conspiracy Claims.

To establish a RICO conspiracy claim, a plaintiff must allege that the defendant "agree[d] to conduct or to participate in the conduct of [an] enterprise's affairs through a pattern of racketeering activity." *United States v. Zemlyansky*, 908 F.3d 1, 11 (2d Cir. 2018) (quoting *United States v. Pizzonia*, 577 F.3d 455, 462 (2d Cir. 2009)). "A conspirator must intend to further an endeavor which, if completed would satisfy all of the elements of a substantive criminal offense[.]" *Salinas v. United States*, 522 U.S. 52, 65 (1997).

Both MSC and Forexware argue that Ms. Gurung has failed to state RICO conspiracy claims against them because Ms. Gurung failed to substantiate a substantive RICO offense. MSC

Br. at 19; Forexware Br. at 15–16. Forexware goes on to argue that Ms. Gurung has failed to plead that Forexware "agreed" to commit at least two predicate racketeering acts. Forexware Br. at 16. The Supreme Court, however, has made clear that the plaintiff need not prove that the defendant himself agreed that he would commit two or more predicate acts. *See Salinas* 522 U.S. at 65 (1997)); *see also United States v. Ciccone*, 312 F.3d 535, 542 (2d Cir. 2002) ("[A] conspirator charged with racketeering conspiracy need not commit or even agree to commit the predicate acts . . . to be found [liable] for the racketeering conspiracy, for it suffices that he adopt[ed] the goal of furthering or facilitating the criminal endeavor."). As described above, Ms. Gurung has adequately pleaded that the Pig Butchering Enterprise was engaged in a substantive RICO violation, and that Moving Defendants both adopted the goal of the enterprise: to defraud victims of their money. *See supra* pp. 4–5. For the reasons described above, Ms. Gurung adequately pled Moving Defendants violated RICO.

## V.    IF THIS COURT DISMISSES MS. GURUNG'S RICO CLAIMS, IT MAY STILL ASSERT SUPPLEMENTAL JURISDICTION OVER STATE LAW CLAIMS.

28 USC § 1367(c) allows a court to determine whether it will "exercise supplemental jurisdiction over a claim if . . . the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. 1367(c)(3). The discretionary language of the statute "permits the district court to weigh and balance several factors, including considerations of judicial economy, convenience, and fairness to litigants." *Purgess v. Sharrock*, 33 F.3d 134, 138 (2d Cir. 1994) (citing *Castellano v. Bd. of Trs.*, 937 F.2d 752, 758 (2d Cir. 1991). Several courts in this circuit have exercised supplemental jurisdiction even after the federal claim has been dismissed at an early stage of the litigation because they are "not willing to defeat the common sense policy of pendent jurisdiction—the conservation of judicial energy and the avoidance of multiplicity of litigation— by a conceptual approach that would require jurisdiction over the primary claim at all stages as a

prerequisite to resolution of the pendent claim." *Philatelic Found. v. Kaplan*, 647 F. Supp. 1344, 1348 (S.D.N.Y. 1986) (retaining pendent jurisdiction over state law claims even after granting defendant's motion to dismiss plaintiff's RICO claim) (internal citation omitted).

Here, even if the RICO claim is dismissed from the case at the motion to dismiss stage, the Court may still exercise discretion in hearing Ms. Gurung's state law claims. Like *Philatelic*, where substantial time and energy had been expended and where "judicial economy, convenience, and fairness to litigants would be disserved by dismissal" of the supplemental claims, jurisdiction of the state law claims were retained. *Id.* Thus, this Court should exercise the discretion granted to it under 28 USC § 1367 and retain jurisdiction over Ms. Gurung's state law claims even if her RICO claims are dismissed.

## VI.    PLAINTIFF ADEQUATELY PLEADS EACH OF THE STATE LAW CAUSES OF ACTION.

### A.    Ms. Gurung's Fraud and Conspiracy to Commit Fraud Claims Meet the Requirements of FRCP 9(b)

#### 1.    Fraud (Count III)

Ms. Gurung successfully pleads claims of fraud in her Complaint with sufficient particularity to satisfy Rule 9(b). Under New York law, to plead fraud, a plaintiff must allege "(1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation; and (4) the plaintiff suffered damage as a result of such reliance." *Duafala v. Globecomm Sys. Inc.*, 91 F. Supp. 3d 330, 338 (E.D.N.Y. 2015). Fraud claims must be pled with particularity under Rule 9(b). *Id.* Moving Defendants both primarily challenge whether the Complaint sufficiently pleads a material false representation, but raise separate secondary arguments with respect to reliance (MSC) and intent to defraud (Forexware). Ms. Gurung sufficiently pleads each element.

***Material False Representations.*** Ms. Gurung sufficiently pleads this element with

particularity under Rule 9(b) because she specified the misleading statements, speaker, time, place, individuals involved, and specific conduct at issue. *Hughes v. Ester C Co.*, 930 F. Supp. 2d 439, 474 (E.D.N.Y. 2013). In particular, and contrary to Moving Defendant's arguments, Ms. Gurung also alleges MSC's broker list was materially misleading because it included illegitimate entities purportedly vetted and licensed by MSC. Compl. ¶ 33, 53, 90; *See Tropical Sails Corp. v. Yext, Inc.*, No. 14 CIV. 7582, 2015 WL 2359098, at *6 (S.D.N.Y. May 18, 2015) (finding fraud claim adequately pled by (1) specifying defendant's website showed "Location Data Errors" when plaintiff conducted a search for its business and (2) explaining the "Location Data Errors" were false because they actually meant plaintiff did not have an account with defendant). Ms. Gurung also explains that MSC and Forexware, through MT5 and the Plug In, falsely represented that the deposits Ms. Gurung made "were being used to fund her trading account because the corresponding balances were visible to her in the MT5 application" and that "MT5's interface showed each one of [Ms. Gurung's] transactions and alleged profit and loss values as provided by the MT5 platform" each time she used the application after creating an MT5 account in late 2021. Compl. ¶¶ 28–34, 57, 90.

 ***Intent to Defraud.*** Ms. Gurung adequately pleads intent to defraud. *Supra* pp. 24–26.

 ***Reasonable Reliance and Damages.*** The true test for fraud damages in New York is that they are the "direct and proximate cause of the claimed losses" and "might reasonably be expected to result from the reliance." *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, 87 A.D.3d 287, 29 (1st Dep't 2011) (concluding causation was established where mortgage lender misrepresented its "underwriting standards and guidelines" to insurer and "knowingly lent to borrowers who could not afford to repay their loans, [and] who committed fraud in loan applications"). Ms. Gurung adequately pleads that she relied on a list that included illegitimate brokers and also relied on falsified financial data on MT5 and the Plug In, which directly caused her $600,000 loss. *Supra* pp. 17–18.

Nonetheless, MSC argues Plaintiff could not have relied on its representations about brokers and account balances because they are contradicted by the EULA. MSC Br. at 21. However, New York does not allow parties to disclaim liability for intentional torts such as fraud. *Kalisch-Jarcho, Inc. v. City of New York*, 58 N.Y.2d 377, 385 (1983). Furthermore, besides broad and unenforceable attempts to waive its liability, none of the provisions in the two sections MSC relied on actually relate to the criminal activity of brokers on the platform or to the accuracy of Ms. Gurung's account balance. In the sole case MSC relies on for this argument, *Herrick v. Grinder, LLC*, 306 F. Supp. 3d 579, 596 (S.D.N.Y. 2018), the alleged representation was contained in the license agreement itself and was *directly contradicted* by other terms. *Id.* MSC also argues that it is "fatal" to Ms. Gurung's claims that her damages were caused by John Doe and the Broker Defendants, relying on *dicta* from *Warren v. John Wiley & Sons Inc*., 952 F. Supp. 2d 610, 623 (S.D.N.Y. 2013), a case where the court found plaintiffs stated no claim for fraud and did not plead any damages at all. MSC Br. at 22. Thus, Ms. Gurung's allegations are sufficient, and Moving Defendants' arguments are unavailing.

## 2.    Conspiracy to Commit Fraud (Count IV)

To plead conspiracy to commit fraud, a plaintiff must allege there was "(1) an agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a plan or purpose; and (4) resulting damage or injury." *Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*, 888 F. Supp. 2d 431, 451 (S.D.N.Y. 2012). The same facts underpinning Ms. Gurung's RICO claim also support her conspiracy to commit fraud claim. *Supra* pp. 18–27.

Forexware argues that the Complaint does not raise any overt act in furtherance of the conspiracy that it participated in. Forexware Br. at 20. However, a conspiracy charge does not require that each conspirator complete an overt act. Under New York law, "the liability of a defendant as a conspirator for co-conspirators' wrongful acts does not necessarily depend upon his

active participation the particular overt acts . . . [and] once a conspiracy is established, all defendants are liable for each other's acts in furtherance of the conspiracy." *Errant Gene Therapeutics, LLC v. Sloan-Kettering Inst. for Cancer Research*, 174 A.D.3d 473, 475 (1st Dep't 2019) (citations and quotations omitted). Even so, the Complaint alleges that Forexware develops software for the MT5 application "that are essential for illegitimate entities to manipulate user account balances and delay trading at prices more favorable to the illegitimate entities" and continued to provide this software despite its use by criminal organizations. Compl. ¶ 57.

### B. The Complaint States Claims for Breach of Contract and Breach of the Implied Covenant of Good Faith and Fair Dealing (Count V)

Mr. Gurung sufficiently pleads breach of contract and breach of the implied covenant of good faith and fair dealing. The elements of a breach of contract claim in New York are: (1) the existence of a contract, (2) performance by the party seeking recovery, (3) non-performance by the other party, and (4) damages attributable to the breach. *See Marks v. New York Univ.*, 61 F. Supp. 2d 81, 88 (S.D.N.Y. 1999) (citations omitted). As Ms. Gurung's pleading explains, she entered into the EULA with MSC. Compl. ¶ 104. Through this agreement, MSC "promised (1) to provide an explicit license agreement with any third-party software, and (2) that [MSC is] not 'INVOLVED DIRECTLY OR INDIRECTLY IN ANY COMMISSION BASED PAYMENTS CONCERNING ANY TRADING OPERATIONS WHATSOEVER.'" *Id*. Ms. Gurung further pleads "upon information and belief, [MSC] through the sale of labels and relationships with [Criminal] Brokers derive commissions from the [Criminal] Brokers." *Id*. Thus, MSC breached its agreement, causing actual damage to Ms. Gurung. *Id*. ¶¶ 104–05.

MSC does not dispute (1) the existence of a contract, (2) Ms. Gurung's performance, and (3) that MSC's breach damaged Ms. Gurung. MSC Br. at 22–23. MSC only argues that Ms. Gurung does not adequately plead breach, but it is wrong. First, MSC incorrectly argues that "the

EULA directly contradicts the allegations that MSC . . . received commissions from brokers." *Id.* at 22. But the terms of the EULA provide that MSC will not be "INVOLVED DIRECTLY OR INDIRECTLY IN ANY RESPECT IN ANY COMMISSION BASED PAYMENTS CONCERNING ANY TRADING OPERATIONS WHATSOEVER." Moreover, the EULA provides that "[t]he use of any … third party software or technology incorporated into the Product *shall fall under the scope of this Agreement*." Georgiades Decl. Ex. A, § 2.4. Ms. Gurung thus pleads breach of contract based upon MSC's promise to not receive commissions from brokers.

Second, MSC argues that it never promised "to provide an explicit license agreement with any third-party software." MSC Br. at 22. But MSC's argument ignores the EULA's provision that "[a]ny and all third party software or technology that may be distributed together with the Product will be subject to You, to explicitly accept a license agreement with that third party." EULA § 2.4. Under this provision, MSC thus promised to indicate or provide to the user the third party's terms. Yet MSC failed to do so.

Finally, MSC claims that the good faith and fair dealing claim "comprises the same conduct" as the breach of contract claim" but does not explain why this means the claim must be dismissed rather than kept as an alternative to the contract claim. MSC Br. at 22–23. Perfunctory arguments are waived where unaccompanied by developed arguments. *Tolbert v. Queens College*, 242 F.3d 58, 75 (2d Cir. 2001). The Court should deny MSC's motion for this reason alone.

## C.    The Complaint Adequately Pleads Unjust Enrichment against MSC Forexware

To establish a claim of unjust enrichment in New York, there must be (1) benefit to the defendant, (2) at the plaintiff's expense, and (3) equity and good conscience require restitution. *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 182 (2011). Ms. Gurung pleads that MSC and Forexware received a benefit from fees and commissions, which were paid by the Broker

Defendants from funds taken from Ms. Gurung. Compl. ¶¶ 51, 115-16. These fees enabled Moving Defendants to benefit from the pig butchering enterprise and resulted from their support to, and failure to conduct due diligence on, John Doe and the Broker Defendants, making it unfair for them to keep any benefit derived from such deposits. *Id.* ¶¶ 51, 116-118.

MSC argues that Ms. Gurung's claim for unjust enrichment should be dismissed because the EULA allegedly "bars an unjust enrichment claim." MSC Br. at 25 (citing *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 12 N.Y.3d 132, 274 (2009)). However, MSC fails to identify *how* the EULA bars the unjust enrichment claim, and is inherently contradictory with its breach of contract argument. MSC Br. at 22. In such a situation, claims for both breach of contract and unjust enrichment are proper as these theories are not mutually exclusive. *Goldman v. Simon*, 58 A.D.3d 208, 220 (2d Dep't 2008) ("[W]here there is a bona fide dispute as to the existence of a contract or the application of a contract in the dispute in issue, a plaintiff may proceed upon a theory of quasi contract as well as breach of contract."); *Henry Loheac, P.C. v. Children's Corner Learning Ctr.*, 51 A.D.3d 476 (1st Dep't 2008) (mem.) ("Plaintiff was not precluded from bringing an action for breach of contract and, as alternative theories, … unjust enrichment."). As MSC has disputed the scope of the contract, *see supra* pp. 6–11, its motion to dismiss the unjust enrichment claim must be denied.

### D.    MSC Owed—and Breached—a Duty of Care to Ms. Gurung.

The elements of a negligence claim based on a duty of care are: "[1] a duty owed to the plaintiff by the defendant, [2] a breach of that duty, and [3] injury [4] proximately resulting therefrom." *Moore Charitable Found. v. PJT Prs., Inc.*, 40 N.Y.3d 150, 157 (2023). Both Moving Defendants only challenge the first element, duty, which both incorrectly argue requires Ms. Gurung to show a "special relationship" with the defendants to support a negligence claim. MSC Br. at 23; Forexware Br. at 21. As a matter of New York law, this is incorrect. *Moore Charitable*

*Found.*, 40 N.Y.3d at 161 & n.4. "A critical consideration in determining whether a duty exists is whether the defendant's relationship with either the tortfeasor or the plaintiff places the defendant in the best position to protect against the risk of harm." *Davis v. South Nassau Cmtys. Hosp.*, 26 N.Y.3d 563, 572 (2015) (citation and quotation omitted).

Here, MSC operates MT5, which acts as an "electronic trading platform" that "allow[s] brokerage platforms to sell brokerage services to clients." Compl. ¶ 11. Courts have repeatedly recognized that both the parties and society reasonably expect such financial services to be provided with some level of care. *See Dubai Islamic Bank v. Citibank, N.A.*, 126 F. Supp. 2d 659, 667 (S.D.N.Y. 2000) (noting it was "true without question" that banks have a duty to "exercise reasonable skill and care in carrying out its activities for its customer" (citation omitted)); *Colo. Cap. v*, 227 F.R.D. 181, 188-89 (E.D.N.Y. 2005) (holding creditor card issuer owed duty of care in selecting debt collectors despite no agency relationship with collectors). Other than Apple App Store reviews, which were deceptively high, the public has no way of assessing the risk of using brokers on MT5's list. *See* Compl. ¶ 49. In contrast, through its licensing application, MSC is in a position to protect consumers by conducting diligence or at least indicating which brokers have been diligenced. Compl. ¶ 53. *See Davis*, 26 N.Y.3d at 579 (noting "'cost' of the duty imposed" would be "small" because it only consisted of providing warning).

Defendant MSC argues that the EULA "explicitly disclaims any duty of [MSC] and repeatedly warns about cautious use of the MT5 application." MSC Br. at 23. However, "in order for [a defendant] to effectively disclaim liability for its own negligence, it should have directly said so or used similar language that imports a disclaimer for its own negligence." *Com. Union Ins. Co. v. Blue Water Yacht Club Assn*., 239 F. Supp. 2d 316, 322 (E.D.N.Y. 2003). Language alerting consumers to the "dangers inherent in" the transaction and disclaiming any liability might

communicate that the business would "bear any responsibility for injuries that ordinarily and inevitably would occur," but not damages caused by the business's negligence. *Gross v. Sweet*, 49 N.Y.2d 102, 109–10 (1979); *Sivaslian v. Rawlins*, 88 A.D.2d 703, 704 (3d Dep't 1982) (clause in agreement saying plaintiff would "'release and hold harmless' the defendants 'of and from any and all manner of actions'" insufficient to waive negligence). The sections of the EULA that MSC refers to do not expressly disclaim "negligence" or liability that is "its own fault or when it fails to use reasonable care," and therefore it does not waive MSC's duty of care. *See Com. Union Ins. Co.*, 239 F. Supp. 2d at 322 (release of liability "irrespective of how the same is caused" insufficient to waive negligence claim).

MSC also claims that the fraud perpetrated by Criminal Brokers were "intervening acts" that relieve it of liability. MSC Br. at 23. However, "liability subsists when the intervening act is a natural and foreseeable consequence of a circumstance created by defendant." *Hain v. Jamison*, 28 N.Y.3d 524, 529 (2016) (citation and alterations omitted). Because MSC knew of prior misuse of its trading platform from a 2014 lawsuit, Compl. ¶ 136, it was highly foreseeable that criminals would exploit the lack of due diligence and the features of MT5 and the Plug In that allowed brokers to manipulate account balances, and thus the "very same risk that rendered [MSC] negligent . . . was, in fact, the risk that came to fruition." *Id.* at 533; *Carmona v. Sea Park E., L.P.*, 206 A.2d 965, 968 (2d Dep't 2022) (criminal act did not break proximate causation because "while the precise nature and manner of [the] crime could not necessarily have been anticipated" it was "foreseeable that some form of criminal conduct could occur" as a result); Compl. ¶ 136. Thus, MSC had a duty of care to Ms. Gurung.

### E. Both MSC and Forexware Breached Their Duty to Warn

Similarly, both Moving Defendants fail to show why, based on the injuries caused by the product they jointly developed and distributed, *see, e.g.* Compl. ¶ 11, 30, they should not be liable

for failing to warn Ms. Gurung about the criminal activity taking place on the MT5 application. The requirements of a failure to warn claim under either theory are that the "defendant (1) has a duty to warn (2) against the dangers resulting from foreseeable uses about which it knew or should have known, and (3) that failure to do so was the proximate cause of the harm."[6] *Whalen v. CSX Transp., Inc.*, No. 13 Civ. 3784, 2017 WL 4075200, at *3 (S.D.N.Y. Sept. 13, 2017) .[7]

Forexware claims to owe no duty to Ms. Gurung because it is "a provider of supplemental software for MT5" and has "no agreement or alleged direct contact with Plaintiff." Forexware Br. at 23. This is completely misguided. Failure to warn claims arise "even where no privity exists between the maker of the hazardous article and its end-user." *In re Eighth Jud. Dist. Asbestos Litig.*, 33 N.Y.3d 488, 495 (2019). The Complaint also specifically alleges that Forexware was more than a "provider of supplemental software" because its contributions to the MT5 application included the features that allowed the Broker Defendants to manipulate Ms. Gurung's account balance. *See* Compl. at 2; *id.* at ¶¶ 30, 57; *see In re N.Y.C. Asbestos Litig.*, 27 N.Y.3d 765, 778 (2016) (holding manufacturer responsible for failure to warn based on danger of using product in combination with third-party product").

As demonstrated above in Sections III–IV, *supra* pp. 15–27, the Complaint plausibly alleges that both Moving Defendants "knew or should have known" that illegitimate entities were using MT4 and MT5 to manipulate customers' account balances to perpetrate fraud. Forexware protests that the Complaint only discusses facts that would put MSC on notice of the fraud. Forexware Br. at 23. However, given their integral role in producing and maintaining the Plug In and their ongoing commercial relationship with MSC, it is plausible on the face of the Complaint

---

[6] Neither Moving Defendant appears to contest that Ms. Gurung would have heeded a warning or that their failure to warn was the proximate cause of her damages. *See Whalen*, 2017 WL 4075200, at *3.
[7] "Under New York law, failure-to-warn claims grounded in strict liability and negligence are functionally equivalent." *Whalen*, 2017 WL 4075200, at *3 (internal citation omitted).

that Forexware "should have known" about the fraud. *See, e.g.,* Compl. ¶¶ 48, 51, 57–58.

MSC relies on *Bocre Leasing Corp. v. General Motors Corp.*, 84 N.Y.2d 685 (2001) to argue that Ms. Gurung "contracted to take the MT5 application 'As is,' which dooms" her negligence claim, but that case is inapposite. MSC Br. at 23. That court concluded that a sophisticated business that had waived contractual warranty claims with an "as-is" clause when purchasing a used helicopter could not recover under tort for a product defect that only caused damage *to the product itself* because "damage to a product itself is most naturally understood as a warranty claim." *Bocre Leasing Corp.,* 84 N.Y.2d at 689. The court did not hold that such clauses waive tort liability where it already exists, such as here where Plaintiff claims damages that have nothing to do with "damage" to Forexware and MSC's product, including for emotional distress.

### F.    The Complaint Adequately Pleads Aiding and Abetting Conversion

Ms. Gurung adequately pleads aiding and abetting conversion. New York law permits a claim for aiding and abetting conversion where the plaintiff can prove "(1) the existence of a violation committed by the primary (as opposed to the aiding and abetting) party; (2) 'knowledge' of this violation on the part of the aider and abettor; and (3) 'substantial assistance' by the aider and abettor in achievement of the violation." *Dangerfield v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, No. 02 Civ. 2561, 2006 WL 335357, at *5 (S.D.N.Y Feb. 15, 2006).

Here, MSC does not contest that there was a violation by Criminal Brokers and Defendant John Doe. Instead, MSC claims that the "Complaint does not allege actual knowledge or substantial assistance with any particularity." MSC Br. at 25. To the contrary, Ms. Gurung alleges that MSC knew of the conversion and how their platform was being used to enable it, and thereby substantially supported conversion. Compl. ¶ 18, 49, 136; *see also supra* pp. 15–18. These allegations make it plausible that MSC had actual knowledge that MT5 brokers were engaged in criminal schemes amounting to conversion on their platform.

### G. Defendants Cannot Escape Liability for Violating New York Deceptive Practices and False Advertising Law

Ms. Gurung has adequately pled violations of the New York Deceptive Practices Act. Under NYGBL § 349, plaintiffs must plead that "(1) the defendant's challenged acts or practices must have been directed at consumers, (2) the acts or practices must have been misleading in a material way, and (3) the plaintiff must have sustained injury as a result." *Cohen v. JP Morgan Chase & Co.*, 498 F.3d 111, 126 (2d Cir. 2007). Additionally, "[t]he standard for recovery under General Business Law § 350, while specific to false advertising, is otherwise identical to Section 349." *Goshen v. Mut. Life Ins. Co. of N.Y.*, 98 N.Y.2d 314, 324 n.1 (2002). As explained above, MSC and Forexware engaged in a customer-oriented business that allowed illegitimate brokers to purchase licenses and falsify data on MT5 using the Plug In to defraud MT5 users. *See* Compl. ¶¶ 147–49, 153; *see also supra* pp. 15–18.

MSC erroneously argues that Ms. Gurung did not identify "any misleading practice or specific advertisement by MSC underlying the claims, much less articulate[d] why any such advertisement or practice has a 'broader impact on consumers at large.'" MSC Br. at 24. But MSC ignores Ms. Gurung's allegations that MSC (1) displays a list that includes illegitimate brokers and "display[s] account balances to end users [that] . . . gives its consumers false confidence that their assets are safe—all the while knowing that its platform is being used by illegitimate organizations to steal from its consumers," Compl. ¶¶ 15, 54–56, 148, 153; and (2) generally engages in "consumer-oriented conduct in offering services" including a provision of a list of illegitimate brokers, and "displaying account balances to end users . . . such as Plaintiff." Compl. ¶¶ 148, 153. MSC also protests that it is protected by the EULA, but nothing in the EULA shields MSC from falsely displaying information, such as a list that includes fake brokers, to unsuspecting customers. *See Goshen v. Mutual Life Ins. Co. of N.Y.*, 98 N.Y.2d 314, 326 (2002) (holding that

- 38 -

documentation including a product disclaimer "do not establish a defense as a matter of law" against §§ 349 and 350 claims). MSC's motion should be denied.

Forexware's arguments fare no better. Forexware Br. at 24–25. To establish MSC and Forexware's engagement in "consumer-oriented" conduct, Ms. Gurung need only allege that Forexware's actions could cause "consumer injury or harm to the public interest" that could "potentially affect similarly situated consumers." *Hawkins v. Coca-Cola Co.*, 654 F. Supp. 3d 290, 300 (S.D.N.Y. 2023). The principal case cited by Forexware, *Gale v. Smith & Nephew, Inc.*, 989 F. Supp. 2d 243, 250 (S.D.N.Y. 2013), concerned misrepresentations made to the Food and Drug Administration by a medical device manufacturer, which the court concluded was not "consumer-oriented" because it only involved "deceiv[ing] the FDA." It did not concern a case where a company's conduct directly deceived consumers (such as Ms. Gurung) through inputs in another company's products. Ms. Gurung sufficiently alleges a direct injury caused by both Moving Defendants, *see supra* pp. 15–27 and the Court should deny their motions.

## H.    The Complaint States a Claim for Negligent Infliction of Emotional Distress and Intentional Infliction of Emotional Distress

MSC fails to explain why the NIED claim against it should be dismissed. "[A] breach of a duty of care resulting directly in emotional harm is compensable even though no physical injury occurred." *Brown v. N.Y. Design Ctr., Inc.*, 215 A.D.3d 1, 9 (1st Dep't 2023). As demonstrated in Section VI.D above, MSC owed a duty of care to Ms. Gurung. Defendants also do not contest that she suffered psychological trauma resulting in a hospitalization. Compl. ¶ 45.

MSC misstates the standard for NIED claims, claiming that it must always involve "endanger[ing] the plaintiff's physical safety, or caus[ing] the plaintiff to fear for his or her own safety," omitting the beginning of the quoted passage which reveals the court was merely noting these are "*generally*" the basis for such a claim. *See Santana v. Leith*, 117 A.D.3d 711, 712 (2d

Dep't 2014); MSC Br. at 24. New York courts have long held that fear of physical injury is not required so long as the defendant owes a duty of care to the plaintiff. *See, e.g.*, *Johnson v. State of New York*, 37 N.Y. 2d 378, 383 (1975).

In the context of Ms. Gurung's IIED claim for sexual harassment and threats, MSC does not contest that John Doe's actions were extreme and outrageous, but contests that John Doe was acting as its agent. MSC Br. at 24–25. But, as discussed above, the Complaint alleges that MSC and Doe were members of a conspiracy to defraud Ms. Gurung and co-conspirators "are liable for each other's acts in furtherance of the conspiracy." *Errant Gene Therapeutics, LLC*, 174 A.D.3d at 475. It is reasonable to infer from the allegations in the Complaint that Doe's actions were taken to further the conspiracy by intimidating Ms. Gurung.

## **CONCLUSION**

For the foregoing reasons, Ms. Gurung respectfully requests that this Court deny the Moving Defendants' motions to dismiss in their entirety.


Date:   January 16, 2024                    Respectfully submitted,

                                                        */s/ Mark A. Cianci*
                                                        Mark A. Cianci
                                                        **ROPES & GRAY LLP**
                                                        Prudential Tower
                                                        800 Boylston Street
                                                        Boston, MA 02199-3600
                                                        Tel: (617) 951-7000
                                                        Fax: (617) 951-7050
                                                        Mark.Cianci@ropesgray.com

                                                        Shong Yin
                                                        **ROPES & GRAY LLP**
                                                        1900 University Avenue, 6th Floor
                                                        East Palo Alto, CA 94303
                                                        Tel: (650) 617-4000
                                                        Fax: (650) 617-4090
                                                        Shong.Yin@ropesgray.com

Karina Thomas
**ROPES & GRAY LLP**
2099 Pennsylvania Ave, NW
Washington, DC 20006
Tel: (202) 508-4600
Fax: (202) 508-4650
Karina.Thomas@ropesgray.com

*Counsel for Plaintiff Anjita Gurung*

# ADDENDUM

**FILED**

Superior Court of California
County of Los Angeles

**JAN 02 2024**

David W. Slayton, Executive Officer/Clerk of Court

By: A. Morales, Deputy

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| AMY NEVILLE; AARON NEVILLE; JAIME PUERTA; MARIAM HERNANDEZ; CINDY CRUZ-SARANTOS; BRIDGETTE NORRING; JAMES MCCARTHY; KATHLEEN MCCARTHY; SAMANTHA MCCARTHY; MATTHEW CAPELOUTO; CHRISTINE CAPELOUTO; PERLA MENDOZA; SAMUEL CHAPMAN; DR. LAURA ANN CHAPMAN BERMAN; JESSICA DIACONT; E.B.; AND P.B., | Case No.: 22STCV33500<br><br>ORDER SUSTAINING IN PART AND OVERRULING IN PART DEFENDANT'S DEMURRER TO PLAINTIFFS' SECOND AMENDED COMPLAINT |
| Plaintiffs,<br><br>v.<br><br>SNAP, INC.,<br><br>Defendant. | Hearing Date: October 18, 2023<br>Hearing Time: 11:00 a.m.<br>Dept.: 7 |

Plaintiffs assert[1] that the conduct of defendant Snap, Inc. ("Snap"), a social media company, has resulted in the foreseeable deaths of (and a serious personal injury to) their children. The law of the State of California provides, or should provide, them with a

_____

[1] Six other cases, asserting similar claims, are related, and assigned to this department.

- 1 -

1    remedy for their alleged losses, they say. Snap disagrees. Snap claims that none of
2    plaintiffs' allegations, even if true, constitute a "cause of action." Alternatively, Snap
3    claims that for one or more other reasons apparent from the face of plaintiffs' operative
4    complaint, their lawsuit should be dismissed. Now before the court is Snap's demurrer to
5    the operative complaint.

6        Both sides contend that the law is clear and the legal path forward obvious. Not
7    so. The depth of disagreement is revealed by the parties' inability jointly to label Snap's
8    social media presence and activities: "service," "app," "product", "tool," "interactive course
9    of conduct," "platform," "website," "software" or something else. What *is* clear and obvious
10   is that the law is unsettled and in a state of development in at least two principal regards:
11   (1) whether "section 230" (a federal statute) immunizes Snap from potential legal liability
12   under the specific allegations asserted and (2) whether concepts of strict products liability
13   — usually applicable to suppliers of tangible products — already do or now should extend
14   to specified alleged conduct of Snap.

15   **Overview of the Case**

16       Snap operates Snapchat, a social media app for smartphones that allows users to
17   send text, picture, and video messages, called "snaps," to other users. (Second
18   Amended Complaint (July 20, 2023) ("SAC") ¶ 19, 33.) Plaintiffs' SAC is voluminous and
19   detailed: 216 pages and 991 separately numbered paragraphs. Its tenor is captured in
20   the first paragraph:

21       This case is about a social media product, Snapchat, that has caused
22       thousands of American teens to die from fentanyl overdoses. Despite Snap
         promoting and portraying Snapchat as a "goofy" app for kids to use to send
23       each other silly pictures, its known common use is an "open air drug
24       market." As detailed below, Snap and Snapchat's role in illicit drug sales to
         teens was the foreseeable result of the designs, structures, and policies
25       Snap chose to implement increase its revenues. Worse, as the predictable
26       use of Snapchat for drug sales—and deaths from fentanyl poisoning—took
         off, Snap not only failed to make feasible changes to Snapchat to make the
27       app safer for kids, but it also engaged in a concerted corporate campaign
28       to delay and dissuade legal action. Snap falsely claimed it was taking
         meaningful and effective steps to protect kids and when using the app, lying
29       to regulators and to grieving parents.

- 2 -

1    Although Snap has not yet formally responded to the allegations, it is clear from its
2  demurrer papers that it vehemently denies them.  It asserts that it abhors the criminal
3  behavior of drug dealers who sold fentanyl to these minors; that it is on the frontlines to
4  stop drug dealers from engaging in this illegal conduct; that it has expended tremendous
5  financial and human capital resources to that end; and that it has worked closely and
6  cooperatively with law enforcement.  More generally it contends that it promotes and
7  protects user safety for its 390 million daily users, and specifies some of its practices and
8  policies in furtherance of that goal.  (Snap not only denies the allegations but seeks
9  monetary sanctions from plaintiffs' counsel for their allegedly asserting allegations that
10  they know are false — a motion the court has set out for hearing in the future.)

11         **Plaintiffs' Legal Claims**

12    Because this is a demurrer, which examines the legal sufficiency of *allegations*,
13  the court cites extensively to the SAC.  The SAC claims that plaintiffs are parents of
14  children who allegedly purchased illicit drugs from other Snapchat users.  The plaintiff
15  parents allege that unknowingly, their children purchased drugs that contained fentanyl,
16  a synthetic opioid that can be lethal in small doses.  (SAC, ¶ 24.)  Except for A.B., the
17  child of plaintiffs E.B. and P.B., who survived a near-fatal fentanyl overdose, plaintiffs'
18  children died of fentanyl poisoning after ingesting the drugs they obtained from other
19  Snapchat users.  (*Id.* at ¶ 17.)

20    According to plaintiffs: Snapchat is specifically chosen by children, teens and
21  young adults for drug distribution because of how Snap designs, markets, distributes,
22  programs and operates Snapchat (SAC, ¶ 2); Snapchat's many data-deletion features
23  and functions made it foreseeable, if not intended, that Snapchat would become a haven
24  for drug trafficking (*Id.* at ¶ 3); the combination of practices and multiple features Snap
25  chose to build into its Snapchat product—such as ineffective age and identify verification,
26  facilitating easy creation of multiple, fake accounting, connecting kids with strangers and
27  drug dealers "in-app" through the "quick add" features and a live mapping feature makes
28  Snap an inherently dangerous product for young users (*Id.* at ¶ 13); Snap was on notice
29  that Snapchat was facilitating an enormous number of drug deals (*Id.* at ¶ 14); Snap

- 3 -

1  knowingly aided and abetted drug distribution to kids through its platform (*Id.* at ¶ 15);
2  fentanyl is highly toxic, is widely abused and has resulted in about 175 deaths per day in
3  the United States (*Id.* at ¶¶ 23-32); Snapchat has evolved into a digital open-air drug
4  market, Snap has targeted minor users and misrepresented the safety of Snapchat, and
5  Snapchat is a "product" (*Id.* at ¶¶ 33-88); Snap has ineffective age verification and
6  parental controls, Snapchat's automatic message deletion feature facilitates illicit drug
7  sales and is unreasonably dangerous, Snapchat's screenshot notification and blocking
8  features discourage reporting illicit drug sales and are unreasonably dangerous,
9  Snapchat's "quick add" feature facilitates drug dealers' targeting of minors with drug
10  menus and solicitations and is unreasonably dangerous, Snapchat's "stories" feature
11  facilitates drug dealers' engagement with minors and is unreasonably dangerous,
12  Snapchat's "snap map" feature provides drug dealers with unique tools to evade detection
13  and is unreasonably dangerous, Snapchat's reporting mechanisms are defective, and
14  Snapchat's "my eyes only" feature facilitates illicit drug sales and is unreasonably
15  dangerous because it serves as a self-destructing vault to evade law enforcement (*Id.* at
16  ¶¶ 89-182); Snap relies on misleading messaging and attempts to spin, control, and
17  manage public outrage on Snapchat's status as an open-air drug market, Snap's role in
18  the drug trade has been reported to Snap within the media and law enforcement since at
19  least 2017, Snap ignored years' worth of grieving parents' warnings and requests for
20  product modifications, Snap convinced grieving parents that they had no legal recourse,
21  rather than make meaningful changes to its product, Snap pursued a more than two year
22  strategy of false assurances and misdirection (*Id.* at ¶¶ 183-268); Snap's re-direction
23  product modifications are ineffective (*Id.* at ¶¶ 269-276); and Snap actively frustrates law
24  enforcement efforts to prosecute criminals who sell illegal drugs on Snapchat (*Id.* at ¶¶
25  277-290). Plaintiff-specific allegations are found in the SAC at paragraphs 299 through
26  719.
27
28
29

Plaintiffs disavow[2] any claim based upon Snap's activities as a publisher of the third-party (drug seller) content. That is, plaintiffs do not contend that Snap is liable for failing to eliminate or otherwise moderate some or all of the third-party drug sellers' content. Instead, plaintiffs' sole focus, they say, is on (1) *Snap's* alleged independent tortious conduct and (2) Snapchat (a "feature-packed social media app.") as a defective *product*. (Plaintiffs' Opposition to Defendant Snap's Demurrer (Aug. 17, 2023) ("Opposition") 3.)

So focusing, plaintiffs assert:

Snap developed and launched Snapchat for the express purpose of encouraging and enabling lewd, illicit, and illegal conduct (SAC ¶¶ 54-61, 1342, 723, 893). Snap marketed and designed Snapchat to encourage and incentivize young users to engage in inherently risky behavior and in a manner that prevented them from appreciating and/or recognizing the risks Snap itself created (SAC ¶¶ 34, 41, 65-72, 134-139, 141-143, 145-149, 156-159, 162-168, 177-182, 246, 723, 885). Snapchat's artificial intelligence targets young users with drug advertisements (SAC ¶¶ 789, 146-158, 307-308, 324, 349-350, 382-383, 393, 414-415, 428, 444, 496-497, 529-531, 568-569, 603-605, 679-690) and affirmatively matches them to Snapchat drug dealers (SAC ¶¶ 49, 133-148, 245, 247, 307, 349, 382, 414, 418, 444, 496, 529, 568, 613, 626, 680, 687, 695, 705, 723, 911, 963). Snap designed features to ensure accessibility by minors even where parents object and attempt to keep their children away from Snapchat (SAC ¶¶ 48, 89-95, 102-112), prevents parents and law enforcement from being able to monitor and protect those children, and implements product changes and updates intended to render third party monitoring software ineffective (SAC ¶¶ 106-108, 121-122, 170-174, 196, 223, 457, 468, 533, 619, 642-643, 748, 942(b).) Finally, Snap knowingly assisted the drug dealers who flocked to Snapchat by designing several unique tools and mechanisms to destroy and otherwise prevent the preservation of data. (SAC ¶¶ 60, 114-116, 119-120, 125-126, 130, 297-298, 431, 452, 546, 577-579).

(Opposition, 3.)

Plaintiffs have "allege[d] more than 21 specific design defects including a defective age verification system, defective parental controls and reporting mechanisms, use of

---

[2] The sincerity, *vel non*, of their disavowal is not relevant. The issue is the legal sufficiency of plaintiffs' allegations, not their intentions. Footnote seven, below, comments on "artful pleading" and "*Lemmon*-lingo."

inherently dangerous products in connection with minor users, creating and sending harmful notifications and communications, defective data retention policies or cooperate [*sic*, "cooperation?"] with parents and law enforcement, the random and/or discriminatory matchmaking between minors and adult strangers, defective system for implementing limits on product downloads and account usage, and more.  (SAC ¶¶ 293-296, 731-754, 790, 869-870.)"  (Opposition, 13.)  Plaintiffs allege that Snapchat was also defective due to inadequate warnings.  (SAC ¶¶ 104-105, 112, 143, 160-166, 177, 221, 263, 271-272, 294, 761-781.)

––––––––

Plaintiffs state their legal claims and theories in the form of 16 "counts," thus warranting a comment on vocabulary.  To be sustained, a demurrer must dispose of the entire complaint or an entire "cause of action."  (Code Civ. Proc., § 430.50, subd. (a); *Fremont Indemnity Co. v. Fremont General Corp.* (2007) 148 Cal.App.4th 97, 113.)  A challenge to less than an entire cause of action in a pleading must be made by a motion to strike, not demurrer.  (*Olson v. Hornbrook Community Services Dist.* (2019) 33 Cal.App.5th 502, 522, fn. 9.)  Unlike our colleagues in the federal courts, California state court judges have no "line-item veto" of allegations on a demurrer.

Snap has made no motion to strike.

There is diversity of language commonly used in the California Superior Court to describe a plaintiff's claim for relief and confusion surrounds the terms "cause of action" and "counts."  (*Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Ins. Co.* (1993) 5 Cal.4th 854, 860, fn.1 [terms "cause of action" and "counts" often used "imprecisely and indiscriminately"].)  Technically, a cause of action refers to a "primary right" of a plaintiff, a corresponding "primary duty" of a defendant, and a wrongful act by the defendant constituting a breach of that duty.  (*Mycogen Corp. v. Monsanto Co.* (2002) 28 Cal.4th 888, 904.)  A cause of action is to be distinguished from both the relief sought (e.g., specific performance vs. damages) and "the legal theory on which liability for that injury is premised: Even where there are multiple legal theories upon which recovery may be

- 6 -

predicated, one injury gives rise to one claim for relief." (*Ibid.,* emphasis and internal quotes omitted.)  The distinction — legal theory versus true cause of action — matters when it comes to applying rules of claim preclusion, motions for summary adjudication, and, as noted, demurrers.

In practice, parties often use "cause of action" or "count" to describe a legal theory even though multiple "counts" stating various legal theories may all be directed to the same "cause of action."  (Edmon & Karnow, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2023) ¶ 6:107.)  For example, California recognizes a cause of action for wrongful death, which may be pursued, based upon the facts, under legal theories ("counts") of negligence or strict product liability.

Here, plaintiffs purport to assert 16 counts. (SAC, ¶¶ 720-991.)  The court understands plaintiffs intend to describe by each count a separate legal theory relating to one or more true causes of action.  Snap appears to share that understanding as its demurrer is asserted to each such count (which Snap calls a cause of action.)  The court will employ plaintiffs' language (and will substitute Arabic for Roman numerals).  Plaintiffs' counts are:

Count 1: Strict product liability (design defect)

Count 2: Strict product liability (failure to warn)

Count 3: Risk benefit test (defective design)

Count 4: Negligence (design defect)

Count 5: Negligence (failure to warn)

Count 6: Negligence

Count 7: Negligence per se

Count 8: Tortious interference with parental rights

Count 9: Public nuisance

Count 10: Aiding and abetting

Count 11: Fraudulent concealment and misrepresentation

Count 12: Fraudulent misrepresentation

Count 13: Negligent misrepresentation

1    Count 14: Wrongful death

2    Count 15: Survival action

3    Count 16: Loss of consortium and society

4        Plaintiffs seek compensatory and punitive damages and declaratory and injunctive

5    relief. It appears to the court that the SAC actually asserts three causes of action in the

6    technical sense: wrongful death, personal injury, and public nuisance. And it alleges

7    multiple legal theories ("counts") applicable to one or more of the causes of action, several

8    of which are sub-species of negligence and fraud. As the court understands it, "aiding

9    and abetting" is neither a cause of action nor an independent legal theory, but a method

10   of extending and imposing liability upon an entity for the acts of another. (CACI No. 3610.)

11   The court understands the count denominated "loss of consortium and society" to be a

12   purported cause of action applicable to spouses, not parents, although a parent asserting

13   a wrongful death action may seek, as a species of damages, "loss of society" of a

14   deceased minor child. (CACI Nos. 3920, 3922.) The claim for "tortious interference with

15   parental rights" is asserted under Virginia law (Opposition, 33), and is discussed further

16   below.

17   **The Nature of a Demurrer**

18       A demurrer is not in any sense a test of the truth of any allegation or denial. Should

19   the case proceed, there are other phases of the proceedings where the truth or falsity of

20   allegations and denials are tested — principally trial, where the parties have the

21   opportunity to present to a factfinder information that meets the strictures of the Evidence

22   Code.

23       The demurrer proceeding is far more limited. A demurrer raises one or more of

24   eight potential legal objections to a pleading. The grounds for the objection must "appear[]

25   on the face" of the complaint or "from any matter of which the court is required to or may

26   take judicial notice." (Code Civ. Proc., §§ 430.10, 430.30, subd. (a).) Less abstractly, a

27   demurrer asks: assuming for argument that all of the factual allegations *are* true, do those

28   allegations constitute a "cause of action" — meaning, do they allege an invasion of a

29   legally protected interest for which the law, under one or more legal theories asserted,

1    provides appropriate relief? If so, the case proceeds. If not, normally the court provides
2    an opportunity for the plaintiffs to make additional or different allegations ("leave to
3    amend") if the plaintiffs request. Otherwise, the court dismisses some or all of the case.

4         Here, however, plaintiffs have made clear they do not seek leave to amend should
5    the court find Snap's demurrer, or any part of it, has merit. They choose to stand on their
6    pleading.

7         In assuming the truth of the allegations of the SAC for the analysis of the demurrer,
8    the court does not employ a "plausibility" test as would be the case in federal court under
9    the analogous procedure to test the sufficiency of allegations in a complaint. (*Bell Atlantic*
10   *Corp. v. Twombly* (2007) 550 U.S. 544, 556-557; *Ashcroft v. Iqbal* (2000) 556 U.S. 662,
11   678-679 [district court disregards legal conclusions, determines whether factual
12   allegations "plausibly give rise to an entitlement for relief"].) Instead, under California
13   procedure, "[a]s a general rule in testing a pleading against a demurrer[,] the facts alleged
14   in the pleading are deemed to be true, however improbable they may be." (*Del E. Webb*
15   *Corp. v. Structural Materials Co.* (1981) 123 Cal.App.3d 593, 604.)

## ANALYSIS

### Snap's Section 230 Challenge

18        Snap demurs "[t]o all causes of action alleged in the SAC — which are based on
19   content created and exchanged by third parties — [and which] are barred as a matter of
20   law under Section 230 of the Communications Decency Act." (CDA) (Snap's Demurrer to
21   Plaintiffs' Second Amended Complaint (Aug. 3, 2023) ("Demurrer") 2.) Snap invokes
22   section 230 of title 47 of the United States Code ("section 230"), a federal statute
23   promulgated in 1996 that has generated an extensive jurisprudence. Federal circuit
24   courts of appeal, federal district courts, and state courts, including California state courts,
25   have considered and applied section 230 in a variety of factual circumstances.

### What law must this court apply?

27        As a state court, this court is bound by the United States Supreme Court's
28   interpretation of federal statutes (*Mullaney v. Woods* (1979) 97 Cal.App.3d 710, 719), but
29

- 9 -

1   "the decisions of federal district and circuit courts, although entitled to great weight, are
2   not binding on state courts even as to issues of federal law." (*Alan v. Superior Court*
3   (2003) 111 Cal.App.4th 217, 229; *Felisilda v. FCA US LLC* (2020) 53 Cal.App.5th 486,
4   497.) By contrast, this court must apply a binding precedent of the California Court of
5   Appeal. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d. 450, 455-456.)
6   Likewise, the California Court of Appeal is bound by the California Supreme Court's
7   interpretation of federal questions in the absence of a contrary decision of the United
8   States Supreme Court and despite contrary holdings of other federal courts. (*People v.*
9   *Greenwood* (1986) 182 Cal.App.2d 729, 734.) But when appellate decisions of the
10  California Court of Appeal are in conflict, "the court exercising inferior jurisdiction can and
11  must make a choice between the conflicting decisions." (*Auto Equity*, at p. 456.)

12      The United States Supreme Court has not yet construed the immunizing reach of
13  section 230 with respect to the claims plaintiffs assert here, namely, (1) for the allegedly
14  tortious independent conduct of a social media company (independent, that is, of
15  "publishing" third-party conduct), and (2) for providing a defective social media platform
16  "product." As to the first, there was anticipation in early 2023 that the court would decide
17  whether section 230 immunizes social media platforms for the act of recommending third-
18  party content users. But it did not. "We therefore decline to address the application of
19  the section 230 to a complaint that appears to offer little, if any, plausible claim for relief."
20  (*Gonzalez v. Google LLC* (2023) 598 U.S 617, 622.)

21      **The statute**

22      Section 230(c)(1) provides:

23      Treatment of publisher or speaker: No provider or user of an interactive computer
        service shall be treated as the publisher or speaker of any information provided by
24      another information content provider.

25      These are, it has been famously (and at this point monotonously) said, "the twenty-
26  six words that created the internet." At least dozens if not hundreds of courts, academics,
27  and other commentators have by now explained that the provision was designed, in 1996,
28  to protect then-fledgling internet companies from incurring liability when millions of users
29

- 10 -

posted content and when the companies made moves to police that content.[3]  Much of the judicial and academic analysis has focused on an issue that is not involved in this case, namely, the potential liability of a social media company for its decision to remove or *not* to remove certain third-party content from its site.  It seems clear that such decisions are in the sweet spot of a traditional publisher's discretion and section 230 immunizes those decisions from tort liability.  Plaintiffs' theories here do not purport to hold Snap liable for failing to remove some or all of the drug sellers' third-party content from Snapchat.

Congress expressed its intention with respect to the preemptive effect of section 230 on state law with a classic "consistent/inconsistent" construct:

> Nothing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section.  No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.

(47 U.S.C. § 230(e)(3).)  This construct kicks back to the courts to decide whether a state's law including its tort common law is or is not consistent with section 230 — exactly what this court is doing now.

And Congress also expressed its five policy goals in enacting section 230 in subdivision (b):

> It is the policy of the United States—
> (1)    to promote the continued development of the Internet and other interactive computer services and other interactive media;
> (2)    to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation;

---

[3] A few examples from the enormous literature in the academic and popular press discussing the history and purpose of section 230 include an article by section 230's preeminent historian, Kossoff, *A User's Guide to Section 230, and a Legislator's Guide to Amending It (or Not)* (2022) 37 Berk. Tech. L.J. 757; Klapper, *Reading Section 230* (2022) 70 Buffalo L.Rev. 1237; Weintraub & Moore, *Section 230* (2020) 4 Geo. L. Tech Rev. 625; and Rozenshtein, *Interpreting the ambiguities of Section 230* (Oct. 26, 2023) Brookings Institute <bookings.edu/articles/interpreting-the-ambiguities-of-section-230/> (as of Dec. 26, 2023).

1
2
   (3)  to encourage the development of technologies which maximize user control over what information is received by individuals, families, and schools who use the Internet and other interactive computer services;

3
4
   (4)  to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material; and

5
6
   (5)  to ensure vigorous enforcement of Federal criminal laws to deter and punish trafficking in obscenity, stalking, and harassment by means of computer.

7
(47 U.S.C § 230(b).)[4]

8
### Construing the statute

9  What do the twenty-six words mean — specifically, to be "treated as a publisher or

10 speaker" — and how do they apply here?  Snap's demurrer advocates for the broadest

11 possible construction: it asserts that it is immunized from any claim "based on" the third-

12 party content.  "No matter how the claims are styled, if the alleged harm *flows from* the

13 content provided by third parties, Section 230 applies."  (Demurrer, 14, emphasis

14 supplied.)  Snap's "based on"/"flows from" test is a "but for" test; if the plaintiffs would

15 have no claim but for the presence of the drug sellers' third-party content on Snap's

16 platform, then section 230 immunizes Snap.  If Snap is correct, the court's work is done:

17
18

19   [4] These policy statements are in some tension.  A free market "unfettered by state
20 or federal regulation" is inconsistent with "vigorous enforcement of federal criminal laws."
21 The related policy goals of "removing disincentives for the development and utilization of
blocking and filtering technologies that empower parents to restrict their children's
22 access" and "encourag[ing] the development of technologies which maximize user control
over what information is received by individuals, families, and schools who use
23 the Internet" may be illusory if any "state or federal regulation" is off the table.  This tension
24 and other drafting oddities of the CDA may be attributable to the legislative genesis of the
final Telecommunications Act of 1996, of which the Communications Decency Act (and
25 section 230) was a part.  The congressional conference committee, faced with a Senate
26 version sponsored by Senator Exon and a House version sponsored by Representatives
Cox and Wyden, "rather than taking the logical step of choosing between the Exon and
27 Cox-Wyden proposals, included both provisions as part of a single 'Communications
28 Decency Act,' with the Cox-Wyden proposal as an added final section to Exon's original
legislation."  (Rozenshtein, *supra*, <bookings.edu/articles/interpreting-the-ambiguities-of-
29 section-230/> (as of Dec. 26, 2023).)

1  the demurrer must be sustained and the case dismissed because plaintiffs' claims surely
2  would not exist but for the presence of the drug sellers' content.

3         But Snap has cited no binding California authority so holding, and at least some
4  federal authority upon which Snap relies says otherwise.  The CDA does not declare "a
5  general immunity from liability deriving from third-party content." (*Barnes v. Yahoo!, Inc.*
6  (9th Cir. 2009) 570 F3d 1096, 1100) (*Barnes*).)  Moreover, it seems clear that a "but for"/
7  "based on"/"flows from" test is not consistent with a plain meaning analysis of the words
8  Congress chose to employ.  If Congress had intended to immunize all interactive
9  computer services from liabilities "based on" third-party content, there are straightforward
10 elocutions to express that intention.[5]  But that is neither what Congress did nor what
11 Congress could have done consistent with the policy statements in subdivision (b) of
12 section 230.  Instead, Congress chose to invoke words of art drawn from common law
13 defamation-liability distinctions between "publishers" and "speakers," on the one hand,
14 and, apparently, "distributors" on the other.

15        Again, why those words and why in 1996?

16        At common law, including in New York state in 1996, publishers were held to a
17 higher standard than distributors over defamatory or other illegal content on the theory
18 they did, or at least reasonably could, exercise editorial control.  Distributors, on the other

19

20 _____

21        [5] For example, see the clarity of Congressional intent regarding immunities for
22 firearm manufacturers in the Protection of Lawful Commerce in Arms Act, title 15 of United
   States Code, sections 7901-7903.  "A qualified civil liability action may not be brought in
23 any Federal or State court." (15 U.S.C. § 7902(a).)  A "qualified civil liability action" means
24 "a civil action or proceeding or an administrative proceeding brought by any person
   against a manufacturer or seller of a qualified product, or a trade association, for
25 damages, punitive damages, injunctive or declaratory relief, abatement, restitution, fines,
26 or penalties, or other relief, resulting from the criminal or unlawful misuse of a qualified
   product by the person or a third party." (§ 7903(5)(A).)  The phrase "qualified product"
27 means "a firearm (as defined in subparagraph (A) or (B) of section 921(a)(3) of title 18),
   including any antique firearm (as defined in section 921(a)(16) of such title), or
28 ammunition (as defined in section 921(a)(17)(A) of such title), or a component part of a
   firearm or ammunition, that has been shipped or transported in interstate or foreign
29 commerce." (§ 7903(4).)

- 13 -

1    hand, were liable only when they knew or should have known that the publication
2    contained illegal content. It is universally accepted by knowledgeable persons, including
3    the members of the California Supreme Court, that Congress's decision to use the
4    publisher/distributor distinction for section 230 was in response to a New York decision,
5    *Stratton Oakmont, Inc. v. Prodigy Services Co.* (N.Y. Sup.Ct. 1995) 1995 WL 323710
6    (*Stratton Oakmont*), applying New York law. (*Barrett v. Rosenthal* (2006) 40 Cal.4th 33,
7    44 (*Barrett*).) An early Internet case, *Stratton Oakmont* held that because the defendant
8    had exercised some editorial control — removing offensive content and automatically
9    screening for offensive language — over the third-party content, it was properly treated
10   as a publisher and not a mere distributor. Section 230(c)(1) overruled, as it were, the
11   *Stratton Oakmont* decision by eliminating common law strict liability for acting like a
12   publisher by posting, or removing some of, a third-party's false statement.[6]

13        An early federal appellate decision, *Zeran v. America Online, Inc.* (4th Cir. 1997)
14   129 F.3d 327, had an outsized influence on the interpretation of section 230. According
15   to the California Supreme Court (among other courts), *Zeran* rejected the notion of any
16   distinction between publisher and distributor liability, instead finding that Congress
17   intended to broadly shield all providers from liability for publishing information received
18   from third parties. (*Barrett*, *supra*, 40 Cal.4th at p. 53.) The *Barrett* court explained, "We
19   agree with the *Zeran* court, and others considering the question, that subjecting Internet
20   service providers and users to defamation liability would tend to chill online speech." (*Id.*
21   at p. 56; see also *Hassell v. Bird* (2018) 5 Cal.5th 522, 556-558 (conc. opn. of Kruger, J.)
22   [*Zeran*'s broad reach did not, however, prevent the Ninth Circuit's conclusion in *Barnes*,
23   namely, that section 230 did not immunize Yahoo for alleged promissory estoppel
24   because the claim did not seek to hold Yahoo liable as a publisher or speaker of third-
25   party content].)

26

27        [6] Note the odd, if not perverse incentives imposed upon an Internet company
28   based on *Stratton Oakmont*. If a company removes offensive third-party material, it might
     face publisher defamation liability, whereas if it does not remove offensive third-party
29   material, it might retain common law immunity as a mere distributor.

- 14 -

1   In federal courts — in the Ninth Circuit at least — the broad section 230 immunity
2   of *Zeran* and its progeny retains vitality.  Snap repeatedly directs the court to the Ninth
3   Circuit's decision in *Dyroff v. Ultimate Software Group, Inc.* (9th Cir. 2019) 934 F.3d 1093
4   (*Dyroff*) as a case on all fours with our case.  There, the defendant, Ultimate, operated a
5   social networking site designed to permit anonymous postings and communications
6   among users.  A user, Wesley Greer, a recovering heroin addict, conducted a Google
7   search to purchase heroin and was directed to Ultimate's website.  He posted to a group
8   title, "where can i score heroin in Jacksonville, fl." Ultimate's website sent Greer an email
9   notifying him that another user posted a response and provided a hyperlink and URL
10  directing his response. The response was posted by Hugo Margenat-Castro, an Orlando-
11  based heroin dealer who regularly used Ultimate's website to sell heroin.  Greer obtain
12  Castro's telephone number from Ultimate's website, made contact with Castro, and
13  purchased heroin from him that contained fentanyl.  Greer suffered a fentanyl overdose
14  and died.  (*Id.* at pp. 1094-1095.)

15  Greer's mother, Dyroff, sued Ultimate.  The district court held that section 230
16  immunized Ultimate.  The Ninth Circuit affirmed.  Employing the Ninth Circuit's three-part
17  *Barnes* test (*Barnes, supra,* 570 F.3d at pp. 1100-1101), the court held that (1) Ultimate
18  was an interactive computer service and (2) plaintiff sought to treat it as a publisher or
19  speaker of (3) information provided by another information content provider.  To the key
20  second point, the court found that Ultimate was not an information content provider (i.e.,
21  a publisher or speaker of content) by virtue of its website utilizing content-neutral website
22  functions. (*Dyroff, supra*, 934 F.3d at p. 1097.)  Although Dyroff argued that Ultimate's
23  website-recommendation algorithms and push notification system constituted the
24  creation of content, the Court disagreed and reasoned the website features were "tools
25  meant to facilitate the communication and content of others," but were not actually
26  content. (*Id.* at p. 1098.)

27  Snap cites other decisions in accord with the broadly immunizing holding in *Dyroff*.
28  These include *Force v. Facebook, Inc.* (2d Cir. 2019) 934 F.3d 53, cert. den., 140 S.Ct.
29  2761 (2020) (*Force*), which held that Section 230 immunizes claims based on "friend-

- 15 -

1 suggestion algorithms [applying] such factors as the users' common membership in
2 Facebook's online 'groups,' geographic location, attendance at events, spoken language,
3 and mutual friend connections on Facebook," and *Jackson v. Airbnb, Inc.* (C.D. Cal. 2022)
4 2022 WL 16753197 *1, in which the trial court granted Snap's motion to dismiss the case
5 that alleged Snapchat had allowed users to engage in sales and purchase of unlawful
6 guns — "exactly the sort of case for which Section 230 provides an impenetrable shield."

7     Some federal appellate and trial courts have disagreed with *Zeran* and its
8 progeny's broad immunity construction of section 230. Analyzing the words of the statute,
9 these authorities explain that "publisher" — the word Congress chose — has (and in 1996
10 had) at least two meanings: (1) one who is in the business of publishing — and under this
11 expansive view of the word, any activity customarily undertaken by a publisher, even
12 making recommendations about (but not literally publishing) third-party content, is
13 immunized by section 230 — and (2) the meaning ascribed by the common law of
14 defamation, as expressed by *Stratton Oakmont*. The plain meaning of the words of
15 section 230 and the context in which it was promulgated, namely, to overrule *Stratton*
16 *Oakmont*, support the view that the better reading is the more limited one. Some powerful
17 judicial voices, some in dissent, have so explained.

18     A principal expression of a narrower reading of Section 230 is found in Chief Judge
19 Katzmann's influential concurrence and dissent to the majority opinion in *Force*. He
20 wrote:

21     Suppose that you are a published author. One day, an acquaintance calls. "I've
22 been reading over everything you've ever published," he informs you. "I've also
    been looking at everything you've ever said on the Internet. I've done the same for
23 this other author. You two have very similar interests; I think you'd get along." The
24 acquaintance then gives you the other author's contact information and photo,
    along with a link to all her published works. He calls back three more times over
25 the next week with more names of writers you should get to know.

26     Now, you might say your acquaintance fancies himself a matchmaker. But would
27 you say he's acting as the *publisher* of the other authors' work?

28     Facebook and the majority would have us answer this question "yes." I, however,
29 cannot do so. For the scenario I have just described is little different from how

1
2
3
4

> Facebook's algorithms allegedly work. And while those algorithms do end up showing users profile, group, or event pages written by other users, it strains the English language to say that in targeting and recommending these writings to users—and thereby forging connections, developing new social networks—Facebook is acting as "the *publisher* of ... information provided by another information content provider."

5

He further explained:

6
7
8
9
10
11
12
13
14
15

> Another way to consider the [section 230] immunity question is to "look ... to what the duty at issue actually requires: specifically, whether the duty would necessarily require an internet company to monitor[, alter, or remove] third-party content." [HomeAway.com, Inc. v. City of Santa Monica (9th Cir. 2019) 918 F.3d 676, 682.]  Here, too, the claims regarding the algorithms are a poor fit for statutory immunity.  The duty not to provide material support to terrorism, as applied to Facebook's use of the algorithms, simply requires that Facebook not actively use that material to determine which of its users to connect to each other. It could stop using the algorithms altogether, for instance.  Or, short of that, Facebook could modify its algorithms to stop them introducing terrorists to one another.  None of this would change any underlying content, nor would it necessarily require courts to assess further the difficult question of whether there is an affirmative obligation to monitor that content.

16

(*Force, supra*, 934 F.3d at pp. 76-77.)

17
18
19

Judge Kaufmann's opinion influenced Judges Berzon and Gould in their respective concurrence and dissent in *Gonzalez v. Google, Inc.* (9th Cir. 2021) 2 F.4th 871, 913, 919 (revd. *Twitter, Inc. v. Taamaneh* (2023) 598 U.S. 471.)  Judge Berzon wrote:

20
21
22
23
24
25
26
27

> I concur in the majority opinion in full. I write separately to explain that, although we are bound by Ninth Circuit precedent compelling the outcome in this case, I join the growing chorus of voices calling for a more limited reading of the scope of section 230 immunity.  For the reasons compellingly given by Judge Katzmann in his partial dissent in Force v. Facebook [citations omitted], if not bound by Circuit precedent I would hold that the term "publisher" under section 230 reaches only traditional activities of publication and distribution — such as deciding whether to publish, withdraw, or alter content — and does not include activities that promote or recommend content or connect content users to each other.  I urge this Court to reconsider our precedent en banc to the extent that it holds that section 230 extends to the use of machine-learning algorithms to recommend content and connections to users.

28

And Judge Gould wrote:

29

- 17 -

1    Although Section 230 arguably means that Google and YouTube cannot be
2    liable for the mere content of the posts made by ISIS, that provision in no
3    way provides immunity for other conduct of Google or YouTube or
4    Facebook or Twitter that goes beyond merely publishing the post.  Here,
5    Plaintiffs allege that Google's "Services" include not just publishing content,
6    but also "use of Google's infrastructure, network, applications, tools and
7    features, communications services," and other specialized tools like "Social
8    Plugins" and "Badges."  Similar allegations are made about other platforms'
9    tools and procedures.  I would affirm in part to the extent the district court
10   applied Section 230 immunity to YouTube or other platforms simply carrying
11   the posts from ISIS on its platform, but not to the extent that it amplified and
12   in part developed the terrorist message by encouraging similar views to be
13   given to those already determined to be most susceptible to the ISIS cause.
14  (Id. at p. 919.)

15       Justice Clarence Thomas expressed reservations about courts' broad reading of
16  immunity flowing from section 230 in his statement respecting the denial of certiorari in
17  *Malwarebytes, Inc. v. Enigma Software Group USA, LLC* (2020) _____ U.S. _____ [141 S.
18  Ct. 13].  Agreeing with the court's denial of certiorari in that case, Justice Thomas wrote
19  separately to explain "why, in an appropriate case, we should consider whether the text
20  of this increasingly important statute [section 230] aligns with the current state of immunity
21  enjoyed by Internet Platforms."  (141 S. Ct. at p. 14.)  Explaining what he considered the
22  "modest understanding" of how section 230 altered the *Stratton Oakmont* rule, he decried
23  the "far cry from what has prevailed in court.  Adopting the too-common practice of reading
24  extra immunity into statutes where it does not belong [citations omitted], courts have relied
25  on policy and purpose arguments to grant sweeping protection to Internet Platforms."  (*Id.*
26  at p. 15.)  He cited with approval 1. R. Smolla, Law of Defamation (2d ed. 2019) § 4:86,
27  p. 4-380 ("[C]ourts have extended the immunity in § 230 far beyond anything that plausibly
28  could have been intended by Congress.")  (*Ibid.*)
29

1         Limitations on the breadth of section 230 immunity are found in reported decisions
2   deriving from the (1) distinctions between a defendant's independent *conduct* as opposed
3   to only posting third-party *content* and/or (2) when the interactive computer service
4   involvement with the third-party content rises to the level of "development" or even partial
5   creation of that content.  A prime example is *Lemmon v. Snap, Inc.* (9th Cir. 2021) 995
6   F.3d 1085 (*Lemmon*).  The Ninth Circuit rejected section 230 immunity for a wrongful-
7   death claim alleged arising from the SnapChat "Speed Filter" feature, which the Ninth
8   Circuit did not characterize as "third-party content."[7]  Another example is *Lee v. Amazon*
9   (2022) 76 Cal.App.5th 200, reversing the trial court's determination that section 230
10  immunized the defendant against liability for listing a third-party cosmetic manufacturer's
11  content without the warning required by Proposition 65.  The Court of Appeal explained
12  that plaintiffs sought to hold Amazon liable for "violation of its own independent [state law]
13  obligations." (*Id.* at pp. 252, 254-255.)  California courts "must be careful not to exceed
14  the scope of [section 230] immunity provided by Congress." (*Id.* at pp. 258, 260.)

15        In *Doe v. Internet Brands, Inc.* (9th Cir. 2016) 824 F3d 846, the Ninth Circuit
16  reversed the trial court's order dismissing the claim of an aspiring model who used a
17  social networking website for people in the modeling industry.  She claimed to have been
18  raped by two individuals who used the website, "Model Mayhem," as part of a scheme to
19  lure her to a fake audition.  The question, according to the Ninth Circuit, was "whether the
20  CDA bars Jane Doe's negligent failure to warn claim under California law." (*Id.* at p. 851.)
21  The court distinguished the line of authority premised on treating the website proprietor
22  as a publisher.  "Jane Doe's claim is different … [she] attempts to hold Internet Brands

---

25      [7] The *Lemmon* distinction, in turn, has resulted in courts confronting claims of "artful
26  pleading" — the notion that clever plaintiffs' counsel plead a defendant's conduct (not
    immunized) but are actually asserting content-based claims (immunized).  So, too, here:
27  Snap argues plaintiffs' disavowal of liability based on the drug sellers' content is indeed
    mere artful pleading. "Such attempts to use 'Lemmon lingo' do not overcome Section
28  230." (Snap's Reply in Support of Demurrer (Sept. 21, 2023) ("Reply") 2.)

1    liable for failing to warn her about information it obtained from an outside source about

2    how third parties targeted and lured victims through Model Mayhem. The duty to warn

3    allegedly imposed by California law would not require Internet Brands to remove any user

4    content or otherwise affect how it publishes or monitors such content." (*Ibid.*)

5        In *A.M. v. Omegle.com, LLC* (D. Or. 2022) 614 F.Supp.3d 814 (*A.M.*), plaintiff, who

6    was an 11-year-old girl in 2014, alleged that she was, at that time, sexually abused by an

7    adult man, Ryan Fordyce, through the defendant's online "chat room." Fordyce allegedly

8    forced A.M. to send pornographic images and videos of herself to him, perform for

9    Fordyce and his friends, and recruit other minors for Fordyce to abuse. He allegedly

10   threatened that if she did not comply, he would release the videos and pictures and A.M.

11   would be arrested. (*Id.* at p. 817.) Among A.M.'s legal claims were theories of negligence

12   and strict liability for defective product design and warnings. Relying on *Barnes*, the

13   district court identified the question to be answered: "courts must ask whether the duty

14   that the plaintiff alleges the defendant violated derives from the defendant's status or

15   conduct as a 'publisher or speaker." (*A.M., supra*, 614 F.Supp.3d at p. 819 [quoting

16   *Barnes, supra*, 570 F.3d at pp. 1101-1102].) "Here, Plaintiff's complaint adequately

17   pleads a product liability lawsuit as to claims one through four. Omegle could have

18   satisfied its alleged obligation to Plaintiff by designing its product differently — for

19   example, by designing a product so that it did not match minors and adults. Plaintiff is

20   not claiming that Omegle needed to review, edit or withdraw any third-party content to

21   meet this obligation ... Because this products liability case does not rest on Defendant's

22   publication of third-party content, I find that Section 230 immunity does not apply...."

23   (*A.M.*, at p. 821; but see *In re Social Media Adolescent Addiction/Personal Injury Products*

24   *Liability Litigation* (N.D. Cal. 2023) ___ F.Supp.3d ___ [2023 WL 7524912 *15] [section

25   230 immunizes defendants from allegations that they recommended adult accounts to

26   adolescents, distinguishing *A.M.* on the basis that "at the time the matching occurred, the

27   'content' or conversation did not exist"].)

28       In *Liapes v. Facebook, Inc.* (2023) 95 Cal.App.5th 910 (*Liapes*), the Court of

29   Appeal reversed the trial court's sustaining of the defendant's demurrer which was

1    premised, in part, on immunity under section 230.  The 48-year-old female plaintiff alleged
2    that the defendant's social media website did not provide women and older people equal
3    access to insurance ads in violation of state law prohibiting business discrimination.
4    Facebook allowed advertisers to target their ads through a "Lookalike Audience" tool,
5    whereby advertisers provided to Facebook a list of users "who they believe are the type
6    of customers they want to reach." (*Id.* at p. 917.)  Facebook then applied its own analysis
7    and algorithm to identify a larger audience that resembled the sample audience; the
8    resulting audience was eligible to receive the ads. (*Ibid.*)  The Court of Appeal concluded
9    that Facebook's activities made it a content provider, not merely a publisher of third-party
10   content.  "Because the algorithm ascertains data about a user and then targets ads based
11   on the user's characteristics, the algorithm renders Facebook more akin to a content
12   developer." (*Id.* at p. 930.)[8]

13        **Rulings re: Section 230**

14        The court agrees with Snap that it, as an "interactive computer service," cannot be
15   liable as a publisher of the third-party drug sellers' content.  But the allegations of the SAC
16   do not purport to impose liability upon Snap for publishing or failing to moderate the drug
17   sellers' content (i.e., to "treat Snap as a publisher") but instead on account of its alleged

18
19
20

21        [8] The *Liapes* court did not cite *Doe II v. MySpace Inc.* (2009) 175 Cal.App.4th 561.
     In *Doe II*, plaintiffs, minor teenage girls, alleged they were sexually assaulted by men they
22   met through the defendant's Internet social networking site.  The *Doe II* court concluded
     that plaintiffs' allegations that MySpace "should have implemented 'readily available and
23   practicable age-verification software' or set the default security settings on the Julie Does'
24   accounts to 'private'" were "precisely" allegations going to MySpace's status as a
     publisher, explaining that plaintiffs "want MySpace to ensure that sexual predators do not
25   again access to (i.e., communicate) with minors on its Website.  That type of activity —
26   to restrict or make available certain material — is expressly covered by section 230." (*Id.*
     at pp. 565, 573.)  That court also found that plaintiffs' allegations that MySpace "allowed
27   the attackers to channel information in profiles, search and browse profiles for particular
28   characteristics and then us the results of those queries to locate, contact and eventually
     sexually assault the Julie Does" did not cause MySpace to become a "content provider."
29   (*Id.* at pp. 574-575.)  As noted, on that point, *Liapes* holds otherwise.

- 21 -

independent tortious conduct — independent, that is, of the drug sellers' posted content.[9] The allegations assert conduct beyond "incidental editorial functions" for which a publisher may still enjoy section 230 immunity. (See, *Batzel v. Smith* (9th Cir. 2003) 333 F.3d 1018, 1031.)  Additionally, the court finds that the alleged attributes and features of Snapchat cross the line into "content" — as the *Liapes* and *Lee* courts found, too.  The court rejects, as did the Ninth Circuit in *Barnes*, Snap's assertion of "general immunity" under its "based on"/"flows from"/"but for" reading of the scope of section 230.

Recall, Snap demurs to "[a]ll causes of action alleged in the SAC — which are based on content created and exchanged by third parties — [as] barred as a matter of law under Section 230 of the Communications Decency Act."  (Demurrer, 2.) The demurrer is overruled on that ground as to counts 1, 2, 3, 4, 5, 6, 7, 8, 9, 11, 12, 13, 14, 15, 16.

The demurrer is sustained without leave to amend on this ground as to count 10 for "aiding and abetting."  Paragraph 931 of the SAC makes clear that plaintiffs seek to impose liability upon Snap because it "encouraged and assisted each of the above-referenced Snapchat Drug Dealers in their use of Snap's unique product features to sell deadly counterfeit pills...."  Unlike their other counts, which focus on Snap's alleged independent tortious acts, count 10 is too intimately tied to Snap's publication of the drug sellers' third-party content to operate outside the zone of section 230 immunity.[10]

### Snap's Strict Product Liability Challenge: Counts 1, 2, and 3

---

[9] It is an unremarkable proposition that California law recognizes that independent tortious conduct can combine to cause an indivisible harm.  A "defendant's negligence is a legal cause of injury, even though it operated in combination with other causes, whether tortious or nontortious." (*Uriell v. Regents of University of California* (2015) 234 Cal.App.4th 735, 746-747.)  California law permits a factfinder to allocate fault or responsibility among joint tortfeasors.  (Civ. Code § 1431.2; CACI No. 406.)

[10] In so ruling, the court treats count 10 as an independent legal theory which, as noted earlier, it is not. That said, whether sustained as a demurrer or dealt with later as a motion in limine, plaintiffs may not proceed on their aiding and abetting theory on account of section 230 immunity.

1    Once again, vocabulary. "'Products liability' is the name currently given to the area
2    of law involving the liability of those who supply goods or products for the use by others
3    to purchasers, users and bystanders for losses of various kinds resulting from so-called
4    defects in those products." (*Johnson v. United States Steel Corp.* (2015) 240 Cal.App.4th
5    22, 30.) "One may seek recovery in a products liability case on theories of both
6    negligence and strict liability." (*Id.* at pp. 30-31, page number omitted.)

7    "Strict liability" is the term used to describe legal responsibility for certain activities
8    that arises irrespective of the care undertaken by the defendant to avoid the harm. This
9    is in contrast to negligence liability, which requires that a defendant breach a duty of
10    reasonable care. Examples of strict liability include harms arising from defendants'
11    engaging in "ultrahazardous activities" such as blasting with explosives, crop dusting,
12    testing rocket motors, using blowtorches near oil and the like. Irrespective of the amount
13    of care employed, including utmost care, liability attaches for harm caused by the activity
14    due to its ultrahazardous character. Another species of strict liability arises with respect
15    to injuries caused by domestic animals with known dangerous propensities (from which
16    the so-called "one free dog bite" rule derives.) These examples of strict liability have
17    nothing to do with products.

18    And then, relevant to this case, there is "strict *products* liability," which is a cross-
19    over subspecies both of "product liability" and "strict liability." Generally, strict product
20    liability rules allow victims who are hurt by defective products to pursue claims for
21    compensation without showing the defendant's negligence or intentional wrongdoing.
22    California law recognizes strict products liability for three types of defects: manufacturing
23    defects, design defects, and warning defects. (This case asserts no manufacturing defect
24    theory.)

25    Strict liability for product design defects can arise under two prongs: either because
26    the product's design fails to perform as safely as an ordinary consumer would have
27    expected it to perform ("the consumer expectation test") or because the risks attendant
28    to the design of the product outweigh the benefits of that design ("the risk-benefit" test).
29    The two prongs are not mutually exclusive. (*Demara v. The Raymond Corp.* (2017) 13

- 23 -

1  Cal.App.5th 545, 554.)    (This case does not assert a claim under the consumer
2  expectation test.)

3       Strict liability for product warning defects likewise can arise under two prongs:
4  because warnings were non-existent or existed but were inadequate.  (*Anderson v.*
5  *Owens-Corning Fiberglas Corp.* (1991) 53 Cal.3d 987, 995.)

6       The development of strict products liability in the U.S. is a long and storied history,
7  with California jurisprudence playing a pivotal role.  It is judge-made law deriving from
8  decisions of Justice Benjamin Cardozo in *MacPherson v. Buick Motor Co.* (1916) 217
9  N.Y. 382 (reducing the role of privity of contract in warranty claims) and Justice Robert
10 Traynor's concurrence in *Escola v. Coca Cola Bottling Co. of Fresno* (1944) 24 Cal.2d
11 453 (*Escola*).  Justice Traynor there observed, "[a]s handicrafts have been replaced by
12 mass production with its great markets and transportation facilities, the close relationship
13 between the producer and consumer of a product has been altered…. The consumer no
14 longer has the means or skill enough to investigate for himself the soundness of a
15 product."  (*Id.* at p. 467.) Three years earlier, in 1941, Dean William Prosser had urged
16 the case for imposition of strict liability upon the manufacturers of defective products in
17 his *Handbook of the Law of Torts* treatise.

18      Then came *Greenman v. Yuba Power Products, Inc.* (1963) 59 Cal.2d 57
19 (*Greenman*) in which Justice Traynor returned to his *Escola* theme but now in a majority
20 opinion.  He famously explained, "[a] manufacturer is strictly liable in tort when an article
21 he places on the market, knowing that it is to be used without inspection for defects,
22 proves to have a defect that causes injury to a human being… The purpose of such
23 liability is to insure that the costs of injuries resulting from defective products are borne
24 by the manufacturers that put such products on the market rather than by injured persons
25 who are powerless to protect themselves."  (*Id.* at pp. 62-63.) The *Greenman* rule was
26 quickly adopted in several other jurisdictions and embodied in section 402A of the
27 Restatement Second of Torts.  In 1997, the American Law Institute adopted a new
28 element of the Restatement Third of Torts, entitled "Products Liability," and the general
29 rule of strict products liability was set out in section 1 thereto.

1    Strict products liability arose in the early- and mid-20th century from the perceived
2    inability of the law of warranty and negligence to provide an adequate means of redress
3    for injuries arising in a new kind of industrialized economy. That economy was
4    characterized by mass production, the introduction of wholesale intermediaries in supply
5    chains, and the expansion of product advertising. Makers and users of products had an
6    increasingly attenuated relationship. Redress for injury arising from product defect,
7    rooted in legal theories of warranty (requiring of privity of contract and immunizing
8    defendants via warranty disclaimers) and negligence (with its virtually unattainable
9    requirement to establish someone's unreasonable conduct somewhere in a complex
10   multi-level production process), required rethinking. The question presented was who
11   should bear the costs of such harms: an innocent purchaser or the product supplier who
12   had means and motivation to eliminate defects, and the ability to spread that cost widely
13   via the mechanism of price and the securing of insurance?[11]

14       Plaintiffs' SAC implies similar questions now about Snapchat and its place in
15   society and the economy.

16                                    ─────────────

17       The SAC purports to state legal theories for strict product liability under counts 1,
18   2 and 3. As pleaded, counts 1 and 3 are duplicative; both assert strict products liability
19   claims for design defect under the risk-benefit prong. (See, e.g., SAC ¶¶ 728, 730-731,
20   750, 753, 789, 798.) Count 2 asserts a claim for strict products liability for failure to warn.

21       Snap demurs to these counts on the ground that Snapchat is "is a service, not a
22   'tangible product.'" (Demurrer, 1-2.) Plaintiffs assert otherwise: "Snapchat is a product
23   under California law." (Opposition, 11.) The parties in their papers compare and contrast

24

25   ───────────

26       [11] Histories of the development of strict product liability law include Graham, *Strict
27   Products Liability at 50: Four Histories* (2014) 98 Marq. L.Rev. 555; Note, *A Broken
     Theory: The Malfunction Theory of Strict Products Liability and the Need for a New
28   Doctrine in the Field of Surgical Robotics Note* (2019) 104 Minn. L.Rev. 3245; and
     Rothstein & Coleman, *Differentiating Strict Product Liability's Cost-Benefit Analysis From
29   Negligence* (2023) 56 Loyola L.A. L.Rev. 637.

1  issues of "product versus service" and "tangibility" drawn from the definition of "product"
2  found in section 19(a) of the Restatement Third of Torts, Products Liability: "A product is
3  tangible personal property distributed commercially for use or consumption."

4        The tangible product versus (intangible) service test is a false dichotomy as applied
5  to Snapchat, at least as Snapchat is described in the SAC. As noted, even the parties
6  struggle to find language with which to categorize Snapchat,[12] but neither "product" nor
7  "service" are up to the job. Snap's reliance on the Restatement definition falls short for
8  several reasons. First, because that definition was drafted long before the applicable
9  technology existed and does not account for an item with Snapchat's characteristics and
10  functionalities; second, because as to "computer software" (probably the most apt
11  category), the Restatement Third reporters found "no cases on point" (Rest.3d Torts,
12  Products Liability, § 19, com. d) — again speaking to the obsolescence of the definition;
13  and third, notwithstanding "tangibility," the definition opens the door to treat intangible
14  items as products "such as electricity" when the context of their distribution and use is
15  sufficiently analogous to the distribution and use of tangible personal property.[13]

16        Snap's arguments rely heavily on tangibility — a concept the court finds unhelpful
17  to the analysis. Under the Restatement's definition, "tangibility," *viz.*, perceptibility to the

---

20    [12] The court agrees with Snap that its calling Snapchat its "flagship product" in its
21  2022 annual report, and its counsel at argument referring to Snapchat as a product before
    correcting herself, is not dispositive.

22    [13] There are, of course, computer software cases since the promulgation of the
23  Third Restatement 25 years ago. They go both ways. On the one hand, for example, is
    *Quinteros v. InnoGames* (W.D. Wash. 2022) 2022 WL 898560 (online computer game
24  was not a "product" as defined under Washington State law [collecting cases]). On the
    other side of the ledger are, for example, *Brookes v. Lyft Inc.* (Cir. Ct. Fla. 2022) 2022 WL
25  19799628 (Lyft's ride-sharing software application is a product for purposes of Florida
    products liability law]; *In re Social Media Adolescent Addiction/Personal Injury Products
26  Liability Litigation*, *supra*, 2023 WL 7524912 (motion to dismiss denied to permit "more
27  fulsome analysis than the global approaches" take by counsel; the court analyzes whether
    the various functionalities of defendants' platforms are products); and *A.M.*, *supra*, 614
28  F.Supp.3d at p. 817 (although it is not clear that the defense raised the "not a product"
29  defense).

1   touch, appears to the court as merely another way of describing a service — something
2   offered for use or consumption that one cannot perceive by touch. It adds nothing to the
3   product versus service binary. What's more, even in 1998, the American Law Institute
4   noted that intangibility *per se* does not answer the question given that the context of the
5   distribution and use of an item may be sufficiently analogous to the distribution and use
6   of tangible personal property for it to be subject to strict products liability.[14]

7          The parties' analyses, relying on the false dichotomy of product versus service and
8   on tangibility, fall far short of the weighty social and economic issues embedded in the
9   question of the applicability of strict liability principles, questions with which Justices
10  Cardozo and Traynor, and Dean Prosser, earlier struggled.

11          **Ruling Re: "Not A Tangible Product"**
12          The court sees the issue as follows: is Snapchat, with its features, functionalities,
13  and its place in our society and economy in 2023, something (pick your descriptor:
14  product, service, interactive platform, app, website, software, tool) for which strict
15  products liability does or should apply? Or, using the 25-year-old Third Restatement's
16  formulation, is the context of Snapchat's distribution and use sufficiently analogous to the
17  distribution and use of tangible personal property to warrant its being treated under the
18  law of strict products liability?

19          The court's answer is: not enough information yet to tell, and the question cannot
20  be resolved on demurrer. Accordingly, the court overrules Snap's demurrer to counts 1,
21  2, and 3 on the ground that Snapchat is not a tangible product. The court will permit the
22  parties to create a factual record as the characteristics, functionalities, distribution, and
23  uses of Snapchat. The court has no doubt that it will revisit later whether California strict

24
25
_____

26          [14] The unhelpfulness of the tangibility test is further revealed by considering
27  whether Snapchat, to the extent it exists as a collection of electrons flitting among silicon
    atoms, has mass and thus could potentially be "tangible" by a profoundly sensitive
28  measuring device. The answer, absurdist and theoretical, is "yes." An electron weighs
    $9.11 \times 10^{-28}$ grams. (Encyclopedia Britannica (2023) Electron
29  <britannica.com/science/electron> [as of Dec. 27, 2023].)

- 27 -

1    products liability law does or should apply in this case, but it will do so on a developed

2    factual record.

3              **Snap's Challenges to Negligence: Counts 4, 5, 6, 7**

4              In California, a plaintiff states a claim for negligence by alleging the existence of a

5    legal duty, a breach of that duty, harm caused by the breach, and resulting damages.

6    (*Ladd v. County of San Mateo* (1996) 12 Cal.4th 913, 917.)  Civil Code section 1714,

7    subdivision (a) establishes a general duty for "everyone" to exercise ordinary care and

8    skill in their property or person.  Failure to do so imposes responsibility for resulting injury

9    except where the injured person willfully or for want or ordinary care brought the injury

10   upon himself or herself.[15]

11             Snap asserts that under the facts as alleged, it is evident that California law

12   recognizes an exception to the general rule of duty based on public policy.  Snap invokes

13   the considerations identified by the California Supreme Court in *Rowland v. Christian*

14   (1968) 69 Cal.2d 108 which, when balanced together, justify a departure from the

15   fundamental principal embodied in section 1714, subdivision (a).  These include the

16   foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered

17   injury, the closeness of the connection between the defendant's conduct and the injury

18   suffered, the moral blame attached to the defendant's conduct, the policy of preventing

19   future harm, the extent of the burden to the defendant and consequences to the

20   community of imposing a duty to exercise care with resulting liability for breach, and the

21   availability, cost and prevalence of insurance for the risk involved.  (*Id.* at pp. 112-113.)

22             The court disagrees with Snap: the allegations of the SAC are sufficient to

23   establish the duty of reasonable care and do not establish as a matter of law an exception

24   under public policy.  The California Supreme Court stated, "As we have explained,

25   however, in the absence of a statutory provision establish an exception to the general

26   rule of [section 1714, subdivision (a)], courts should create one only where clearly

27

28              _____

29        [15] In the modern era, California employs a comparative negligence regime to
     reduce a plaintiff's damages attributable to his or her own fault in bringing about harm.

- 28 -

1  supported by public policy." (*Cabral v. Ralphs Grocery Co.* (2011) 51 Cal.4th 764, 771
2  (internal quotes omitted).)  Once again, however, the question of duty is not resolved for
3  all time.  On a factual record, where the court has the ability to appropriately weigh the
4  competing policy factors, the question of the existence of duty may well come up again.

5  Snap also asserts that the SAC fails to allege causation.  The court disagrees.
6  "The element of causation requires there to a connection between the defendant's breach
7  and the plaintiff's injury." (*Coyle v. Historic Mission Inn Corp.* (2018) 24 Cal.App.5th 627,
8  645.)  "A substantial factor in causing harm is a factor that a reasonable person would
9  consider to have contributed to the harm.  It must be more than a remote or trivial factor.
10 It does not have to be the only cause of the harm." (CACI No. 430.)  The SAC alleges
11 causation sufficiently to survive attack by demurrer.

12 Snap demurs to count 6 (negligent failure to warn) on the basis that "the danger of
13 buying illegal drugs online is obvious, so no warning is required." (Demurrer, 2.)  The
14 SAC, however, alleges that the harm arose from a non-obvious danger, namely, the
15 presence of fentanyl in the drugs purchased by the minors.  The SAC does not allege an
16 obvious danger for which no warning is required.

17 With respect to count 7 (negligence per se), plaintiffs allege, "At all relevant times,
18 Snap had an obligation to comply with applicable statutes and regulations governing the
19 sale and distribution of illegal drugs to minors and distribution of controlled substances to
20 Americans more generally."  (SAC, ¶ 879.)  Plaintiffs do not identify the statutes or
21 regulations. The negligence per se doctrine is codified in Evidence Code section 669.
22 Under this doctrine, the plaintiff "borrows" statutes or regulations to establish a duty of
23 care and a standard of care.  Proof of violation of the statute or regulation raises a
24 presumption of negligence which then may be rebutted by evidence showing justification
25 or an excuse for the violation. (*David v. Hernandez* (2014) 226 Cal.App.4th 578, 584;
26 *Spriesterbach v. Holland* (2013) 215 Cal.App.4th 255, 263.)

27 Snap's demurrer is premised on "failure to state facts sufficient to constitute a
28 cause of action" but does not demur on the grounds of uncertainty. (Code Civ. Proc., §
29 430.10, subds. (e)-(f).)  The demurrer on this ground is overruled.  Even were the

1  demurrer based on uncertainty, it would be overruled. The statutes and regulations at
2  issue may be ascertained through the discovery process.  Plaintiffs' negligence per se
3  theories may be subject to later challenge once the statutes and regulations are identified.

4  **Rulings re: Negligence Challenges**

5  Snap's demurrers to counts 4, 5, 6, and 7 are overruled.

6  **Snap's Challenge to Tortious Interference with Parental Rights: Count 8**

7  Plaintiff Jessica Diacont, a resident of Virginia, asserts Snap tortiously interfered
8  with her custodial rights and parental relationship arising from the death of her child,
9  Jacob. (SAC, ¶¶ 900-909.) She invokes Virginia state law[16]; in the heading of count 8,
10  she refers to the Virginia Code Annotated, section 1-240.1.[17]  She explains in her
11  Opposition that the Virginia Supreme Court recognized the tort of interference in parental
12  rights in *Wyatt v. McDermott* (Va. 2012) 725 S.E.2d 555. She is correct. Borrowing from
13  extant Florida law, the Virginia Supreme Court stated the elements of this common law
14  tort including, as relevant here, that "a party outside of the relationship between the
15  complaining parent and his/her child intentionally interfered with the complaining parent's
16  parental or custodial relationship by removing or detaining the child from returning to the
17  complaining parent, without that parent's consent, or by otherwise preventing the
18  complaining parent from exercising his/her parental or custodial rights." (*Id.* at p. 562.)

19  Plaintiff Diacont's theory apparently is not that the death of Jacob was the
20  interference at issue; it was the denial of the mother's parental ability to prevent access
21  to the Snapchat. (Opposition, 33.) Nowhere, however, does Diacont allege that Jacob's
22  access to Snapchat was without her consent.

23
24
25
26

---

27  [16] It is not clear whether the court would apply Virginia law and neither side briefs
28  the court on the choice-of-law question. For purposes of this demurrer only, the court will
assume that Virginia law applies.

29  [17] This section reads, "A parent has a fundamental right to make decisions
concerning the upbringing, education, and care of the parent's child."

- 30 -

**Ruling re: Count 8**

Assuming for argument that the Virginia law applies in this California proceeding, the court sustains Snap's demurrer without leave to amend for failing to state facts constituting a cause of action.

### Snap's Challenge to Public Nuisance: Count 9

A claim for public nuisance requires allegations, among others, that the defendant, by acting or failing to act, caused a "condition" that was harmful to health and that the condition affected a substantial number of people at the same time. It is an offense against the exercise of rights common to the public. (*People ex rel. Gallo v. Acuna* (1997) 14 Cal.4th 1090, 1103.) A "public right," the California Supreme Court explained with citation to section 821B of the Second Restatement of Torts, "is common to all members of the general public. It is collective in nature and not like the individual right that everyone has not to be assaulted or defamed or defrauded or negligently injured." (*Id.* at p. 1104.)

The essence of plaintiffs' claims is that Snap's conduct resulting in the death (or serious injury) to their specific children. While the SAC asserts that a substantial number of other children have also died or been so injured, the rights involved are not "public rights" designed to be vindicated by the law of nuisance. They are personal in nature.

**Ruling re: Count 9**

The court sustains Snap's demurrer without leave to amend.

### Snap's Challenges to Fraud, Concealment and Misrepresentation: Counts 11, 12 and 13

In California, a claim for fraudulent misrepresentation or concealment requires pleading (a) misrepresentation (false representation, concealment or nondisclosure); (b) knowledge of falsity (scienter); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage. (*Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 974.) Negligent misrepresentation does not include the element of intent to deceive. (*Moncada v. West Coast Quartz Corp.* (2013) 221 Cal.App.4th 768, 781.) The pleading requirements for fraud require particularity and specificity: how, when, where, to whom, and by what means the representations were tendered. (*Lazar v.*

1    *Superior Court* (1996) 12 Cal.4th 631, 645.)  Witkin explains, "The effect of this rule is
2    twofold: (a) general pleading of the legal conclusion of "fraud" is insufficient; the facts
3    constituting the fraud must be alleged; and (b) every element of the cause of action for
4    fraud must be alleged in the proper manner (i.e., factually and specifically), and the policy
5    of liberal construction of the pleadings [citation omitted] will not ordinarily be invoked to
6    sustain a pleading defective in any material respect." (5 Witkin, Cal. Procedure (6th ed.
7    2023) Pleading, § 707.)

8        Snap asserts that plaintiffs have failed to meet the particularity and specificity
9    requirements; plaintiffs assert they have and direct the court to footnotes 26 and 27 of
10   their Opposition, citing specific paragraphs of the SAC.

11       The court finds that the allegations contained in paragraph 942, subsections (a)
12   through (*l*), at a minimum, are sufficiently particular and specific to meet the pleading
13   standard.  The allegations of reliance likewise are sufficient.  Given that a demurrer must
14   eliminate an entire cause of action, these allegations are sufficient to overcome the
15   demurrer.

16       In so finding, the court has in mind the Court of Appeal's explanation in *West v.*
17   *JPMorgan Chase Bank, N.A.* (2013) 214 Cal.App.4th 780, 793 (*West*) (cleaned up): "We
18   enforce the specificity requirement in consideration of its purposes.  The first purpose is
19   to give notice to the defendant with sufficiently definite charges that the defendant can
20   meet them. [Citations omitted.]  The second is to permit a court to weed out meritless
21   fraud claims on the basis of the pleadings; thus, the pleadings should be sufficient to
22   enable the court to determine whether, on the facts pleaded, there is any foundation,
23   prima facie at least, for the charge of fraud."

24       Here, the SAC has sufficiently apprised Snap of the allegations of fraud,
25   concealment, and misrepresentation (which may or may not be supplemented by
26   information obtained in discovery).  "Prima facie" — meaning assuming the allegations
27   are true — the court finds the SAC meets the "any foundation" test of *West*.

28       **Ruling re: Fraud, Concealment and Misrepresentation**
29       The court overrules Snap's demurrer to counts 11, 12 and 13.

- 32 -

1

2                  **Snap's Challenges to Counts 14, 15 and 16**

3          **Rulings**

4          Snap's demurrer to count 14 (wrongful death) and 15 (survival action) are

5   overruled.  The allegations are sufficient to state causes of action for wrongful death and

6   survival under California law.

7          Snap's demurrer to count 16 ("loss of consortium and society") is sustained without

8   leave to amend because California law recognizes no cause of action for parents of

9   minors.  This ruling does not affect any entitlement under law for the recovery of damages

10  under a recognized legal theory.

11                 **Snap's Statute of Limitations Challenges**

12         Snap asserts that some of plaintiffs Chapmans' and Diacont's claims are time-

13  barred by California (or Virginia's[18]) two-year statute of limitations.  Plaintiffs respond by

14  invoking the delayed discovery rule.  (*Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th

15  797, 803.)  On reply, Snap argues that the delayed discovery allegations in the SAC are

16  "implausible."  (Reply, 20.)  Plausibility, however, is not the test on demurrer in the

17  California state courts.

18         **Rulings**

19         Snap's demurrers, as presented, based on the statute of limitations are overruled.

20  To the extent Virginia law applies to a claim and such law provides a defense under a

21  statute of limitations, the matter may be raised later on a motion for summary judgment.

22

23                              **CONCLUSION**

24         Snap's demurrers to counts 1, 2, 3, 4, 5, 6, 7, 11, 12, 13, 14 and 15 are overruled.

25         Snap's demurrers to counts 8, 9, 10 and 16 are sustained without leave to amend

26  (recall, plaintiffs do not seek leave to amend.)

27

28
            [18] Again, neither side briefs the court on the applicability of Virginia law including
29  whether Virginia recognizes a delayed discovery rule.

                                    - 33 -

Snap is ordered to file its answer to the SAC within 30 days of service of this order.

Dated: January 2, 2024

LAWRENCE P. RIFF
JUDGE OF THE SUPERIOR COURT

- 34 -